**UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND**

|  |  |
|---|---|
| IN RE MUNICIPAL MORTGAGE & EQUITY, LLC DERIVATIVE LITIGATION | MDL 08-MD-1961 |
|  | **VERIFIED SHAREHOLDER CONSOLIDATED AMENDED DERIVATIVE COMPLAINT** |
|  | JURY TRIAL DEMANDED |

## TABLE OF CONTENTS

**NATURE OF THE ACTION** ................................................................................................ 3

**JURISDICTION AND VENUE** ....................................................................................... 7

**PARTIES** .......................................................................................................................... 8

**DUTIES OF THE DIRECTOR DEFENDANTS** ...................................................... 16

**DEFENDANTS' BREACHES OF FIDUCIARY DUTIES** .................................... 19

**DEFENDANTS JOSEPH AND FALCONE'S PARTICIPATION IN AND OR
KNOWLEDGE OF THE WRONGDOING ALLEGED HEREIN** ......................... 23

**DEMAND WOULD BE FUTILE** ................................................................................. 26

**DEFENDANTS' FALSE AND MISLEADING STATEMENTS** ........................... 46

**FIRST CAUSE OF ACTION**
Against Individual Defendants
For Breach of Fiduciary Duty ........................................................................................ 97

**SECOND CAUSE OF ACTION**
Against The Individual Defendants
For Abuse of Control ...................................................................................................... 98

**THIRD CAUSE OF ACTION**
Against The Individual Defendants
For Gross Mismanagement ............................................................................................ 98

**FOURTH CAUSE OF ACTION**
Against The Individual Defendants
For Waste of Corporate Assets ..................................................................................... 99

**FIFTH CAUSE OF ACTION**
Against The Individual Defendants
For Unjust Enrichment ................................................................................................... 99

**SIXTH CAUSE OF ACTION**
Against The Individual Defendants
For Contribution And Indemnification ...................................................................... 100

**PRAYER FOR RELIEF** ............................................................................................. 100

Plaintiffs William Johnston, Robert Staub, The Mary L. Kieser Trust (the "Derivative Plaintiffs") bring this action derivatively and on behalf of Nominal Defendant Municipal Mortgage & Equity, LLC (hereafter "MuniMae" or the "Company") against Individual Defendants herein and allege the following based  on information and belief based upon, *inter alia,* the investigation conducted by and through Derivative Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, public announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding MuniMae and information readily obtainable on the Internet.   Derivative Plaintiffs believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought by Derivative Plaintiffs for the benefit of nominal defendant MuniMae against certain current or former officers and directors of MuniMae seeking to remedy the Defendants' violations of state law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment and negligence that occurred from May 3, 2004 through the present, (the "Relevant Period") which has caused substantial losses to the Company. [1]

2.     During the Relevant Period, the Individual Defendants (defined herein) breached their fiduciary duties by, among other things, failing to implement adequate internal controls and procedures relating to financial accounting and disclosures, which led to a sustained and

---

[1] Because Defendants have failed to take action to remedy the breaches of fiduciary duties that occurred between May 3, 2004 and January 28, 2008, the Relevant Period continues through this day instead of ceasing on the day before the public became aware of the wrongdoings at the Company.

systematic failure by the Company to properly account for a myriad of issues, thereby necessitating a multi-year restatement.

3.      MuniMae is a financial services company that arranges debt and equity financing for developers and owners of real estate and clean energy projects, as well as investment management and advisory services for institutional investors.  It was one of the country's largest syndicators of low income housing tax credits.

4.      Throughout the Relevant Period, MuniMae and the Individual Defendants knew or recklessly disregarded the fact that financial statements and results of over 230 off-the-book-LIHTC funds and partnerships in which MuniMae was a general partner or otherwise the primary beneficiary of the risks and rewards of the partnerships were required to be consolidated with MuniMae's financial statements in order to comply with generally accepted accounting principles ("GAAP") and FASB Interpretation No. 46 – "Consolidation of Variable Interest Entities" ("FIN 46").  This enabled MuniMae to keep operating losses and liabilities off of the Company's financial statements and to maintain the Company's leverage to debt ratios.

5.      During the Relevant Period the Defendants falsely represented to investors that MuniMae had consolidated its off-the-book partnerships and was in compliance with GAAP and FIN 46.  As a result of Defendants failure to consolidate more than 230 entities, MuniMae's reported liabilities were materially understated and its reported net income and shareholder equity were materially overstated in violation of GAAP and FIN 46.

6.      Thus, Defendants knowingly or recklessly concealed the fact that their failure to properly and timely consolidate the partnerships on MuniMae's financial statements exposed the Company to the massive cost involved in consolidating these partnerships and that those costs would have a material adverse impact on the amount of cash available for distribution ("CAD")

as dividends to shareholders.  Yet Defendants told investors that the restatement would have no impact on the CAD.

7.      Considering MuniMae's highly complicated business model,[2] which generates income through a variety of leverage transactions, the Individual Defendants knew that the bare minimum internal controls in place at the Company were inadequate to ensure accurate financial accounting and disclosures by the Company.  Specifically, the Individual Defendants failed to: (i) maintain a sufficient complement of personnel with the requisite knowledge of Generally Accepted Accounting Principles ("GAAP") commensurate with the Company's financial reporting requirements and business activities; (ii) maintain or disseminate accounting policy guidance with a sufficient level of precision to enable Company personnel to adequately apply accounting policies in accordance with GAAP; (iii) emphasize the need to maintain effective controls to monitor results of operations in accordance with GAAP; (iv) design and implement exception and monitoring reports to review transactions and detect errors in journal entries regarding financial accounting; (v) maintain

---

[2] According to the Company's public filings, MuniMae operates through four business segments:

- Through our debt segment we (1) invest in tax exempt bonds and bond securitizations; (2) make taxable construction, supplemental and permanent loans; (3) provide loan servicing; and (4) originate loans that are ultimately sold to government sponsored enterprises ("GSEs"), such as the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac") and the Government National Mortgage Association ("Ginnie Mae") or insured by agencies such as the Federal Housing Administration ("FHA") and the U.S. Department of Housing and Urban Development ("HUD").

- Through our tax credit equity segment we provide tax credit equity syndication and asset management services.

- Through our structured finance segment we invest in other real estate-related securities, including equity investments in real estate operating partnerships, tax exempt and taxable bonds, bond securitizations and taxable loans.

- Through our fund management segment we (1) provide loan origination, loan servicing, investment advisory, asset management and other related services and (2) invest in real estate operating partnerships.

effective controls over the identification and disclosure of the Company's segments, reporting the Company's segment performance differently for external reporting purposes than to the Company's chief operating decision maker; and (vi) maintain sufficient preventive internal controls to ensure that it complied with its contractual agreements.   Moreover, the Individual Defendants failed to act in good faith to correct the deficiencies in MuniMae's internal controls, despite being put on notice of the substantial material deficiencies in the Company's accounting and disclosure procedures by numerous "red-flags," including the Company's own admission of its defective internal controls.

8.      The deficiencies in the Company's internal controls began to be uncovered on March 10, 2006, when MuniMae announced that it would be necessary for the Company to restate its historical financial statements for the first three fiscal quarters of 2005, as well as fiscal years 2002 through 2004. However, after the Individual Defendants caused the Company to file restated financial statements on June 22, 2006, which acknowledged numerous material weaknesses in the Company's internal controls and detailed a number of remedial measures purportedly already implemented or in the process of being implemented to correct the deficiencies, less than three months later the Company announced the need for further restatement of the previously restated financial statements.

9.      This second restatement, announced on September 10, 2006, has dragged on for more than a year and a half and has cost the Company more than $54 million in 2007 alone. During this process the Individual Defendants continued to uncover additional material weaknesses in the Company's internal controls that resulted in additional accounting errors. Then, on January 28, 2008, MuniMae announced that the Company would not be able to timely complete its second restatement by March 3, 2008 as previously announced, and as a result MuniMae's stock would be delisted from the New York Stock Exchange ("NYSE").   Moreover, the Company would be forced to drastically reduce its first quarter dividend to $.33 per share, down nearly $.20 per share from the previous

quarter's dividend of $0.525 per share.  The very next day, the Company announced wide-ranging changes in its accounting policies.  Following these two announcements MuniMae's stock price collapsed, closing at $9.19 per share, down $8.01 from the stock's closing price of $17.20 on January 28, 2008, which represents a decline of nearly 47%. On April 9, 2008, the Company released its still unaudited financial results, disclosing that as a result of the restatement, shareholders' equity in the Company for the fiscal year ended December 31, 2005 had been reduced by $44.974 million.

10.     On August 15, 2008, the Company again released its still unaudited financial results, disclosing that as a result of the restatement *the requisite adjustments would reduce the December 31, 2006 shareholders' equity by approximately $80 million – almost double what the Company had announced on April 9, 2008.*  Further, the Company disclosed that the value of its portfolio of assets had decline to $2.8 billion as of June 30, 2008 compared with $3.6 billion, the value announced as of June 30, 2007.

11.     As of November 13, 2008, the Company has not yet filed its audited restated 2004 and 2005 financial statements, nor its audited 2006 or 2007 financial statements.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.  §1332(a) because Derivative Plaintiffs and Defendants are citizens of different states and the matter in controversy exceeds $75,000.  This action is not a collusive action designed to confer jurisdiction on a Court of the United States that it would not otherwise have.

13.     Venue is proper in this Court pursuant to 28 U.S.C. §§1391(a) and 1391(b) because Nominal Defendant is headquartered in this District, substantially all of the Defendants either reside or conduct business in this District and a substantial portion of the transactions and wrongs complained of herein occurred in this District and the bulk of the evidence and civil witnesses relevant to this case are located in this District.

## PARTIES

14.     Plaintiff Robert Staub is a shareholder of MuniMae and was a shareholder during the period in which the wrongful conduct alleged herein occurred.  Plaintiff Staub is a citizen of the state of California.

15.     Plaintiff the Mary L. Keiser Trust is a shareholder of MuniMae and was a shareholder during the period in which the wrongful conduct alleged herein occurred.  Plaintiff the Mary L. Keiser Trust is a citizen of the state of Missouri.

16.     Plaintiff William Johnston is a shareholder of MuniMae and was a shareholder during the period in which the wrongful conduct alleged herein occurred.  Plaintiff Johnston is a citizen of the state of California.

17.     Plaintiffs Staub, the Mary L. Keiser Trust and Johnston are collectively referred to herein as the "Derivative Plaintiffs."

18.     Nominal Defendant MuniMae is a Delaware limited liability company that provides debt and equity financing to various parties, invests in tax-exempt bonds and other housing-related debt and equity investments, and is a tax credit syndicator that acquires and transfers low-income housing tax credits.  MuniMae maintains its principle offices at 621 E. Pratt St., Ste 300, Baltimore, MD 21202.

19.     Defendant Mark K. Joseph ("Joseph") has served as Chairman of the Board since 1996.  Prior to January 1, 2005, he also served as the Company's Chief Executive Officer.  He also served as the President and a director of the managing general partner of the SCA Tax-Exempt Fund Limited Partnership, the Company's predecessor, from 1986 through 1996. Defendant Joseph sold 179,815 shares of MuniMae stock for $4,680,768.75 in proceeds while in

possession of material non-public information.  Upon information and belief, defendant Joseph is a citizen of the state of Maryland.

20.    Defendant Michael L. Falcone ("Falcone") is a Director of the Company and has served as the Company's Chief Executive Officer and President since January 1, 2005.  Prior to his appointment as Chief Executive Officer, he served as Chief Operating Officer since 1997.  During the Relevant period, Falcone sold 59,812 shares of MuniMae stock for $1,524,619.39 in proceeds while in possession of material non-public information.  Upon information and belief, defendant Falcone is a citizen of the state of Maryland.

21.    Defendant Richard O. Berndt ("Berndt") has served as a Director of the Company since 1996 and is the Managing Partner of Gallagher Evelius & Jones LLP ("GEJ"), a law firm engaged in the general practice of law.  Mr. Berndt has been a partner in that firm since 1972.  According to the Company's Annual Proxy Statement filed with the SEC on Form DEF 14A on July 19, 2006 (the "2006 Proxy"), as of December 31, 2005, Berndt owned 5.7% of the equity of GEJ.  GEJ provides legal services to the Company, some of which are provided as part of real estate transactions and are paid for by the borrowers and some of which are paid directly by MuniMae.  Stephen A. Goldberg ("Goldberg"), a partner at GEJ, serves as MuniMae's General Counsel.  The Company pays GEJ directly for Mr. Goldberg's legal services at his standard hourly rates, and Mr. Goldberg is eligible for an annual stock award but otherwise receives no compensation directly from MuniMae.  For the year ended December 31, 2005, GEJ received $1.2 million in legal fees for borrower paid legal fees involving MuniMae and $3.7 million in legal fees paid directly by the Company.  The fees paid directly by the Company represented 19.5% of GEJ's total revenues for 2005, and MuniMae anticipated that it would transact an equal

or greater amount of business with GEJ in 2006.  Upon information and belief, defendant Berndt is a citizen of the state of Maryland.

22.     Defendant Charles C. Baum ("Baum") has served as a Director of the Company since 1996.  Baum is the President and Chief Financial Officer of United Holdings Co., Inc., a company that invests in real estate and securities.  Upon information and belief, defendant Baum is a citizen of the state of Maryland.

23.     Defendant Eddie C. Brown ("Brown") has served as a Director of the Company since 2003.  Brown is the founder, president and board member of Brown Capital Management, Inc., an investment management firm which manages money for institutions and wealthy individuals.  Upon information and belief, defendant Brown is a citizen of the state of Maryland.

24.     Defendant Robert S. Hillman ("Hillman") has served as a Director of the Company since 1996.  Upon information and belief, defendant Hillman is a citizen of the state of Maryland.

25.     Defendant Barbara B. Lucas ("Lucas") has served as a Director of the Company since 2005.  Upon information and belief, defendant Lucas is a citizen of the state of Maryland.

26.     Defendant Douglas A. McGregor ("McGregor") has served as a Director of the Company since 1999.   Upon information and belief, defendant McGregor is a citizen of the state of New Hampshire.

27.     Defendant Arthur S. Mehlman ("Mehlman") has served as a Director of the Company since 2004.  Until 2002, Defendant Mehlman also served as a Partner at KPMG, LLP, an independent registered public accounting firm, where since 1972 he was in charge of KPMG's audit practice for the Baltimore/Washington region.  Upon information and belief, defendant Mehlman is a citizen of the state of Maryland.

28.     Defendant Fred N. Pratt, Jr. ("Pratt") has served as a Director of the Company since 2003.  Upon information and belief, defendant Pratt is a citizen of the commonwealth of Massachusetts.

29.     Defendant Keith J. Gloeckl ("Gloeckl") is a MuniMae Executive Vice President and has been since July 2003.  Gloeckl was MuniMae's Senior Chief Investment Officer from July 2001 to July 2003 and Senior Vice President from October 1999 to 2003.  Because of Gloeckl's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of MuniMae including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Gloeckl participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and MuniMae shareholders.  During the Relevant Period Defendant Gloeckl sold 65,000 shares of MuniMae stock for $1,609,073.40 in proceeds while in possession of material non-public information. Upon information and belief, defendant Gloeckl is a citizen of the state of Florida.

30.     Defendant Gary A. Mentesana ("Mentesana") is a MuniMae Executive Vice President and head of the Affordable Housing Group and has been since July 2003. Mentesana was MuniMae's Chief Capital Officer from July 2001 to 2003; Senior Vice President from May 1997 to 2003; Chief Financial Officer from January 1998 to April 2001; and Vice President from August 1996 to May 1997. Because of Mentesana's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public

information about the business of MuniMae including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Mentesana participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and MuniMae shareholders. During the Relevant Period, Mentesana sold 15,000 shares of MuniMae stock for $391,511 in proceeds while in possession of material non-public information.  Upon information and belief, defendant Mentesana is a citizen of the state of Maryland.

31.    Defendant Earl W. Cole, III ("Cole") is MuniMae's Executive Vice President responsible for the Corporate Credit and Portfolio Risk Management group and has been since 2003.  Because of Cole's position, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of MuniMae including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as reports and other information provided  to him in connection therewith. During the Relevant Period, Cole participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and MuniMae shareholders. During the Relevant Period, Cole sold 20,750 shares of MuniMae stock for $531,432.50 in proceeds while in possession of material non-public information.  Upon information and belief, defendant Cole is a citizen of the state of Maryland.

32.     Defendant William S. Harrison ("Harrison") was MuniMae's Executive Vice President and Chief Financial Officer from April 2001 to January 2006 and Secretary from 2001 to October 2003. Because of Harrisons's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of MuniMae including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Harrison participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and MuniMae shareholders. During the Relevant Period, Harrison sold 50,240 shares of MuniMae stock for $1,307,188 in proceeds while in possession of material non-public information.   Upon information and belief, defendant Harrison is a citizen of the state of Maryland.

33.     Defendant Angela A. Barone ("Barone") was MuniMae's Vice President of Finance and Budgeting from about March 2002 to at least March 2003 and Vice President of Finance and Administration from about March 2000 to at least March 2002.   Because of Barone's positions, she knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of MuniMae including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as reports and other information provided to her in connection therewith.   During the Relevant Period, Barone participated in the

issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and MuniMae shareholders. During the Relevant Period, Barone sold 10,000 shares of MuniMae stock for $255,321 in proceeds while in possession of material nonpublic information. Upon information and belief, defendant Barone is a citizen of the state of Maryland.

34.     Defendant Melanie M. Lundquist ("Lundquist") was MuniMae's Chief Financial Officer and Executive Vice President from January 2006 to July 2007 and Senior Vice President and Chief Accounting Officer from March 2005 to January 2006. Because of Lundquist's positions, she knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of MuniMae including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as reports and other information provided to her in connection therewith. During the Relevant Period, Lundquist participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and MuniMae shareholders.  Upon information and belief, defendant Lundquist is a citizen of the state of Maryland.

35.     Defendant Robert J. Banks ("Banks") was MuniMae's Vice Chairman from 2003 to December 2004; Executive Vice Chairman from 2001 to 2003; and a director from 1999 to December 2004. Because of Banks' positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of MuniMae including its finances, markets and present and future business

prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Banks participated in the issuance of improper statements, including the preparation of the improper press releases and other statements and approval of SEC filings made to the press, securities analysts and MuniMae shareholders. During the Relevand Period, Banks sold 183,500 shares of MuniMae stock for $4,560,078 in proceeds while in possession of material non-public information.  Upon information and belief, defendant Banks is a citizen of the state of Maryland.

36.     Defendant David Kay ("Kay") has served as CFO of the Company since November 2007.  As CFO of MuniMae, Kay is responsible for overseeing all elements of the Financial, Accounting and certain Administrative functions, including Accounting Policy, Treasury and Corporate Capital Raising, External Reporting, Financial Planning, Taxes and Corporate Accounting.  Previously, Kay spent 20 years at the independent registered public accounting firm Arthur Andersen, LLP, where he ended his tenure as Managing Partner of the Mid-Atlantic Accounting, Audit and Risk Management Services.  Upon information and belief, defendant Kay is a citizen of the commonwealth of Virginia.

37.     Defendant Charles M. Pinckney ("Pinckney") has served as the Chief Operating Officer of the Company since July 2007 and served as interim CFO from July 2007 to November 2007.  Mr. Pinckney is responsible for each of the business units of MuniMae (MMA Realty Capital, MMA Financial, MMA Renewable Ventures, and International Housing Solutions) as well as the oversight of all elements of the Financial, Accounting, and Administrative functions within the company including Capital raising, Treasury, Financial Planning & Strategy,

Accounting, Internal Audit, Information Technology and Human Resources.  Pinckney formerly served as head of MMA Realty Capital, the subsidiary that handled the Company's Merchant Banking, Investment Management and Agency Investing businesses.  Pinckney joined the Company in 2000 when MuniMae purchased Whitehawk Capital, a business Pinckney co-founded and that was engaged in structural finance.  Upon information and belief, defendant Pinckney is a citizen of the state of Florida.

38.     Defendants Joseph, Falcone, Berndt, Baum, Brown, Hillman, Lucas, McGregor, Mehlman, and Pratt are referred to herein as the "Director Defendants."

39.     Defendants Joseph, Falcone, Gloeckl, Mentesana, Cole, Harrison, Barone, Lundquist, Banks, Kay and Pinckney are referred to herein as the "Officer Defendants."

40.     Defendants Banks, Barone, Cole, Falcone, Harrison and Joseph are referred to herein as the "Insider Selling Defendants."

41.     The Director Defendants, Officer Defendants and Insider Selling Defendants are referred to as the "Individual Defendants."

**DUTIES OF THE DIRECTOR DEFENDANTS**

42.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty

to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

43.     The Director Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

44.     To discharge their duties, the Director Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.   By virtue of such duties, the Director Defendants were required to, among other things:

a.     exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business; exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

b.     when placed on notice of improper or imprudent conduct by the Company and/or its employees, exercise good faith in taking action to correct the misconduct and prevent its recurrence; and,

c.     maintain and implement an adequate system of controls and information systems, such that no officer, director or employee of the Company would make false statements about MuniMae to the securities markets or would be able to misappropriate internal confidential information for his or her own benefit and

17

profit, by insider stock trading or otherwise.

45.     Because of the Director Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

46.     By virtue of their high-level positions with the Company, many of the Director Defendants directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein.  Said Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware, or deliberately disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements.

47.     The Director Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue.

48.     The Director Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or deliberately disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their Board membership and/or executive and managerial positions with MuniMae, each of the Director Defendants had access to the adverse undisclosed information about MuniMae's business prospects and financial condition and performance as particularized herein and knew (or deliberately disregarded) that these adverse facts rendered the positive representations made by or about MuniMae and its business issued or adopted by the Company materially false and misleading.

49.     The Director Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Relevant Period.  Each Director Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Director Defendants are responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

## DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

50.     As fiduciaries of the Company and by reason of their ability to control the business and corporate affairs of MuniMae, the Defendants owed the Company obligations of fidelity, trust, loyalty and care, were required to use their utmost ability to control and manage the Company's affairs in a fair, just, honest and equitable manner, and were required to act in

furtherance of the best interests of the Company and its shareholders and not in their own personal interest and benefit.

51.     As senior officers and/or directors of the Company, the Defendants owed duties to the Company to conduct its affairs in good faith, in furtherance of the best interest of the Company and its shareholders and within the bounds of the law.

52.     In contravention of those duties and obligations, the Defendants caused MuniMae to engage in unlawful conduct which has severely harmed the Company.  As described herein, the Company has exposed itself to a barrage of private litigation, and enormous legal and other professional expenses in connection with the regulatory investigations, as well as to costs related to the defense of these actions.

53.     The Company's shareholders have brought suit for violations of the federal securities laws as a result of the artificial inflation of the Company's stock by the Company's false and misleading announcements.  The Company is now subject to potential civil judgments totaling tens of millions of dollars, in addition to the substantial legal and professional costs to be incurred in having to defend those actions.

54.     The Company's reputation has been severely damaged.

55.     Since 2002, the Company, with the knowledge, approval, and/or acquiescence of the Individual Defendants, regularly and systematically violated GAAP by materially misstating or overstating, among other things, the following:

       a.     Real estate syndication fees;

       b.     Impairments of investments in real estate partnerships held by guaranteed tax credit equity funds;

       c.     Consolidated tax credit equity funds;

      d.      Capitalized interest costs associated with investments in real estate partnerships;

      e.      Deferral and recognition of bond and loan origination fees and direct costs;

      f.      Investments in partnerships under the equity method of accounting;

      g.      Income taxes;

      h.      Employee benefits;

      i.      Accrued Expenses;

      j.      Consolidation of variable interest entities;

      k.      Tax credit equity fund start-up costs; and

      l.      Costs of acquiring investments in partnerships.

56.     Since 2002, the Individual Defendants received numerous reports regarding problems with MuniMae's accounting and financial reporting practices and internal controls. Through their receipt of weekly, monthly, and quarterly reports; attendance at Board and Audit Committee meetings; review of the Company's financial statements; the Individual Defendants knew that MuniMae's accounting and financial reporting practices were improper and its internal controls were materially deficient. In breach of both their fiduciary duty of good faith and, with respect to defendants Baum, Brown, Mehlman and Pratt, and their responsibilities pursuant to the Audit Committee Charter, the Individual Defendants willfully ignored the sustained and systematic failure of MuniMae's accounting and financial reporting practices and procedures and internal controls, and failed to make a good faith effort to correct the problems or prevent their recurrence.

57.     From and including 2003 until 2006, the Company, with the knowledge, approval and participation of each of the Individual Defendants, disseminated false financial statements in, *inter alia*, the following Form 10-K filings:

    a.      Form 10-K for the fiscal year ended December 31, 2002, filed with the SEC on March 27, 2003 and signed by defendants Joseph, Falcone, Baum, Berndt and McGregor;

    b.      Form 10-K for the fiscal year ended December 31, 2003, filed with the SEC on March 12, 2004 and signed by defendants Joseph, Falcone, Baum, Berndt, Brown, Pratt and McGregor;

    c.      Form 10-K for the fiscal year ended December 31, 2004 filed with the SEC on March 16, 2005 and signed by defendants Joseph, Falcone, Baum, Berndt, Brown, Pratt, Mehlman and McGregor; and

    d.      Form 10-K for the fiscal year ended December 31, 2005, filed with the SEC on June 22, 2006 and signed by defendants Joseph, Falcone, Baum, Berndt, Brown, Lucas, Pratt, Mehlman and McGregor.

58.     Furthermore, the Individual Defendants failed to act in good faith to implement appropriate remedial measures to cure the known material deficiencies in the company's internal controls, ignoring the sustained and systematic failure in MuniMae's accounting and the internal control practices and procedures and failing to make a good faith effort to correct the problems or prevent their recurrence.   Specifically, the Individual Defendants, despite recognizing the Company's need for additional qualified accounting personnel, at least as early as 2004, has still failed to hire adequate numbers of trained personnel following the Company's initial restatement in June 2006 – *more than two years later*.   Additionally, as of June 22, 2006, the Individual

Defendants were "continuing [to implement remedial] efforts in 2006" in the following areas, among others: (i) establishing a group dedicated to improving the use of technology to automate analyses, provide the direct interfaces from subsidiary systems, and aggregate and process transactions; (ii) developing accounting models related to the Company's business activities to train the accounting staff to reduce errors; (iii) developing standard reporting for each of the Company's business unites; and (iv) establishing and documenting formal accounting policies. Effectively, this declaration by the Company acknowledges that despite knowledge of the Company's sustained and systematic failure of its internal controls over a multi-year period, the Individual Defendants had still failed in good faith to implement adequate internal controls even after the Company had been forced to restate its financial statements for the first time in 2006. By the time the Individual Defendants finally attempted to cure the deficiencies in the Company's internal controls, it was far too late and cost the Company tens of millions of dollars.

59.     The Individual Defendants breached their fiduciary duties of loyalty and good faith by knowingly disseminating false information about the financial condition of the Company, which resulted in injury to the Company.  Furthermore, the Individual Defendants knowingly failed to implement adequate internal accounting and disclosure controls and procedures, and then failed to make a good faith effort to cure the admitted deficiencies in the Company's internal controls and procedures.  As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages, including, but not limited to, the substantial costs and expenses in connection with the Company's restatement of its financial statements, the delisting of the Company's stock from the NYSE and the SEC inquiry.

**DEFENDANTS JOSEPH AND FALCONE'S PARTICIPATION IN AND ORKNOWLEDGE OF THE WRONGDOING ALLEGED HEREIN**

60.     Defendant Joseph was responsible for ensuring the accuracy of MuniMae's financial reports and filings with the SEC during the early part of the Relevant Period.  Joseph signed the Company's quarterly report on Form 10-Q, as filed with the SEC, for the first, second and third quarters of fiscal year 2004.  Joseph also filed sworn certifications with the SEC on May 6, 2004, August 6, 2004 and November 9, 2004, in which he separately attested to the accuracy of MuniMae's financial results for the first, second and third quarters of fiscal year 2004.

61.     Joseph also certified to the SEC on May 6, 2004, August 6, 2004 and November 9, 2004 that he was "responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)).  He certified that he designed these controls: "(a) to ensure that material information relating to the registrant…is made known to us by others within those entities;" "(b) to provide reasonable assurances regarding the reliability of financial reporting and the preparation of financial statements."  He further certified that he had "evaluated the effectiveness of the registrant's disclosure controls and procedures" and had disclosed any "deficiencies and material weaknesses" in the Company's financial reporting.

62.     Defendant Falcone was responsible for ensuring the accuracy of MuniMae's financial reports and filings with the SEC throughout the Relevant Period.  Falcone signed each of the Company's annual reports on Form 10-K, as filed with the SEC, for fiscal years 2004 and 2005.  Also, on March 15, 2005 and June 22, 2006, Falcone filed a sworn certifications with the SEC in which he separately attested to the accuracy of MuniMae's reported financial results for fiscal year 2004.

63.     Falcone also signed the Company's quarterly report on Form 10-Q, as filed with the SEC, for the first, second and third quarters of fiscal year 2005 and the first quarter of fiscal year 2006.  Falcone filed sworn certifications with the SEC on May 9, 2005, August 4, 2005, November 9, 2005 and August 1, 2006, in which he separately attested to the accuracy of MuniMae's financial results for the first, second and third quarters of fiscal year 2005 and the first quarter of fiscal year 2006.

64.     Falcone also certified to the SEC on March 15, 2005 that he was "responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)).  He certified that he designed these controls: "(a) to ensure that material information relating to the registrant…is made known to us by others within those entities;" "(b) to provide reasonable assurances regarding the reliability of financial reporting and the preparation of financial statements."  He further certified that he had "evaluated the effectiveness of the registrant's disclosure controls and procedures" and had disclosed any "deficiencies and material weaknesses" in the Company's financial reporting.

65.     Falcone and Joseph were both principally responsible for the Company's communications to securities analysts and investors during the Relevant Period.  Joseph commented on the Company's financial performance in press releases dated May 3, 2004, August 2, 2004 and November 10, 2004.  Falcone commented on the Company's financial performance in press releases dated March 16, 2005, May 2, 2005, July 28, 2005, November 7, 2005 and April 11, 2006.  Joseph and Falcone also communicated directly with investment analysts concerning the Company's financial results in conference calls held throughout the Relevant Period.

66.     Through his direct participation and involvement in the Company's financial reporting functions, as detailed above, Joseph knew or was severely reckless in disregarding that, contrary to his representations: (i) MuniMae was failing to variable interest entities of which the Company was deemed the primary beneficiary, but could also be negatively impacted by the losses of such entities; (ii) MuniMae was failing to write-down in a timely fashion the fair value of its "held-for-sale" loans, bonds, derivatives, mortgage servicing rights and guarantee obligations; (iii) MuniMae was materially overstating the value of its assets; and (iv) MuniMae lacked adequate internal controls and was therefore unable to ascertain its true financial condition.

67.     Through his direct participation and involvement in the Company's financial reporting functions, as detailed above, Falcone knew or was severely reckless in disregarding that, contrary to his representations: (i) MuniMae was failing to variable interest entities of which the Company was deemed the primary beneficiary, but could also be negatively impacted by the losses of such entities; (ii) MuniMae was failing to write-down in a timely fashion the fair value of its "held-for-sale" loans, bonds, derivatives, mortgage servicing rights and guarantee obligations; (iii) MuniMae was materially overstating the value of its assets; and (iv) MuniMae lacked adequate internal controls and was therefore unable to ascertain its true financial condition.

## DEMAND WOULD BE FUTILE

68.     Derivative Plaintiffs bring this action derivatively in the right and for the benefit of MuniMae to redress injuries suffered and to be suffered by MuniMae as a result of the breaches of fiduciary duty by the Defendants.

26

69.     Derivative Plaintiffs will adequately and fairly represent the interests of MuniMae and its shareholders in enforcing and prosecuting its rights.

70.     Derivative Plaintiffs are holders of MuniMae common stock and were holders of Company common stock during the period in which the Defendants' wrongful course of conduct alleged herein was occurring through the present.

71.     As a result of the facts set forth herein, Derivative Plaintiffs have not made a demand upon the Company's Board of Directors (the "Director Defendants") to institute this action against the Defendants.   Such a demand would be a futile and useless act because a majority of the Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons:

a.     The Director Defendants exhibited a sustained and systematic failure to fulfill their fiduciary duties by actively participating or acquiescing in the wrongdoing alleged herein and/or by failing to implement adequate controls and procedures necessary to reasonably assure that the wrongdoing alleged herein did not occur which could not have been an exercise of good faith business judgment and the Defendant Directors face a substantial likelihood of liability for such breaches of fiduciary duties.

b.     The Director Defendants participated in the drafting, preparation, and/or approval of the various public communications complained of herein and was aware of, and/or recklessly disregarded, the misstatements contained therein and omissions therefrom, and was aware of their materially false and misleading nature.   Because of their Board membership and/or executive and managerial positions with MuniMae, each of the Defendant Directors had access to the undisclosed information about MuniMae's business prospects and as particularized

herein knew (or recklessly disregarded) that the positive representations made by or about MuniMae, its business and its business prospects were materially false and misleading.

c.      The Director Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the Company's statements during the Relevant Period.  Each Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after its issuance and/or had the ability and/or opportunity to prevent its issuance or cause it to be corrected. Accordingly, each of the Defendants was responsible for the accuracy of the press release and the representations contained therein.

d.      The Director Defendants had a responsibility and obligation to assure that all press releases and filings of SEC reports were truthful and not materially misleading and that proper controls and other oversight procedures were in place that would have detected and prevented the false and misleading statements put out by the Company to the public that are described in this complaint but failed to do so.

e.      As a result of their conduct described herein, each of the Director Defendants faces a substantial likelihood of liability for non-exculpated breaches of fiduciary duty.  Among these non-exculpated breaches are the Director Defendants' abdication of their responsibility to implement adequate disclosure controls concerning the Company's financial information.

f.      The Director Defendants have not only been complacent in acting on behalf of the Company, but were necessary actors in the improper conduct alleged herein, and have actively condoned and facilitated a campaign of deceit upon the shareholders of the Company through the Company's filings with the SEC, communications with the public, and the

Board's authorization of dividend increases.   The Director Defendants approved option compensation, approved officers' incentive compensation, and received their own stock options as compensation, thereby personally benefiting from the improper conduct alleged herein. Moreover, they promoted the continuation of the scheme to further their personal interests as directors of the Company and as a result of their loyalty to Defendants Joseph and Falcone.   In addition, certain of the Director Defendants, including Defendants Joseph, Falcone and Berndt benefited financially through their personal interest in entities that benefited financially through the transactions complained of herein.   Accordingly, the Director Defendants cannot possibly be expected to act independently in charging themselves with wrongdoing.

g.   Defendants have failed to rectify the internal control and accounting issues identified in its 2005 Annual Report and have breached their fiduciary duties of loyalty and good faith owed to the Company and its shareholders on an ongoing basis.   The continued and systemic pattern of wrongful conduct throughout the Relevant Period represents a lack of good faith and has exposed MuniMae to costly and continued litigation, costly and continued restatements, and its stock to be delisted from the NYSE.

h.   All of the Director Defendants face a substantial likelihood of liability in this action because of their failure, as directors, to assure that a reliable system of financial controls was in place and functioning effectively.   The dramatic breakdowns and gaps in those controls were so widespread and systematic that the entire board faces substantial exposure to liability.   These directors either knew or should have known that violations of law were occurring and took no steps in a good faith effort to prevent or remedy that situation, proximately causing millions of dollars of losses for the Company.

i.      If the Director Defendants were to bring this derivative action against themselves, they would expose their own recklessness and misconduct which underlies the allegations against the Company contained in the class action complaints for violations of the federal securities laws which have been brought against the Company and many of the Defendants herein.  Such admissions would impair the Company's and their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Defendants.

j.      Derivative Plaintiffs have not demanded that MuniMae's Board of Directors bring the claims herein asserted because any such demand would be futile and is therefore excused. Among other things, MuniMae's Board of Directors developed, implemented and approved the policies giving rise to the conduct complained of herein and directly reviewed and authorized the transactions discussed herein.

72.    MuniMae has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein; yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for such wrongful conduct that caused the filing of securities class actions against the Company, resulted in a formal SEC investigation of the Company, the halting of trading of the Company's securities, and the delisting of the Company's securities from the New York Stock Exchange.

73.    In addition to the affirmative actions by each of the Defendants in authorizing the transactions and accounting failures, each of the Defendants failed to monitor and enforce the Company's internal policies, and continued to consciously and intentionally disregard their responsibilities despite the numerous red flags that they knew, or should have known given their

positions in the company and the requirements necessary to fulfill each of their fiduciary duties, which included:

(a)     The extensive, and alarming, decline in debt service for the assets comprising the Company's tax-exempt bond portfolio, the primary asset of the Company;

(b)     The alarmingly low level of debt service coverage for the assets comprising the Company's tax-exempt bond portfolio;

(c)     The high level of foreclosures of debt comprising the Company's tax-exempt bond portfolio amounting to no less than $162 million, as much as 27% of its total debt portfolio, during Relevant Period;

(d)     The extensive number, and high aggregate fee value of bonds comprising the tax-exempt bond portfolio that were in a loss position;

(e)     The ongoing continuation for a material length of time that bonds in a loss position remained in a loss position;

(f)     The high aggregate face-value and combined total of loans comprising the tax-exempt bond portfolio that had non-accrual status;

(g)     The stated intention of the Company to make fewer new loans to 501(c)(3) and change the focus of its business on loan origination reflecting the extensive deterioration in its tax-exempt bond portfolio and the Company's abilities to perform in that loan origination sector;

(h)     The Company's own admissions concerning the outlook on the portfolio in light of the miniscule other-than-temporary impairments the Company had taken and the significant amount of non-performing loans;

(i)     The significance and materiality of the Company's charitable

contributions to certain related borrowers, which the Defendants were required to approve, and non-related, which were utilized in order to round-trip debt service payments and which reflected on the quality of the borrowers and the obvious poor-financial position of such borrowers who were otherwise unable to maintain the debt service;

(j)     The numerous representations that each of the Defendants caused the Company to make in its Annual Reports which were used to indicate adequate internal controls but which Defendants knew were not accurate, including, but not limited to, the fact that the Company relied on outside quotes and sources to value certain of its bonds despite knowing that such external sources were limited, that the company was not engaging outside appraisals for properties that had been distressed for more than five years, and ignoring key sources of reliable external valuations;

(k)     The utilization of improper asset transactions involving defaulted assets that generated substantial profits on sales occurring shortly after the deed in lieu of foreclosure that amounted to significant portions of the Company's quarterly and annual profits beginning 2003 and were necessary for certain of the Defendants to receive bonus incentive compensation;

(l)     The Company was issuing dividends greater than its net income and operating cash flows permitted;

(m)     The deterioration in the transparency of the Company's public disclosures which were executed and directed by the Defendants, along with the subsequent increase in the quantity and materiality of questionable transactions such as the improper asset transactions and the charitable contributions;

(n)     The improper asset transactions and similar transactions implicating the improper treatment of the tax-exempt status of such loans held by captive non-profits and the

tax-exempt status of the captive non-profits themselves;

(o)     The utilization of company assets to maintain and financially support failed investment ventures of Defendants Joseph and Falcone and other affiliates of the Company;

(p)     The number and extent of conflicted relationships between certain Defendants, key members of management, affiliated companies, and the Company:

      i.     The Shelter Group:

1.     Joseph, through certain family holding companies, controls a 34.7% interest in The Shelter group, LLC.  Shelter Group's operations include acting as a developer of, and providing property management services primarily to multifamily residential real estate projects. The Shelter Group provides management services for certain properties that Defendant serves as collateral for some for the tax-exempt bond investments of the Company;

2.     Defendants Falcone and Joseph have been close colleagues due to The Shelter Group since 1983.  Falcone joined The Shelter Group in 1983 and worked closely with Joseph on every aspect of the development of the company.

3.     The Company acts as tax credit syndicator for The Shelter Group's projects;

4.     The Company has extended a $1.5 million revolving loan to the Shelter Group;

5.     Having a Joseph-controlled entity as the transferee of all of the Company's deed in lieu of foreclosure transactions, including transactions where it was a Joseph-controlled entity that was in default. These transfers involved $175 million in assets;

6.     The entangled, extensive, yet not completely clear,

relationship between the Company and The Shelter Group has been referenced by at least one analyst as cause for concern, and the Defendants represent through the Company's annual reports that the disinterested board members are responsible for approving transactions between the Company and The Shelter Group.

ii.     Midland Multifamily Equity REIT ("MMER"): Falcone serves as a purportedly non-compensated trustee for MMER, an affiliate of the Company that is a pooled investment vehicle which invests income producing real estate through limited partnership interests originated by the Company. MMER has engaged in business transactions only with the Company through which the Company derives fee income for investment management services provided to MMER. In addition, the Company receives origination fees for investments placed with MMER. Four of MMER's trustees were officers of the Company, including Defendants Falcone, Banks, Gloeckl and Mentesana.

iii.     Midland Affordable Housing Group Trust ("MAHGT"): Defendant Falcone is a trustee of MAHGT, an affiliate of the Company that is a pooled investment vehicle which invests primarily in real estate backed debt investments originated by the Company.  To date, MAHGT has engaged in business transactions only with the Company. The Company earns fee income from MAHGT for providing investment management services, originating MAHGT loans, and servicing individual MAHGT investments.

iv.     MuniMae Affordable Housing, Inc. ("MMAH"): Defendant Joseph is the Chairman and one of five directors. Defendant Falcone, Harrison, Mentesana, Cole, are also officers and directors of MMAH. As of December 31, 2005, MMAH directly or indirectly owned eleven properties, and the aggregate carrying value of such assets was $55.4 million.

v.     SCA Successor, Inc., SCA Successor II, Inc. MMA Successor I,

Inc.: These corporations are general partners of the operating partnerships whose property collateralizes the Company's investments. Defendant Joseph controls the general partners of these operating partnerships and is a limited partner in eight of these partnerships. Defendant Falcone and Harrison, serve as officers and directors of one such general partner. Defendant Barone also served as a director in one such general partner.

vi.     The Greater Baltimore Committee:   The Greater Baltimore Committee is a non-profit organization that sponsors initiatives within the greater Baltimore area.

1.     Defendants' Brown, Joseph and Robert Hillman's wife sit together on the board of the Greater Baltimore Committee.  The Greater Baltimore Committee has benefitted substantially through these three board members' involvement in MuniMae is a major corporate donor to the non-profit organization.  They were given the "Silver Sponsor" designation for their gifts to the Greater Baltimore Committee.

2.     Defendant Berndt sits on the boards of Mercy Health Services, Inc. and John Hopkins Medicine.   Both entities are major donors to the Greater Baltimore Committee.  In 2006 and 2007, they were given the "Silver Sponsor" designation for their gifts to the Greater Baltimore Committee.

3.     Defendant Mehlman is on the board of the Legg Mason Family of Mutual Funds.  Legg Mason is a major corporate donor to the Greater Baltimore Committee.  They were given the "Silver Sponsor" designation for their support.

4.     Defendants Lucas and Joseph are on the board of directors for Provident Bankshares.  Defendant Lucas chairs their Compensation Committee.  Provident

Bankshares is a major corporate donor to the Greater Baltimore Committee.  They were given the "Silver Sponsor" designation for their donations to the organization.

vii.     Cristo Rey Jesuit School: Defendant Berndt is on the board of trustees for Cristo Rey Jesuit School.  The school has benefitted greatly from Berndt's membership on the board and his relationships through MuniMae.  Defendant Mehlman sits on the board of the Legg Mason Family of Mutual Funds.  Legg Mason is a major corporate donor to the school.  Defendant Lucas chairs the board of Greater Baltimore Medical.  Greater Baltimore Medical is a major donor to the school.  MuniMae is also a major corporate donor to the school.

viii.     Gallagher, Evelius & Jones: Berndt is a partner in the law firm Gallagher, Evelius & Jones.  Stephen Goldberg, MuniMae's general counsel, is also a member of this law firm.  As a partner in Gallagher, Evelius & Jones, Berndt directly profits from the business relationship his firm has with the Company.

ix.     Mercantile Bankshares: Defendants Berndt and Brown both sit on the board of directors for Mercantile Bankshares.

x.     Provident Bankshares: Defendants Lucas and Joseph serve together on the board of Provident Bankshares.

(q)     The growing deterioration in the Company's accounting controls, policies and disclosures as evidenced by, among other things:

i.     the ongoing restatement process that the Company has been engaged in for a year and which has resulted in the split with the Company's "independent" auditor often years;

ii.     material swings in key financial numbers not accounted for

through usual external accounting directives but instead the failure of the Company's own internal accounting controls and policies;

      iii.      the inability of the Company to timely-file its accounting disclosures with the SEC;

      (r)      The disregard of numerous red flags that should have alerted the Board to the critical importance of MuniMae's overall poor state of financial internal controls. These red flags included the following:

      i.      The Enron Scandal: This massive accounting scandal, which was revealed in late 2001, principally involved the use of "off balance sheet financing" to hide losses off of a company's books. Enron used a variety of entities in which it did not have a controlling interest to hide losses. Since MuniMae also had extensive dealings with a number of entities in which it did not have a majority interest (at least 2,000), the Board should have been on high alert as to the propriety of MuniMae's accounting for these interests.

      ii.      The First Restatement: On September 23, 2004, MuniMae was forced to restate for deferred compensation paid to defendant Joseph. This restatement should have put the Board on notice as to potential defects in the Company's internal controls.

      iii.      MuniMae's Adoption of FIN 46R: MuniMae's adoption of FIN 46R had a substantial impact on the Company's fiscal 2004 earnings, which were $27 million compared to fiscal 2003 earnings of $72.5 million. This substantial impact should have alerted the Board as to how sensitive they should be to MuniMae's interests in VIEs especially in light of a poor internal control environment.

      iv.      The Second Restatement: On March 10, 2006, MuniMae was forced to announce a second restatement. This was a restatement of MuniMae's past earnings for

fiscal 2002 through 2004 and the nine months ended September 30, 2005 to recognize syndication fees and interest income that the Company earned from particular variable interest entities ("VIEs"). This second restatement in less than two years should have alerted the Board to serious deficiencies in MuniMae's internal controls and its accounting for VIEs.

v.      The Subprime Mortgage Crisis: Due to the fact that that MuniMae had dealings with at least 2,000 real estate partnerships that may need to be consolidated into the Company's books under FIN 46R, the Board should have been sensitive to the subprime mortgage crisis. This crisis, which arose in early 2006, came about when a downturn in the housing market coincided with rising delinquency rates amongst subprime borrowers. And the aftershocks of that crisis have been far reaching with a number of investment banks and mortgage lenders reporting billions of dollars in losses. Those losses could extend to a number of the VIEs that MuniMae is currently evaluating for consolidation onto the Company's balance sheet.

vi.      The Delaware Action:   On September 7, 2006, shortly after the Company's second restatement, a MuniMae shareholder filed a shareholder derivative action in the Delaware Court of Chancery.  *Wood v. Baum, et al.,* C.A. No. 2404-VCL (Del. Ch.) (the "Delaware Action").  The Delaware Action raised additional "red flags" concerning MuniMae's conduct and the Board's knowledge of and participation in the wrongful conduct alleged herein. Despite the ongoing litigation of the Delaware Action, the Defendants have still failed to address the core issue of overhauling its internal controls and protocols.  This was demonstrated by the January 28 press release wherein the Company disclosed a reduction in the dividend distribution from $0.5250 to $0.33 per share is due to, among other things, the cost of the Company's ongoing restatement of its financial statements.  The January 29 press release further reinforced

Defendants' failure to address known issues regarding internal controls and accounting procedures resulting in further need to correct ongoing restatements.  The market reacted swiftly, causing MuniMae's stock to plunge 46% by the close of trading on January 29, 2008.  The Director Defendants knew of or consciously ignored the continued systemic violations and "red flags" presented to them.

74.     Despite these red flags, the Board took no action to ensure that MuniMae was properly accounting for its debts and assets.  Instead, the Board changed the Company's independent auditors rather than address MuniMae's accounting problems.  The Board's conscious disregard of the red flags described above and failure to take action was not the product of valid business judgment.

75.     The Director Defendants authorized the repurchases of over $1.3 million worth of the Company's shares at artificially inflated prices.  MuniMae repurchased these shares during its first fiscal quarter 2005 under a stock repurchase program that the Board authorized during July 2002. The Board's decision to authorize the stock repurchases was not the product of valid business judgment. Among other things, the Board failed to properly discuss or consider the red flags alleged herein.  Further, Defendant Falcone and Joseph engaged in self-dealing in that they sold their personally held shares while directing the Company to buy shares.

76.     While in possession of material adverse, non-public information regarding the Company, the following Director Defendants participated in the illegal insider selling by selling the following amounts:

      a.     Joseph sold 179,815 shares of MuniMae stock for proceeds of $4,680,768.75;

      b.     Falcone sold 59,812 shares of MuniMae stock for proceeds of

$1,524,619.39;

Because these Defendants received a personal financial benefit from the challenged insider trading transactions, these Defendants are interested. Moreover, these Defendants face a sufficiently substantial threat of liability for breach of their fiduciary duties for insider selling. Since these directors have breached their fiduciary duties and are interested, any demand upon them is futile.

77.    Other Company insiders also sold collectively sell 470,210 shares of their personally-held MuniMae common stock for gross proceeds of approximately $12 million.  Because these Defendants received a personal financial benefit from the challenged insider trading transactions, these Defendants are interested. Moreover, these Defendants face a sufficiently substantial threat of liability for breach of their fiduciary duties for insider selling. Since these directors have breached their fiduciary duties and are interested, any demand upon them is futile. The following chart sets forth the insider trading:

| Insider | Date | Shares | Price | Proceeds | Last Reported Holdings | % Sold |
|---|---|---|---|---|---|---|
| **ROBERT BANKS** | 08/19/04 | 18,000 | $24.48 | $440,640 | | |
| | 08/20/04 | 7,800 | $24.51 | $191,178 | | |
| | 08/23/04 | 7,000 | $24.39 | $170,730 | | |
| | 08/24/04 | 7,500 | $24.43 | $183,225 | | |
| | 08/25/04 | 14,000 | $24.42 | $341,880 | | |
| | 08/26/04 | 27,000 | $24.66 | $665,820 | | |
| | 08/27/04 | 6,200 | $24.79 | $153,698 | | |
| | 09/07/04 | 25,000 | $25.08 | $627,000 | | |
| | 09/08/04 | 11,800 | $25.24 | $297,832 | | |
| | 09/09/04 | 13,100 | $25.24 | $330,644 | | |
| | 09/10/04 | 9,900 | $25.09 | $248,391 | | |
| | 09/13/04 | 17,600 | $25.16 | $442,816 | | |
| | 09/14/04 | 9,000 | $25.04 | $225,360 | | |
| | 09/15/04 | 9,600 | $25.09 | $240,864 | | |
| **Banks Subtotal** | | 183,500 | | $4,560,078 | 515,150 | 26.26% |

| | | | | | | |
|---|---|---|---|---|---|---|
| **ANGELA BARONE** | 08/05/04 | 2,100 | $24.00 | $50,400 | | |
| | 08/05/04 | 400 | $24.12 | $9,648 | | |
| | 11/19/04 | 1,300 | $25.92 | $33,696 | | |
| | 11/19/04 | 600 | $25.93 | $15,558 | | |
| | 11/19/04 | 500 | $26.05 | $13,025 | | |
| | 11/19/04 | 100 | $25.94 | $2,594 | | |
| **Barone Subtotal** | | 5,000 | | $124,921 | 6,262 | 44.40% |
| | | | | | | |
| **EARL COLE** | 11/18/04 | 2,500 | $26.19 | $65,475 | | |
| | 11/18/04 | 2,300 | $26.10 | $60,030 | | |
| | 11/18/04 | 2,000 | $26.16 | $52,320 | | |
| | 11/18/04 | 1,000 | $26.21 | $26,210 | | |
| | 03/29/05 | 1,800 | $24.70 | $44,460 | | |
| | 03/29/05 | 1,200 | $24.73 | $29,676 | | |
| | | | | | | |
| | | | | | | |
| **WILLIAM HARRISON** | 12/01/04 | 3,500 | $26.47 | $92,645 | | |
| | 12/01/04 | 3,300 | $26.40 | $87,120 | | |
| | 12/01/04 | 2,000 | $26.42 | $52,840 | | |
| | 12/01/04 | 1,600 | $26.44 | $42,304 | | |
| | 12/01/04 | 1,600 | $26.43 | $42,288 | | |
| | 12/01/04 | 1,400 | $26.30 | $36,820 | | |
| | 12/01/04 | 1,200 | $26.45 | $31,740 | | |
| | 12/01/04 | 900 | $26.36 | $23,724 | | |
| | 12/01/04 | 800 | $26.41 | $21,128 | | |
| | 12/01/04 | 700 | $26.35 | $18,445 | | |
| | 12/01/04 | 600 | $26.46 | $15,876 | | |
| | 12/01/04 | 600 | $26.33 | $15,798 | | |
| | 12/01/04 | 300 | $26.38 | $7,914 | | |
| | 12/01/04 | 300 | $26.34 | $7,902 | | |
| | 12/01/04 | 200 | $26.39 | $5,278 | | |
| | 12/02/04 | 6,800 | $26.23 | $178,364 | | |
| | 12/02/04 | 2,000 | $26.25 | $52,500 | | |
| | 12/02/04 | 1,200 | $26.55 | $31,860 | | |
| | 12/02/04 | 500 | $26.24 | $13,120 | | |
| | 12/02/04 | 500 | $26.21 | $13,105 | | |
| | 12/02/04 | 500 | $26.20 | $13,100 | | |
| | 12/02/04 | 400 | $26.22 | $10,488 | | |

|  | 12/02/04 | 300 | $26.30 | $7,890 |  |  |
|  | 12/02/04 | 100 | $26.33 | $2,633 |  |  |
|  | 12/02/04 | 100 | $26.32 | $2,632 |  |  |
|  | 12/03/04 | 11,600 | $26.20 | $303,920 |  |  |
| **Harrison Subtotal** |  | 43,000 |  | $1,131,434 | 12,193 | 77.91% |

78.     Defendants Baum, Brown, Hillman, Mehlman and Pratt (the "Audit Committee Defendants") were, during the Relevant Period, members of the Audit Committee. The Audit Committee's charter provides that the Audit Committee is responsible for reviewing and discussing: (i) the annual and quarterly financial statements; (ii) the integrity of MuniMae's financial reporting process and controls; (iii) MuniMae's policies with respect to risk assessment and risk management, including major financial accounting exposures and steps management has taken to control such risks; and (iv) earnings press releases, earnings guidance and information provided to analysts and rating agencies. Thus, the Audit Committee Defendants were responsible for overseeing and directly participating in the dissemination of MuniMae's improper press releases, financial results and guidance. Accordingly, the Audit Committee Defendants breached their fiduciary duties of due care, loyalty and good faith because they participated in the preparation of improper financial statements and earnings press releases that contained improper material information. Particularly, these Defendants reviewed and failed to correct MuniMae's improper statements described above. Thus, the Audit Committee Defendants face a sufficiently substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

79.     The Audit Committee Defendants are also responsible for preparing the Audit Committee report required by the Securities Exchange Commission.  In an 8-K filed with the Securities Exchange Commission on March 16, 2006, the Company stated the following:

(a) On March 10, 2006, the Audit Committee of the Board of Directors (the "Committee") of MuniMae & Equity, LLC (the "Company") concluded, based upon the recommendation of the Company's management that certain previously issued financial statements covering the fiscal years ended December 31, 2004, 2003 and 2002, and the quarterly periods within those years, and the first three quarterly periods in the fiscal year ended December 31, 2005 (the "Affected Financial Statements") should be restated to reflect adjustments to correct certain errors therein and summarized below. Accordingly, the Affected Financial Statements with respect to the 2002, 2003 and 2004 fiscal years were inaccurate and could not be relied upon. Both the Committee and management discussed the matters disclosed in this report with the Company's independent registered public accountants.

(b) The Company is evaluating the effectiveness of its internal controls over financial reporting as of December 31, 2005, as required under Section 404 of the Sarbanes-Oxley Act of 2002. To date, management has identified material weaknesses related to the financial reporting process, including the sufficiency of the resources dedicated to the Company's accounting function. Additional material weaknesses have been identified that relate to the recognition of syndication fees, the application of the equity method of accounting, and the recognition of interest income. Management's assessment is ongoing and may identify additional material weaknesses as part of the process of restating the Affected Financial Statements.

80.     Their failure to monitor the integrity of the financial statements of MuniMae and MuniMae's compliance with legal and regulatory requirements renders the members of the Audit Committee unable to prosecute claims against themselves if Derivative Plaintiffs demanded that they do so.

81.     Members of the Company's Compensation Committee, which is comprised of Defendants Hillman, Baum, McGregor and Lucas (the "Compensation Committee Defendants"), breached their fiduciary duties to the Corporation and its shareholders by failing to implement and/or enforce policies properly establishing the determination of compensation and benefits to key executives, including Defendant Joseph and Falcone, resulting in the excessive compensation to these executives. The Compensation Committee's primary duties and responsibilities are to oversee the administration of the Company's compensation programs,

review the compensation of executive officers and prepare the report on executive compensation required to be set forth annually in the proxy statement prevent employees and executives from engaging in the practices complained of herein. In their capacity as members of the Company's Compensation Committee, each of these Defendants was tasked with understanding the Company's financial condition and direction in order to properly determine the bases for providing base compensation as well as performance compensation. In this capacity, and as Directors, each of these Defendants was aware of the Company's true financial performance as well as the extent of the improper actions taken by the Company to meet certain financial projections. Despite this knowledge, each of these Defendants caused the Company to set artificially low performance compensation targets as well as pay performance compensation when, in reality, the targets were not met due to the improper conduct alleged herein. Their failure to monitor the integrity of the financial performance of the Company, as required of them to carry out their duties as members of the Compensation Committee and their causing the Company to pay performance compensation in circumstances when it was improper, renders the members of the Compensation Committee unable to prosecute claims related to the wrongs alleged herein.

82.     Defendants Joseph and Falcone have personal and financial interests in the actions challenged herein, and have each personally benefited from the alleged wrong-doing. Each of their personal interests rests not only with fruits from past misconduct but remain substantially intertwined with the Company and its operations.

83.     Defendant Joseph has numerous personal dealings with the Company, as of July 2006 owned over 1 million shares of the Company (reflecting just under 3%) and sold during the Relevant period nearly $5 million worth of MuniMae stock;

84.     Defendant Falcone's primary employment is with MuniMae, pursuant to which he received and continues to receive substantial monetary compensation and other benefits. Specifically, MuniMae has paid Falcone the following compensation:

| Year | Salary | Bonus | Tax Reimbursements | TOTAL |
|------|--------|-------|--------------------|-------|
| 2005 | $423,077 | $600,000 | $26,721 | **$1,049,798** |
| 2004 | $362,500 | $525,000 | $22,498 | **$909,998** |
| 2003 | $312,813 | $378,125 | $18,183 | **$709,121** |

Accordingly, Falcone lacks independence from defendants Baum, Hillman, Lucas and McGregor, who are not disinterested and/or independent and who exert influence over Falcone's compensation by virtue of their positions as members of the Compensation Committee. The Compensation Committee has the authority to review and approve Falcone's base salary, bonus and equity compensation. This lack of independence renders Defendant Falcone incapable of impartially considering a demand to commence and vigorously prosecute this action.

85.     Demand is further excused because the actions of the Defendants could not have been the result of good business judgment. Demand is excused because the Director Defendants are subject to liability for breaching their fiduciary duties by failing to adequately monitor the activity of MuniMae and the officers and employees with which it was charged with overseeing through the establishment and enforcement of Company policies, failing to prevent and/or being complicit in the various improper actions complained of herein. The Director Defendants have directly ratified the egregious actions complained of herein. The Director Defendants' fiduciary breaches include the ratification of transactions giving rise to the damages sustained by the Company, delegation of compensation and incentive compensation, including establishing the terms for bonuses and options grants received by Company officers. Because Defendants ratified

the improper actions, in breach of their fiduciary duties they cannot be expected to prosecute claims against themselves if Derivative Plaintiffs demanded that they do so. In addition, each of the Defendants is exposed to liability for conduct for which he or she is not entitled to indemnification by the Company including causing the Company to issue false statements and omit material information in the Company's Annual Reports as well as liability for improper tax treatments. Institution of, or influence over, any action on behalf of the Company would require the Director Defendants to sue themselves and take control of this action, which is unlikely, but in any event would not result in effective prosecution of these claims. Consequently, the Director Defendants' substantial risk of liability renders futile any demand.

86.     Demand would also be futile because the Director Defendants have not only been complacent in acting on behalf of the Company, but were necessary actors in the improper conduct alleged herein, and have actively condoned and facilitated a campaign of deceit upon the shareholders of the Company through the Company's filings with the SEC, communications with the public, and the Board's authorization of dividend increases. The Director Defendants approved option compensation, approved officers' incentive compensation, and received their own stock options as compensation, thereby personally benefiting from the improper conduct alleged herein. Moreover, they promoted the continuation of the scheme to further their personal interests as directors of the Company and as a result of their loyalty to Defendants Joseph and Falcone. In addition, certain of the Director Defendants, including Defendants Joseph, Falcone and Berndt benefited financially through their personal interest in entities that benefited financially through the transactions complained of herein. Accordingly, the Director Defendants cannot possibly be expected to act independently in charging themselves with wrongdoing.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

87.     Throughout the Relevant Period, Defendants engaged in a scheme and continuing course of conduct pursuant to which they issued a series of false and misleading statements to the market which misrepresented the operating and financial condition of the Company.

88.     Knowing the true financial condition of the Company, the Defendants allowed the Company to make false and misleading statements, detailed below, that failed to disclose and misrepresented that MuniMae: (1) was materially overstating its financial performance by failing to properly account for its interests in certain entities;  (2) was failing to timely write-down the fair value of its "held for-sale" loans, bonds, derivatives, mortgage servicing rights and guarantee obligations;  (3) was materially overstating the fair value of these assets; and (4) lacked adequate internal controls.

89.     On May 3, 2004, MuniMae issued a press release announcing purported strong financial and operational results for the first quarter of 2004, the period ending March 31, 2004. For the quarter, the Company reported net income allocated to common shares of $1.2 million, diluted earnings per share of $0.04 and cash available for distribution ("CAD") per common share of $0.37. Defendant Joseph, commenting on the results, stated, in relevant part:

> We are very pleased with the Company's results for the first quarter. As we had previously advised our investors, we expected first quarter results to come in below the prior-year figures due to seasonality in our tax credit equity syndication business, which we significantly expanded through a July 2003 acquisition. While our CAD per share for the first quarter of 2004 did come in below the prior-year results, it significantly exceeded our expectations. This was largely due to strong results in our tax credit equity unit during the quarter. Based in part on the Company's results and our outlook for the remainder of the year, our Board of Directors recently raised the quarterly distribution to holders of our common shares to $0.4575, an increase of 3% over the same period in 2003.

90.     On August 2, 2004, MuniMae issued a press release announcing its financial results for the second quarter of 2004, the period ending June 30, 2004. For the quarter, the Company reported net income allocated to common shares of $11.2 million, diluted earnings per share of $0.32

and CAD per common share of $0.61. Defendant Joseph, commenting on the results, stated, in relevant part:

> We are extremely pleased to have been able to raise our distribution for thirty consecutive quarters. So far this year we are outperforming our own and analysts' expectations, particularly in our tax credit equity business, and we expect to finish the year somewhere between 2% and 4% above analyst current consensus expectations of $2.22.

91.     On September 2, 2004, the Company announced that MFH Financial Trust I, a subsidiary of Midland Financial Holdings, Inc. ("Midland"), completed the sale of $24,000,000 of its 9.5% trust preferred securities. Midland is an indirect wholly owned subsidiary of MuniMae. The press release stated that "[Midland] will use the proceeds to repay a portion of an inter-company loan from MuniMae. MuniMae, in turn, intends to use its proceeds for general corporate purposes."

92.     On November 10, 2004, MuniMae issued a press release announcing its financial results for the third quarter of 2004, the period ending September 30, 2004. For the quarter, the Company reported net income of $11.6 million, diluted earnings per share of $0.33 and CAD per common share of $0.72. Defendant Joseph, commenting on the results, stated, in relevant part:

> MuniMae is pleased to continue its long history of steady growth in cash generated by our businesses. The Company has recently declared its 31st consecutive increase in its distribution to common shareholders. Despite higher regulatory and compliance costs, particularly those related to the Sarbanes-Oxley Act of 2002 our management team continues to deliver strong results.

93.     On February 2, 2005, the Company issued a press release announcing that it "raised gross proceeds of $68.3 million through the public offering of 2,575,000 common shares at a price of $26.51 per share."

94.     On March 15, 2005, the Company announced that MFH Financial Trust II, a subsidiary of MMA Financial Holdings, Inc. ("MMA Financial"), completed the sale of

$50,000,000 of its 8.05% trust preferred securities to TABERNA Preferred Funding I, Ltd. and

Merrill Lynch International. MMA Financial is an indirect wholly owned subsidiary of

MuniMae. The press release stated that "[MMA Financial] will use the proceeds to repay a portion

of a loan from an affiliate and other indebtedness of [MMA Financial] and its affiliates, and for

general corporate purposes."

95.     On March 16, 2005, MuniMae distributed an earnings and production press

release announcing its financial results for the fourth quarter and year end of 2004, the period

ending December 31, 2004. For the quarter, the Company reported net income of approximately

$5.6 million, diluted earnings per share of $0.16 and CAD per share of $0.63. Defendant

Falcone, commenting on the results, stated, in relevant part:

> By capitalizing on the synergies between our tax credit business and our tax-exempt
> and taxable lending businesses, we successfully structured over $2.5 billion in
> multifamily and other real estate investments, which is a 68% increase over 2003
> production. As a result, our Cash Available for Distribution ("CAD") per common
> share grew 9% over 2003, representing our 8th consecutive year of CAD per share
> growth.

With regard to certain aspects of the Company, the press release stated:

**Investing Segment**

> During the three months ended December 31, 2004, MuniMae acquired tax-exempt
> bonds and entered into forward funding commitments for financings totaling
> approximately $145.4 million in par value, which is a 5% increase as compared to
> $138.1 million for the three months ended December 31, 2003.

> For the twelve months ended December 31, 2004, MuniMae acquired tax-exempt
> bonds and entered into forward funding commitments for financings totaling
> approximately $401.6 million, which represents a 60% increase as compared to
> $250.4 million for the twelve months ended December 31, 2003.

> Of the 2004 total, $321.1 million of the financings were tax-exempt bonds secured
> by affordable multifamily housing properties. The remaining $80.5 million were
> investments in Community Development District Bonds ("CDD") secured by
> assessments pledged by local governments for community infrastructure projects.

**Tax Credit Equity Segment**

MuniMae's Tax Credit Equity segment ended 2004 on a very strong note. During the three months ended December 31, 2004, the Company raised tax credit equity of approximately $487.9 million bringing the Company's total tax credit equity raised during 2004 to approximately $1.1 billion. In addition to representing an increase of 99% over 2003, this accomplishment distinguished MuniMae as one of only two companies to surpass the $1 billion mark in tax credit equity raised during a calendar year. MuniMae had approximately $6 billion in tax credit equity assets under management as of December 31, 2004.

In addition, during the fourth quarter, the Company made equity investments in tax credit properties totaling $303.2 million. These equity investments brought the Company's total twelve-month investment activity to $846.3 million, which is an increase of approximately 86% as compared to 2003 and, we believe, a record breaking amount for the industry for a single year.

Other accomplishments of the Tax Credit Equity segment in 2004 included the establishment of a guaranteed tax credit equity program with Merrill Lynch, through which the Company raised $165 million in investor equity, and the development and implementation of a joint program to improve our marketing of tax credit equity and bond financing to developers.

**Real Estate Finance Segment**

MuniMae's Real Estate Finance segment production was approximately $348.1 million during the three months ended December 31, 2004, bringing the segment's total production for the twelve months ended December 31, 2004, to approximately $1.0 billion. This represents a 45% increase over the 2003 production volume and brought the segment's total assets under management to approximately $2.1 billion as of December 31, 2004.

96.     MuniMae financial results for the fourth quarter and year end of 2004, the period ending December 31, 2004, were repeated in the Company's Report on Form 10-K filed with the SEC on March 16, 2005 and signed by Defendants Joseph, Falcone, Baum, Berndt, Brown, Hillman, McGregor, Mehlman and Pratt.  Defendant Falcone also certified the Form 10-K.

97.     On May 2, 2005, MuniMae distributed an earnings and production press release announcing its financial results for the first quarter of 2005, the period ending March 31, 2005. For the quarter, the Company reported net income of $2.2 million, diluted earnings per share of $0.06 and CAD per share of $0.42. Defendant Falcone, commenting on the results, stated, in relevant part:

We had a productive first quarter and remain on track to meet our overall earnings per share and CAD per share targets for fiscal year 2005. Our business volumes continue to grow in our major business segments. In addition, during the quarter we completed a successful public offering of common equity and a private placement of subsidiary trust preferred securities, which together raised $118 million of capital. Finally, we closed a small but strategically important acquisition of an established business, which we have re-branded MMA Realty Capital and which we expect to form the cornerstone of an expanded fund management business targeting pension funds, insurance companies and other institutional investors.

With respect to certain aspects of the Company's business, the press release stated:

**Production Summary**

*Investing Segment*: During the three months ended March 31, 2005, MuniMae acquired tax-exempt bonds and entered into forward funding commitments for financings totaling approximately $55.3 million in par value, which is a 12% increase as compared to $49.3 million for the three months ended March 31, 2004. All of the first quarter 2005 financings were tax-exempt multifamily revenue bonds associated with low-income housing tax credits.

*Tax Credit Equity Segment*: During the three months ended March 31, 2005, the Company raised $107.4 million in tax credit equity, representing an 18% increase over the three months ended March 31, 2004. In the first quarter of 2005, MuniMae also closed its largest tax credit equity fund to date, raising $319 million from sixteen corporate investors.

*Real Estate Finance Segment*: MuniMae's Real Estate Finance segment production was approximately $161.3 million during the three months ended March 31, 2005, which represents a 22% decrease as compared with the three months ended March 31, 2004. If not for a single $66.7 million construction loan transaction closed in the first quarter of 2004, we would have shown a year-over-year increase in first quarter production of 14% for this segment.

98.     On July 1, 2005, the Company issued a press release announcing that it closed on the acquisition of Glaser Financial Group, Inc. for a purchase price, payable in combination of cash and stock, of approximately $67.0 million.

99.     On July 28, 2005, MuniMae distributed an earnings and production press release announcing its financial results for the second quarter of 2005, the period ending June 30, 2005. For the quarter, the Company reported GAAP diluted earnings per share of $0.58 and CAD of $0.55 per share. Defendant Falcone, commenting on the results, stated, in relevant part:

MuniMae had a productive second quarter and, though our year-to-date CAD per share is essentially flat as compared with the first half of 2004, it was above our internal budget. Moreover, based on a review of our pipeline and business prospects for the remainder of the year, we are on track to meet or slightly exceed the current analysts' consensus CAD estimate of $2.41 for fiscal 2005.

We are increasingly seeing the benefits of the diversification strategy we have pursued for the past six years. While the persistent low interest rate environment is causing pricing pressure in some of our business lines, particularly in our tax-exempt bond business, we are simultaneously benefiting from a strong seller's market for multifamily properties, and we are seeking to take advantage of this market to harvest significant gains on some of our equity investments and bonds. The regular realization of gains on sale has been part of our overall business plan for several years, and the pricing we have seen this year has generally met or exceeded our going-in return expectations for these investments. We remain committed to our strategy of diversifying our product offerings while building scale, both through acquisitions and through organic growth in our existing businesses. In this connection, we are very pleased to have closed the Glaser Financial acquisition, which gives us new product capabilities, additional scale in our DUS lending franchise, geographic diversification in our loan servicing portfolio and a strong management team.

With respect to certain aspects of the Company's business, the press release stated the following:

**Production Summary**

*Investing Segment*: For the three and six months ended June 30, 2005, MuniMae acquired tax-exempt bonds and entered into forward funding commitments totaling approximately $40.7 million and $96.0 million in par value, representing a decrease of 67% and 44% as compared to the three months and six months ended June 30, 2004, respectively. All of the second quarter 2005 financings were tax-exempt multifamily revenue bonds associated with low-income housing tax credits syndicated by MuniMae and other third party syndicators.

*Tax Credit Equity Segment*: For the three and six months ended June 30, 2005, MuniMae raised $215.3 million and $322.7 million of tax credit equity, representing a decrease of 12% and 4% as compared to the three months and six months ended June 30, 2004, respectively. For the three and six months ended June 30, 2005, MuniMae invested $220.2 million and $394.2 million in tax credit properties, representing an increase of 15% and 18% as compared to the three months and six months ended June 30, 2004, respectively.

*Real Estate Finance Segment*: For the three and six months ended June 30, 2005, MuniMae's Real Estate Finance segment production was $315.4 million and $476.8 million, representing an increase of 4% and a decrease of 7% as compared to the three months and six months ended June 30, 2004, respectively.

100.    On November 4, 2005, the Company issued a press release announcing that MuniMae TE Bond Subsidiary, LLC ("TEB"), an indirect wholly owned subsidiary of MuniMae, completed a $100 million private placement of rated tax-exempt perpetual preferred shares with a weighted average distribution rate of 5.43%. The press release stated that "TEB intends to use the net proceeds from this offering to acquire investments that produce tax-exempt interest income and for general corporate purposes, which may include the repayment of indebtedness of TEB to an affiliated entity."

101.    On November 7, 2005, MuniMae distributed an earnings and production press release announcing its financial results for the third quarter of 2005, the period ending September 30, 2005. For the quarter, the Company reported net income of $20.4 million, diluted earnings per share of $0.52 and CAD of $0.76 per share. Defendant Falcone, commenting on the results, stated, in relevant part:

> Although our tax-exempt bond originations in 2005 have fallen significantly below 2004 levels, production volumes remain strong in our other lines of business, and the continued low interest rate environment has enabled us to sell selected investments at very attractive cap rates. We remain confident in our outlook for the rest of the year, and based on our current pipeline, we expect CAD per share for the fiscal year 2005 to be at least $2.43.

With respect to certain aspects of the Company's business, the press release stated:

**Production Summary**

*Investing Segment*: For the three and nine months ended September 30, 2005, MuniMae acquired tax-exempt bonds and entered into forward funding commitments totaling approximately $80.2 million and $176.2 million in par value, representing decreases of 6% and 31 % as compared to the three months and nine months ended September 30, 2004, respectively. All of the third quarter 2005 financings were tax-exempt multifamily revenue bonds associated with low-income housing tax credits syndicated by MuniMae and other third party syndicators.

*Tax Credit Equity Segment*: For the three and nine months ended September 30, 2005, MuniMae raised $370.2 million and $692.9 million of tax credit equity, representing an increase of 32% and 12% as compared to the three months and nine months ended September 30, 2004, respectively. For the three and nine months

ended September 30, 2005, MuniMae invested $254.5 million and $595.6 million in tax credit properties, representing increases of 22% and 10% as compared to the three months and nine months ended September 30, 2004, respectively.

*Real Estate Finance Segment*: For the three and nine months ended September 30, 2005, MuniMae's Real Estate Finance segment production was $726.8 million and $1,240.2 million, representing an increase of 293% and 78% as compared to the three months and nine months ended September 30, 2004, respectively. Increased production in this segment was driven largely by taxable debt production from the business formerly known as Glaser Financial, acquired on July 1, 2005, and production within the Company's fund management business, which grew significantly as a result of an acquisition that closed in February 2005.

102.    On March 10, 2006, MuniMae announced that the Company would have to restate it earnings for fiscal years 2002, 2003 and 2004 and the first three fiscal quarters of 2005 in a press release entitled "MuniMae to Restate GAAP Net Earnings." Therein, the Company stated, in relevant part:

MuniMae & Equity, LLC, also known as MuniMae (NYSE: MMA), announced today that it will restate net earnings for the nine month period ended September 30, 2005 as well as fiscal years 2004, 2003 and 2002 resulting in higher aggregated net earnings over this period than previously reported. This restatement does not impact cash available for distribution (CAD) in any period. CAD is a supplemental non-GAAP performance measure reported by the Company in addition to net earnings.

For the nine months ended September 30, 2005, and year ended December 31, 2004 the Company will be increasing previously reported net earnings by $10.5 million ($.27 per diluted share) and $19.4 million ($.56 per diluted share), respectively. For the years ended December 31, 2003 and 2002, the Company will be decreasing net earnings by $4.2 million ($.15 per diluted share) and $2.6 million ($.09 per diluted share), respectively. The adjustments described above are subject to the completion of the review by the Company's independent registered public accountants.

In connection with its fourth quarter financial reporting processes, the Company identified the need to record certain adjustments related to four main areas: 1) recognition of syndication fees, 2) application of equity method accounting, 3) recognition of interest income, and 4) amortization of mortgage servicing rights. As a result of the efforts necessary to reflect the restatements of prior periods, the Company expects to file for a 15 day extension to file its annual report on Form 10-K for the year ended December 31, 2005. Currently, the Company expects that it will file its 2005 Form 10-K before the expiration of this extension.

103.    On March 17, 2006, MuniMae Filed with the SEC a Form 12b-25 indicating that the Company would be delinquent in filing its Annual Report on Form 10-K. In this filing, the

Company declared that it expected to complete the restatement and file the Company's Form 10-K

for the fiscal year ended December 31, 2005 by March 31, 2006.

104.    On April 11, 2004, MuniMae announced unaudited financial results for the fourth

quarter of 2007 in a press release entitled, "MuniMae Reports Financial Results," which stated in

relevant part:

> In recognition of these outstanding achievements, the Company's Board of Directors approved the 36th consecutive increase in the quarterly distribution that was paid to shareholders on February 10, 2006. The distribution of $.4925 per share represents a 4% increase from the comparable distribution last year. On an annualized basis, the distribution equates to $1.97 per common share and represents a 7.5% yield based on the April 10, 2006 closing price of $26.35 per share. The stated yield does not give effect to any tax savings investors may realize from the portion of the distribution that is exempt from Federal income taxes.
>
> Commenting on the Company's strong performance, Michael L. Falcone, Chief Executive Officer stated, "We accomplished a great deal in 2005. We closed the acquisitions of MONY Realty Capital and Glaser Financial which significantly expanded the mortgage banking products we offer as well as the services we can provide to institutional investors. In addition, we reorganized our operations to improve profitability and client service for many years to come. *With greater diversity of revenue sources, a more efficient operating platform and a distribution that represents a lower percentage of CAD, MuniMae is well positioned for continued growth over the long-term.*" (Emphasis added).

105.    MuniMae finally filed the 2005 Form 10-K on June 22, 2006.  In the 2005 Form

10-K, MuniMae identified the following deficiencies in the Company's disclosure controls and

procedures:  (1) an ineffective control environment; (2) an ineffective financial reporting process;

(3) a lack of effective controls over the accuracy of accounting for the tax credit equity business;

(4) a lack of effective controls over the accuracy of accounting for the deferral and recognition of

bong and loan origination fees and direct costs; (5) a lack of effective controls to ensure accurate

application of the equity method of accounting for investments in certain partnerships; (6) a lack of

effective controls over the identification and valuation of certain derivative financial instruments;

and (7) a lack of effective controls over the accounting for income taxes.  Specifically, the 2005

Form 10-K stated in relevant part:

> An evaluation was conducted under the supervision and with the participation of management, including the CEO and CFO, on the effectiveness of our disclosure controls and procedures, as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act as of December 31, 2005. Based on this evaluation, the CEO and CFO concluded that, *as a result of the material weaknesses set forth below, our disclosure controls and procedures were not effective as of December 31, 2005*.

> As part of our financial reporting process and during the preparation of this Annual Report, management identified certain errors in our previously issued financial statements and concluded it was necessary to restate our consolidated financial statements for the years ended December 31, 2004, 2003 and 2002, for each of the first three quarters in 2005 and for each quarter in 2004. In addition, management concluded that our internal control over financial reporting was not effective as of December 31, 2004, and at the end of each of the first three quarters of 2005.

> \* \* \*

> Under the supervision and with the participation of management, including our CEO and CFO, we conducted an evaluation of the effectiveness of the company's internal control over financial reporting as of December 31, 2005 based on the criteria related to internal control over financial reporting described in "Internal Control—Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO").

> A material weakness is a control deficiency, or a combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of annual or interim financial statements would not be prevented or detected. Management has identified the following material weaknesses as of December 31, 2005:

>> 1. *Ineffective control environment*—We did not maintain an effective control environment as defined in the COSO framework. Specifically, we identified the following material weakness related to our control environment:

>> • We did not maintain a sufficient complement of personnel with a level of accounting knowledge and experience in the application of GAAP commensurate with our financial reporting requirements and business activities, particularly as our business grew in diversity and complexity.

>> • We did not maintain or disseminate accounting policy guidance with respect to certain areas with a sufficient level of precision to enable existing personnel to adequately analyze related transactions and apply accounting policies that were in conformity with GAAP.

- Our control environment did not emphasize the need to maintain effective controls to monitor results of operations determined in accordance with GAAP. Specifically, we did not budget net earnings and did not maintain a process to monitor net earnings results against expected results

These material weaknesses contributed to the material weaknesses discussed below in items 2 through 7, and resulted in the restatement of our consolidated financial statements for the years ended December 31, 2004, 2003 and 2002, for each of the first three quarters in 2005 and for each quarter in 2004. In addition, these material weaknesses could result in a misstatement of any of substantially all our financial statement accounts and disclosures that would cause a material misstatement of the Company's annual or interim financial statements that would not be prevented or detected. Accordingly, management has concluded that these control deficiencies constitute material weaknesses.

2. ***Ineffective financial reporting process***—We did not maintain effective controls, including monitoring, over our financial close and reporting process. Specifically, we identified the following material weaknesses related to the financial reporting process:

- Controls over journal entry review and account reconciliations failed to prevent or detect material financial statement errors. In addition, we failed to design and implement exception and monitoring reports to review transactions and detect errors and to integrate our subsidiary and feeder systems with our general ledger system. As a result, our financial reporting process is manually intensive and is based on the review and approval of individual transactions (and resulting journal entries) without adequate compensating controls to detect errors.

- We did not maintain effective controls over the identification and disclosure of our segments. Specifically, we did not identify our segments or report their performance in the same manner for external reporting purposes and for reporting to our chief operating decision maker. This control deficiency resulted in segment disclosures that did not conform to GAAP.

These material weaknesses in our financial reporting process contributed to the material weaknesses discussed below in paragraphs 3 through 7, and resulted in the restatement of our consolidated financial statements for the years ended December 31, 2004, 2003 and 2002, for each of the first three quarters in 2005 and each quarter in 2004. In addition, these material weaknesses could result in a misstatement of any of substantially all our financial statement accounts and disclosures that would cause a material misstatement our annual or interim financial statements that would not be prevented or detected. Accordingly, management has concluded that these control deficiencies constitute material weaknesses.

3. ***Accounting for tax credit equity business***—We did not maintain effective controls over the accuracy of our accounting for the tax credit equity business. Specifically:

- Accounting for real estate syndication fees—We did not correctly recognize

syndication fees ratably as syndication partnerships invested in low income housing properties as required by GAAP. Instead, we (1) eliminated certain syndication fees related to consolidated syndication partnerships and (2) recognized syndication fees as investors subscribed to our funds and when we selected or acquired interests in low income housing properties to be sold to syndication partnerships rather than when the syndication partnerships made investments.

- Accounting for impairments of investments in real estate partnerships held by guaranteed tax credit equity funds—We presented equity in the impairment losses of low income housing properties owned by guaranteed tax credit funds and related revenues earned by providing related tax losses net instead of reporting these amounts separately as required by GAAP.

- Accounting for consolidated tax credit equity funds—We did not correctly record or did not properly reverse certain adjustments to ensure consolidated amounts were in accordance with GAAP.     Accounting for capitalized interest costs associated with investments in real estate partnerships—We did not correctly capitalize interest costs on investments in real estate partnerships developing low income housing properties in accordance with GAAP.

This control deficiency resulted in the restatement of our consolidated financial statements for the years ended December 31, 2004, 2003 and 2002, for each of the first three quarters in 2005 and each quarter in 2004. In addition, this control deficiency could result in a misstatement of syndication fee income, equity in the earnings (losses) of partnerships, interest expense, and net earnings (losses) allocated to minority interest that would result in a material misstatement in our annual or interim financial statements that would not be prevented or detected. Accordingly, management has concluded that this control deficiency constitutes a material weakness.

4. ***Accounting for deferral and recognition of bond and loan origination fees and direct costs***—We did not maintain effective controls over the accuracy of our accounting for the deferral and recognition of bond and loan origination fees and direct costs and the related amortization expense. Specifically, we failed to amortize our deferred bond and loan fees using the effective interest method over their contractual terms as required by GAAP rather than the straight-line method over terms anticipating prepayments. In addition, we failed to defer direct costs of originating bonds in accordance with GAAP and effectively monitor our recorded yields on bonds against our expected effective yields. This control deficiency resulted in the restatement of our consolidated financial statements for the years ended December 31, 2004, 2003 and 2002, for each of the first three quarters in 2005 and for each quarter in 2004. In addition, this control deficiency could result in a misstatement of deferred bond and loan origination fees and the related amortization expense that would result in a material misstatement of our annual or interim financial statements that would not be prevented or detected. Accordingly, management has concluded that this control deficiency constitutes a material weakness.

5. ***Accounting for investments in partnerships using the equity method of accounting***—

We did not maintain effective controls to ensure accurate application of the equity method of accounting for investments in certain partnerships. Specifically, we did not apply the equity method to an investment when our share of the investee's cumulative losses exceeded our original investment even though we had guaranteed certain obligations of the investee. In addition, we did not account for differences between our cost of an investment and the amount of underlying equity of the investee. We also did not correctly calculate our share of this investee's losses using our economic share of the entity. This control deficiency resulted in the restatement of our consolidated financial statements for the years ended December 31, 2004, 2003 and 2002, for each of the first three quarters in 2005 and for each quarter in 2004. In addition, this control deficiency could result in a misstatement of equity method investments and equity in their earnings (losses) that would result in a material misstatement of our annual or interim financial statements that would not be prevented or detected. Accordingly, management has concluded that this control deficiency constitutes a material weakness.

6. *Identification and valuation of derivative financial instruments*—We did not maintain effective controls over the identification and valuation of certain derivative financial instruments. Specifically, we did not maintain effective controls to identify derivative financial instruments embedded within financial guarantees. In addition we did not maintain effective controls over the accuracy of assumptions used to value derivatives embedded within commitments to lend. This control deficiency resulted in the restatement of our consolidated financial statements for the years ended December 31, 2004, 2003 and 2002, for each of the first three quarters in 2005 and for each quarter in 2004. In addition, this control deficiency could result in a misstatement of derivative financial instruments and related gains (losses) that would result in a material misstatement of our annual or interim financial statements that would not be prevented or detected. Accordingly, management has concluded that this control deficiency constitutes a material weakness.

7. *Accounting for income taxes*—We did not maintain effective controls over the accounting for income taxes. We did not maintain effective controls over the completeness and accuracy of our income tax provision.

This control deficiency resulted in the restatement of our consolidated financial statements for the years ended December 31, 2004, 2003 and 2002, for each of the first three quarters in 2005 and for each quarter in 2004. In addition, this control deficiency could result in a misstatement of income taxes that would result in a material misstatement of our annual or interim financial statements that would not be prevented or detected. Accordingly, management has concluded that this control deficiency constitutes a material weakness.

Because of the material weaknesses described above, management has concluded that our internal control over financial reporting was ineffective as of December 31, 2005.

Management's assessment of the effectiveness of our internal control over financial reporting as of December 31, 2005 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, whose opinion thereon is included herein.

(Emphasis added).

106.    In response to these identified material weaknesses in the Company's internal controls and procedures, MuniMae announced substantial remedial measures purportedly already implements, or being implemented to correct the deficiencies.  The 2005 Form 10-K sets forth these purported remedial measures:

**(c) Remediation of Material Weaknesses**

Management is responsible for maintaining effective internal control over financial reporting, including the adequacy of accounting resources and the quality of the financial reporting processes.

***Control environment***—In 2004, we recognized the need for additional qualified accounting personnel and began recruiting efforts. By the end of 2004, the accounting staff had more than doubled with most of the new hires starting in the second half of the year. We continued our efforts in 2005 by hiring two Assistant Controllers, a Chief Financial Officer/Chief Accounting Officer and a Controller, each with over 15 years of real estate industry experience.

In 2005, the corporate accounting department was reorganized and the reporting structures of tax credit equity and fund management accounting and finance personnel were realigned to report through the corporate accounting and finance departments. These actions were taken, in part, to improve communication and the nature, extent and oversight of financial reporting controls.

We will continue to hire additional qualified staff, train existing staff, and assess the roles and responsibilities and related qualifications of the accounting staff to ensure that they are adequate to support our financial reporting requirements. Management will also improve the documentation and dissemination of clear accounting policies, particularly those related to accounting for the tax credit equity business, deferral and recognition of loan and bond origination fees and direct costs, the application of the equity method of accounting for investments in partnerships, identification and valuation of derivative financial instruments, accounting for income taxes and disclosures about our segments.

We will also perform a comprehensive review of our business segments, including developing and implementing performance measures and metrics to enhance monitoring controls and error detection efforts, and to more effectively integrate our accounting and financial reporting personnel into our operating businesses.

***Financial reporting process***—Management has taken certain of the steps necessary to remediate the weaknesses related to its financial reporting process including:

    i.      increasing the levels of review for complex and judgmental accounting issues, including key estimates;

    ii.     developing analyses that aggregate similar transaction types, correlate balance sheet and income statement accounts and better support account balances; and

    iii.    training staff.

Management will continue these efforts in 2006 by:

    i.      hiring additional qualified staff with significant relevant experience;

    ii.     establishing a group dedicated to improving the use of technology to automate analyses, provide direct interfaces from subsidiary systems, and aggregate and process transactions;

    iii.    developing accounting models related to each of our business activities to train and be used by accounting staff to reduce errors in recording recurring transactions;

    iv.    developing standard reporting for each of our business units, including exception reports to assist in error detection;

    v.     establishing and documenting formal accounting policies;

    vi.    continuing its overall training efforts;

    vii.   simplifying its accounting processes; and

    viii.   establishing relationships between accounting staff and key business personnel to proactively manage the accounting implications of prospective transactions.

107.    Less than three months later, however, on September 13, 2006, MuniMae announced the need for further restatement of the Company's historical financial statements in a release entitled, "MuniMae to Restate Consolidated Financial Results," which stated, in relevant part:

MuniMae & Equity, LLC (NYSE: MMA), announced today that it will restate its previously filed consolidated financial statements for the three month period ended March 31, 2006 as well as for the years ended December 31, 2005, 2004, and 2003. The restatement will not impact cash available for distribution, a supplemental non-GAAP performance measure reported by the Company in addition to net earnings, in any period, or the Company's ability

to pay future distributions to common shareholders.

In connection with previously announced efforts to improve its financial reporting processes, the Company identified the need to record adjustments for errors related primarily to three main areas: accounting for syndication fees, accounting for equity commitments related to affordable housing projects and the classification of cash received from investors in guaranteed tax credit equity funds. These items are more fully discussed in a Form 8-K that was filed by the Company today.

108.   On October 26, 2006, MuniMae filed with the SEC a Form 8-K announcing that on October 20, 2006, the Company had dismissed its independent registered public accounting firm PricewaterhouseCoopers LLP.

109.   On November 16, 2006, the Company issued a press release announcing that one of its subsidiaries, MuniMae TE Bond Subsidiary, LLC ("TEBS"), had completed a $192 million fixed rate bond securitization with a private placement of Class A TEBS Tax-Exempt Multifamily Housing Certificates, Series 2006A. The press release stated that the "net proceeds will be used to refinance $177 million of floating rate TEBS senior obligations and originate investments in tax exempt revenue bonds."

110.   On December 8, 2006, MuniMae filed with the SEC a Form 12b-25, which stated in relevant part:

As described in the registrant's Current Report on Form 8-K filed on September 13, 2006 (the "Current Report"), on September 7, 2006 the Audit Committee of the Board of Directors of the registrant concluded, based upon the recommendation of its management, that certain previously filed financial statements covering the fiscal years ended December 31, 2005, 2004 and 2003, and the quarterly periods within those years, and the quarterly period ended March 31, 2006 (the "Affected Financial Statements") should be restated to reflect adjustments to correct certain errors therein and summarized in the Current Report.

As a result of the dedication of significant management resources to these efforts, the registrant was unable to file its Quarterly Report on Form 10-Q for the quarter ended September 30, 2006 within the prescribed time period.

Management has previously determined that as of December 31, 2005 the registrant's internal controls over financial reporting were not effective due to the material weaknesses disclosed within item 9A of the registrant's Annual Report on Form 10-K for the year ended December 31, 2005. In connection with the restatement of the Affected Financial Statements,

management has evaluated the impact of these accounting errors on the effectiveness of the registrant's internal controls over financial reporting as of December 31, 2005 and determined that the misapplications of generally accepted accounting principles noted in the Current Report were further instances of certain of the material weaknesses previously identified as of December 31, 2005.

In addition, since the filing of the registrant's Quarterly Report on Form 10-Q for the quarter ended March 31, 2006, the registrant has identified an additional material weakness in its internal control over financial reporting. The registrant did not maintain effective policies and procedures over the accounting *for certain of its employee benefits*. Specifically, it did not properly accrue annual carryover vacation benefits due to its employees or vacation benefits due to its employees upon voluntary termination. In addition, the registrant erroneously calculated compensation expense related to deferred shares granted in 2006. *This control deficiency resulted in a misstatement of employee benefit costs and more than a remote likelihood that a material misstatement of the registrant's annual or interim financial statements would not be prevented or detected. Accordingly, management of the registrant has concluded that this control deficiency constitutes a material weakness.*  (Emphasis added).

111.    On May 4, 2007, MuniMae filed with the SEC a Form 12b-25 disclosing additional material weaknesses in the Company's internal controls.   Specifically, the Company stated, in relevant part:

Management has previously determined that as of December 31, 2005 the registrant's internal controls over financial reporting were not effective due to the material weaknesses disclosed within item 9A of the registrant's Annual Report on Form 10-K for the year ended December 31, 2005. In connection with the restatement of the Affected Financial Statements, management has evaluated the impact of these accounting errors on the effectiveness of the registrant's internal controls over financial reporting as of December 31, 2005 and determined that the misapplications of generally accepted accounting principles noted in the Current Report were further instances of certain of the material weaknesses previously identified as of December 31, 2005.

In addition to these material weaknesses and the material weakness described in the registrant's Form 12b-25 with respect to its Quarterly Report on Form 10-Q for the quarter ended September 30, 2006 (related to policies and procedures over the accounting for certain of its employee benefits), since the date of the filing of that Form 12b-25 *the registrant has identified additional material weaknesses in its internal control over financial reporting*:

1.    *The registrant did not maintain effective policies and procedures over the accounting for accrued expenses*. Specifically, it did not properly accrue professional services costs in the period in which the services were rendered. In addition, the registrant erroneously accrued costs for legal contingencies for which the risk of loss was not both probable and reasonably estimable;

2.   ***The registrant did not maintain sufficient preventive internal controls to ensure that it complied with its contractual agreements***; and

3.   ***The registrant did not maintain effective policies and procedures over the identification of entities requiring consolidation***. Specifically, we have determined that we are required to consolidate certain entities not previously consolidated. The determination to consolidate these entities, primarily tax credit equity funds of which we are the sponsor, results from our conclusion that we are the primary beneficiary of a variable interest entity, or, we are the general partner of a partnership and we do not overcome the presumption of control of the partnership since the limited partners have neither kick-out rights nor substantive participating rights.

These control deficiencies resulted in misstatements of our financial statements and more than a remote likelihood that a material misstatement of the registrant's annual or interim financial statements would not be prevented or detected. Accordingly, management of the registrant has concluded that these control deficiencies constitute material weaknesses.

*In addition, the registrant has identified additional errors in the accounting for the tax credit equity business, which was previously disclosed as a material weakness within item 9A of the registrant's Annual Report on Form 10-K for the year ended December 31, 2005. The registrant did not maintain effective policies and procedures over the accounting for tax credit equity fund start-up costs and costs of acquiring investments in partnerships. Specifically, it:*

- *Did not expense start-up costs as incurred as required by AICPA Statement of Position 98-5, Reporting on the Costs of Start-up Activities; and*

- *Incorrectly classified costs of acquiring investments in partnerships developing affordable housing projects as required by Statement of Financial Accounting Standards No. 67, Accounting for Costs and Initial Rental Operations of Real Estate Projects.*

(Emphasis added).

The registrant is developing remediation plans to address these material weaknesses

112.   On the same day, the Company issued a press release entitled "MuniMae Announces 41st Consecutive Increase in Quarterly Distribution," which stated, in relevant part:

MuniMae & Equity, LLC ("MuniMae" or "the Company," NYSE:MMA) **announced that yesterday its Board of Directors declared a distribution of $0.5175 per common share payable on May 23, 2007 to shareholders of record as of May 10, 2007. This represents a 4% increase over the distribution for the comparable period last year. On an annualized basis, the distribution equates to $2.07 per common share and represents a 7.5% yield based**

*on the May 3, 2007 closing price of $27.56 per share*. Although a portion of the income allocated to shareholders may qualify for exemption from Federal income taxes, the stated yield does not reflect potentially higher net returns investors may realize compared with other investments. The Company also confirmed that assuming it is able to execute its capital plan and the business performs in accordance with management's plans, the Company will continue with its quarterly distribution policy. In July or August 2007, the Company intends to provide a mid-year review of its investment originations as compared to the first half of 2006. *Michael L. Falcone, Chief Executive Officer stated, "Our business is performing well. MMA Financial continues to be widely recognized as a leader in affordable housing finance, and we are encouraged by the prospects from MMA Realty Capital, and longer-term, our new business initiatives. We are pleased to be able to increase our cash distribution to shareholders and are very proud of our more than 10 year history of consistent growth in quarterly cash distributions."*

The Company also announced updated information on its ongoing efforts to complete the restatement of its previously filed consolidated financial statements as well as its 2006 consolidated financial statements. The Company has prioritized its restatement efforts by initially focusing its efforts on completing the audited financial statements of two key subsidiaries, MuniMae TE Bond Subsidiary, LLC ("TE Bond Sub") and MMA Mortgage Investment Corporation ("MMIC"). Completing these subsidiary level financial statements facilitates the Company's access to sources of capital and its ability to continue to originate mortgage loans that are ultimately sold to government-sponsored enterprises, such as the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"). The Company currently expects that the audited financial statements of TE Bond Sub and MMIC will be completed during the second quarter of 2007.

*As a result of prioritizing the completion of these subsidiary level audited financial statements, the need to consolidate the majority of the low income housing tax credit equity funds in which it holds interests, and its ongoing restatement efforts, the Company currently expects to file its 2006 annual report on Form 10-K on or before November 30, 2007. As the Company's restatement effort has progressed, additional material weaknesses in its controls over financial reporting have been identified. Consistent with previously identified matters, the Company is developing and implementing remediation plans to address these weaknesses. The Company has met with all its lenders to update them on its progress and current expectations. Further, the Company has obtained waivers from all its lenders which provide for an extension for submitting the 2006 Form 10-K by November 30, 2007, and it is currently in compliance with all of its debt covenants.*

Since the Company did not file its 2006 annual report on Form 10K in a timely fashion, the Company was notified by the New York Stock Exchange ("NYSE") that the NYSE would monitor the Company's filing status for a period of six months from the due date of the 10-K. For companies that are unable to file their annual reports within six months from the required due date, the NYSE may, in its sole discretion, allow the company's securities to trade for up to an additional six month period. Management of the Company met with representatives of the NYSE to provide an update on the progress of its restatement efforts and current expectations for completion. The Company informed the NYSE that it expects to formally request an extension from the NYSE to continue listing its common shares beyond September 1, 2007 once the six month period commencing on the due date for the annual report has elapsed, however, there can be no assurances that such extension will be granted. Management

plans to update its lenders and the NYSE on a regular basis as it makes progress in its restatement efforts. ***The Company continues to cooperate fully with the Securities and Exchange Commission in connection with its non-public, informal inquiry.***

(Emphasis added).

113.    On July 10, 2007, MuniMae announced the resignation of the Company's Chief Financial Officer, Melanie Lundquist, issuing a press release entitled "MuniMae Announced Organizational Changes," which stated in relevant part:

> July 10, 2007, MuniMae & Equity, LLC ("MuniMae" or the "Company," NYSE: MMA) today announced that Charles M. Pinckney has been named Chief Operating Officer and that it has accepted the resignation of Melanie M. Lundquist, the Company's Chief Financial Officer. Mr. Pinckney will also serve as interim Chief Financial Officer while the Company searches for a replacement for Ms. Lundquist. The Company today also announced the completion of the audited financial statements for MuniMae TE Bond Subsidiary, LLC ("TE Bond Sub"), the subsidiary that holds the majority of the Company's tax-exempt bond investments.

> Ms. Lundquist, who joined the Company in 2005 from The Rouse Company, has accepted an offer to become the Chief Financial Officer of Haven Custom Homes, Inc. Michael L. Falcone, the Company's Chief Executive Officer and President, commented, "We are grateful to Melanie for all of her leadership, including her work that led to the completion of the TE Bond Sub financial statements. We remain strongly committed to completing the restatement efforts, and the Company will continue to devote itself to bringing these efforts to fruition." He added, "We are excited that Charlie has stepped into an expanded role, and we anticipate that he will bring a wealth of experience, leadership and focus to the Company's operations. In the short term, he will be focused on bringing the Company's restatement efforts to conclusion."
> * * *
> The Company today also announced that it has engaged Navigant Consulting, Inc. to support Mr. Pinckney's efforts to complete the Company's restatement efforts. Mr. Falcone added, "The Company is fortunate to have engaged the services of the Navigant team. Their track record with complex accounting and restatement issues is an invaluable asset and, coupled with Charlie's skilled leadership and operational expertise, we believe that we have the pieces in place to complete our efforts and emerge a stronger enterprise."

> As previously disclosed, the Company has focused its efforts on completing the audited financial statements of TE Bond Sub and another of its subsidiaries, MMA Mortgage Investment Corporation ("MMIC"), as it simultaneously continues its efforts to complete the restatement of its financial statements and finalize its 2006 annual report. Mr. Falcone stated, "Completing the TE Bond Sub audit is a very important step along the road toward the completion of our restatement efforts and the filing of our 2006 annual report. As a result of non-cash restatement adjustments, shareholders' equity in TE Bond Sub (whose common stock is 100% owned by the Company) as of December 31, 2005 was approximately $52.9 million higher than the $272.5 million previously reported and net income for TE Bond Sub

for the year then ended was approximately $11.9 million lower than the $37.5 million previously reported."

These restatement adjustments consist largely of corrections for errors related to the Company's estimation of the fair value of bonds (which increased shareholders' equity in TE Bond Sub by approximately $66.9 million as of December 31, 2005) and the Company's assessment of bond impairments (which decreased shareholders' equity in TE Bond Sub by approximately $14.1 million as of December 31, 2005), for the net increase of $52.9 million mentioned above, including certain other adjustments. The effects of these restatement adjustments are not necessarily indicative of the effects of other restatement adjustments that may be required in the Company's financial statements.

Certain other subsidiary level audited financial statements, specifically some of those for funds the Company manages on behalf of others, have also been completed and provided to the appropriate investors.

The Company is continuing to work towards completing the audited financial statements of MMIC and has obtained extensions through August 31, 2007 from the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac), each of which require audited MMIC financial statements. In addition, the Company has obtained waivers through August 31, 2007 from those of its lenders that require delivery of audited financial statements for MMIC, and it is currently in compliance with all of its debt covenants.

The Company reiterated its intent to provide a mid-year review of the Company's performance in late July or August. At that time, the Company also expects to provide more information on the timing of the completion of MMIC's financial statements.

The Company today also announced information about material weaknesses in its internal controls over financial reporting that were identified by management during the preparation of the financial statements of TE Bond Sub and MMIC. Details about these material weaknesses, and others that have been identified as the Company's restatement efforts have progressed, are included in a Current Report on Form 8-K filed by the Company today.

114.     Then on August 2, 2007, certain of the Individual Defendants conducted a

conference call.  The Company attached  prepared remarks for this conference call, which had no

question and answer session, to a Form 8-K filed with the SEC on August 7, 2007 and stated in

relevant part:

***Mike Falcone***:

Good afternoon everyone, and welcome. We are glad you are able to join us today. With me on the call today are Charlie Pinckney, our COO and interim CFO, Gary Mentesana (who runs our affordable housing business), Earl Cole (who is our chief credit officer and interim head of our commercial real estate finance business), Matt Cheney (who runs our renewable energy

finance business) and Jenny Netzer (who is in charge of new business development).

Before we get into the "meat" of the call, I would like to make two introductory points. First, there has clearly been a lot of trepidation in the financial markets about recent developments in the sub-prime mortgage lending markets and their potential effects on the broader markets, especially the CMBS market. *Let me restate that the company is not engaged in sub-prime or any other single family mortgage lending activities. In fact, the debt and equity financings arranged by the company in the housing sector are strictly for multi-family rental properties, and our outlook for the multi-family rental sector is positive.* Given recent weakness in the CMBS and CDO world, I also want to make clear that we do not own any CMBS or CDO securities, and, in fact, we believe that weakness in those markets generally creates a competitive advantage for us. Our business is to arrange debt and equity financing for commercial real estate, affordable rental housing and clean energy projects. *As you'll note when we describe our production for the first half of 2007, we don't know of any business development that would give rise to the current decline in our stock price.* We assume but of course we can't be certain that we are being treated like a subprime lender or CMBS investor, which we most definitely are not.

Second, we should be clear what this call is, or rather is not. This is not an earnings call. Because of our pending restatement we cannot speak to earnings, only production. In that regard, we want to assure you that we are very focused on getting the restatement successfully completed.

*As we have stated previously, assuming we can continue to execute on our capital plan and our business continues to perform as we expect, management plans to ask the Board to maintain the current dividend policy, and in that regard, I am very pleased to announce that yesterday, our Board of Directors declared a distribution of $0.5225 per common share payable on August 22, 2007 to shareholders of record on August 8, 2007. This represents an approximately 4% increase over the distribution for the comparable period last year. This distribution represents the company's 42nd consecutive increase in its quarterly distribution. We are pleased to be able to increase our cash distribution to shareholders and are very proud of our more than 10 year history of consistent growth in quarterly cash distributions.*

I will now move to a review of the highlights of our performance for the first half of 2007, and after that Charlie will speak briefly about his new role with the company. As you may be aware, on July 10, 2007 the company announced that Charlie had been named chief operating officer and interim chief financial officer. Following Charlie's presentation, Gary, Earl, Jenny and Matt will each speak briefly about the significant developments during the first half of the year within their respective business units.

Overall our production for the first half of the year exceeded our production for the first half of 2006. During the first half of 2006, the dollar value of our total production across all business lines was approximately $1.4 billion. During the first half of 2007, the dollar value of our total production across all business lines (which we'll break down in greater detail later) was approximately $1.9 billion, including approximately $290 million in production related to an acquisition during the period. Although production in our affordable housing business during

the first half of 2007 was down against last year, performance in our market rate business and our new business initiatives was up in comparison to last year, and Gary, Earl, Jenny and Matt will drill down further on 2007 performance metrics in a moment. Margins have varied among the business units, but across the company they have held up. We have seen compression in some product lines but expansion in others.

\* \* \*

**Charlie Pinckney**:
\* \* \*
To date, the transition to my new role has been smooth. Melanie Lundquist, formerly our CFO, agreed to stay on for a transition period, and she has been helpful both to me over the past few weeks and the Navigant team throughout their engagement in aiding with the transition. As I mentioned, Navigant Consulting offers a wealth of resources to our ongoing restatement efforts as well as a fresh perspective on the challenges confronting the company's corporate accounting and finance department. We feel that the recent and relevant restatement experience of the principals who are working with us (including working on both Fannie Mae's and Freddie Mac's restatement efforts) makes them uniquely qualified to assist us. In addition, we have incentives in place for key senior accounting staff designed to encourage their dedication through the completion of the restatement process.

*Although we have previously announced our intention to complete our restatement efforts in time for filing our annual report by November 30, 2007, and we continue to work towards this goal, we believe that there is a significant risk that we won't be able to make this date. We have asked Navigant Consulting to work toward the November 30 date, but they are not far enough along in their work for us to say with certainty what the exact date will be. What we can say is that we are devoting as many resources as we can to getting this done as soon as we can, and we certainly expect to finish our efforts within the first two months of 2008.*
\* \* \*
**Gary Mentesana**:

Thanks, Charlie. As you may know, MMA Financial is responsible for all of the company's affordable housing finance, tax credit equity, tax-exempt bonds and taxable lending operations. We generate revenues through the origination, syndication, financing and management of debt and equity investments secured primarily by affordable multifamily housing projects.

During the first six months of 2007, MMA Financial's total production, including both debt originations and equity placements, was $680 million, down somewhat from total production of $821 million during the same period in 2006:

- Debt originations during the first half of 2007 totaled $138 million (which included $31 million in private placement bonds, $14 million in taxable construction loans and $93 million in taxable agency loans), as compared to approximately $170 million during the first half of 2006 (which included $144 million in private placement bonds, $5 million in taxable construction loans and $21 million in taxable agency loans).

- LIHTC equity syndicated during the first half of 2007 totaled $318 million from 12 different capital partners. Of this amount, $183 million was syndicated through our guaranteed program. During the first half of 2006, approximately $481 million of equity was syndicated from 10 different capital partners, none of which was through our guaranteed program.

- The remaining $224 million of production through June 30 consisted of debt acquired within the Tender Option Bond (TOB) program as compared to $169 million during the same period in 2006 (I should note that we began this program in April of 2006).

As compared to prior periods, for the six months ended June 30, 2007 the debt business experienced greater competition resulting in lower origination fees and spreads to our cost of capital. However, we are benefiting from additional fees through a greater percentage of equity syndicated through our guaranteed program.

MMA Financial's production pipeline for the remainder of 2007 appears to be strong. Although we will continue to monitor the recent events within the capital markets that have the ability to impact our future production, we currently expect that the amount of equity we will syndicate this year will be in line with the amount syndicated in 2006 while the amount of debt that we will originate this year will materially exceed the volume originated in 2006.

*As for credit quality within our $1.5 billion private placement bond portfolio, we are seeing some meaningful improvement. Debt service coverage for the stabilized, fixed rate multifamily bonds in the portfolio remains stable at 1.14 as of June 30, 2007 (which is the same as the debt service coverage as of June 30, 2006). However, by original issue amount, bonds in default fell to 12% of the portfolio at June 30, 2007, down from 16% of the portfolio at June 30, 2006, and the number of bonds on our watch list fell to 14% of the portfolio at June 30, 2007, down from 19% of the portfolio at June 30, 2006.*

You've heard Mike and Charlie talk about our continuing restatement efforts, and in that regard the MMA Financial business unit has a large success to report in that area. As you may know, on July 10th the company announced that it had completed the audited financial statements for MuniMae TE Bond Subsidiary, the subsidiary that holds the majority of the Company's tax-exempt bond investments. Completing the TE Bond Sub audit is an important step along the road toward the completion of our restatement efforts and the filing of our 2006 annual report.

As a result of non-cash restatement adjustments, shareholders' equity in TE Bond Sub (whose common stock is 100% owned by the Company) as of December 31, 2005 was approximately $52.9 million higher than the $272.5 million previously reported and GAAP net income for TE Bond Sub for the year then ended was approximately $11.9 million lower than the $37.5 million previously reported. These restatement adjustments consist largely of corrections for errors related to the Company's estimation of the fair value of bonds and the Company's assessment of bond impairments, including certain other adjustments. The effects of these restatement adjustments are not necessarily indicative of the effects of other restatement adjustments that may be required in the Company's financial statements, but they offer some clarity on the impact of the restatement on TE Bond Sub's results.

\* \* \*

**Earl Cole**:

Thanks, Gary. As Mike mentioned earlier, I am the Interim Head of MMA Realty Capital. I am not a stranger to MRC, as the head of risk management for the company, I have known and worked closely with the management of MRC for some time. I'm glad to have been invited to play a more direct role with this group.

MRC manages and directs the market rate real estate transactions pursued by MuniMae. We generally define these transactions as those that are not tax advantaged and do not generate tax credits or tax exempt income. We conduct the majority of this activity through two primary business units of MRC, the merchant banking and agency operations.

The merchant banking unit pursues debt and equity transactions on behalf of our investment partners as well as for our own account. In situations where we originate for third parties, we also act as asset managers, generating recurring income. These transactions cover a wide variety of investment types, from traditional commercial mortgages to B note and mezzanine debt investments. Underlying collateral can be virtually any commercial real estate type, from industrial and retail properties to office and multifamily projects (but not single-family home mortgages and not CMBS or CDO securities).

The other major MRC business line, our agency business, manages all of the market rate multi-family project debt that we originate and underwrite for sale to the government sponsored entities, Fannie Mae, Freddie Mac and Ginnie Mae. We make these loans and then resell them to these agencies after we ensure that they meet all necessary requirements. After the sale, we remain engaged as the loan servicer, for which we collect a fee. Again, these loans do not include single-family home mortgages

We are pleased with MRC's production thus far in 2007, which results in part from decisions made earlier regarding how we wanted to move forward as a real estate investment firm. In late 2006 we discussed ways to better position MRC in response to the increased volatility in some US real estate markets; we decided that we needed to reduce our reliance on transaction based income and establish a critical mass in our asset management and servicing businesses. Accordingly, we began to shift our production focus in order to achieve a more efficient delivery of assets to our investment partners.

To do this, we began to emphasize higher quality assets that would satisfy the investment criteria of our partners. This move was designed to both manage credit risk and to build our recurring income. As a result, our third party origination has grown, we have moved away from certain assets types and asset management income will become more important over time.

Along with this targeted production focus, in 2007 we also established new investment funds and expanded our base of investment partners. These new resources allowed us to support strong Q1 and Q2 production.

MRC had production of just over $1 billion for the first six months of the year compared to

approximately $606 million in the first half of 2006. Production was generated through a diverse set of products, and was geographically distributed in 14 states, representing practically all regions of the country. Of this total, $670 million in production came from our merchant banking business (including $290 million in production resulting from business lines acquired in the first quarter) and $350 million from the agency business. Together, this production represented an increase of 68% above the production seen in the first half of 2006 (or approximately 21% excluding growth in production resulting from acquisitions). With respect to margins, compared to the same period last year margins seem to be holding up.

Merchant banking saw strong results in third party originations, as assets originated on behalf of other investors totaled $364 million for the first two quarters, an increase of 135% over 2006. This offset a decline in some other asset types, most notably land funding, where we purposely decided to reduce our risk and our exposure. As a result, land related debt origination declined by 63% to $90 million when compared to the first two quarters of 2006. We expect this shift to benefit us from a credit risk perspective, and allow us to rely on more predictable asset classes and income sources.

The agency business also had a strong start to 2007, with production up by 196% over 2006 levels to $350 million. This resulted as deliveries to Fannie, Freddie and Ginnie were up in almost every category. We achieved especially strong performances in originating and delivering taxable debt supporting stabilized properties to the agencies.

The high levels of production in our merchant banking unit and our agency business would not be possible without the support of our capital partners. These include banks which help us to finance our investments through lines of credit and other debt facilities and our investment partners, who purchase assets from us or fund them directly after we originate them.

Thus far in 2007 we have worked hard to increase the capacity and flexibility of our capital sources. In Q1 2007, we launched a new investment vehicle with a foreign pension fund that is already developing into one of our most promising new capital sources. Over the last seven months this fund has grown to become one of our most important sources of capital; by the end of this month, we expect to have delivered over $240 million of assets to this vehicle.

Additionally, during Q1 and Q2 we either renewed or expanded several credit facilities with our bank partners to support MRC activities.

In summary, the past two quarters have seen accelerating production at MRC in multiple product types with an expansion of our capital sources as well. Things have gone well and I am personally excited to be a part of this operation. This would not have been possible without the hard work of our employees and the support of our capital partners. We would like to say thank you to both.

I'd now like to turn the presentation over to Matt for an update on the performance of our renewable energy finance business.

\* \* \*

**Mike Falcone**:

*As I said earlier, we are pleased with our production performance so far in 2007. As in most years, the second half of the year looks to be a busier period for us than the first half*. Our success has been in large measure due to the hard work of our employees, their dedication to our values of integrity, innovation and service, and the strong support we have received from our capital partners and developer clients. We will continue to work hard to make this business grow and prosper, and we appreciate deeply your support as shareholders.

*We are obviously disappointed with our failings around our financial reporting, but we are committed to making our business stronger through the marriage of entrepreneurial spirit and strong financial controls. Again, I'd like to assure you that we are very focused on getting the restatement successfully completed.*

Additionally, although we are pleased to have been able to announce at the beginning of July our success in completing the financial statements for TE Bond Sub, we have not yet completed work on the financial statements for MMA Mortgage Investment Corporation, our commercial lending subsidiary, also known as MMIC. We are continuing to work to complete these efforts as well. The financial statements for this entity are fairly closely tied to the overall restatement efforts in the rest of the company and completing MMIC will depend to some extent on our overall timeline.

*Also, as we have previously reported, during our work on the restatement we have identified a number of weaknesses in our internal controls over financial reporting. Although I won't list them now, you can read about them in our previously filed reports, including the current report that we filed at the beginning of July. As we continue our hard work on the restatement, we are formulating our remediation plans for these issues simultaneously with the goal of emerging from these efforts as a stronger enterprise.*

As I mentioned earlier, I want to be completely clear that the company is not engaged in sub-prime or any other single family mortgage lending activities. The debt and equity financings that we arrange in the housing sector are strictly for multi-family rental properties, and our outlook for the multi-family rental sector is positive. And we do not own any CMBS or CDO securities. *We are pleased to have been able to announce our 42nd consecutive increase in the company's quarterly distribution, and again we appreciate your support.*

(Emphasis added).

115.    On August 31, 2007, in a supplement to the Company's August 2, 2007 conference call, MuniMae filed with the SEC a Form 8-K which answered questions received by the Company from shareholders following the August 2, 2007 call.  Specifically, the Defendants caused the Company to make the following statements:

Q: Do you have exposure to the subprime lending market?

A: The company does not originate subprime or any other single family mortgages. The company does invest in highly rated (AA- or better by S&P) tax exempt bonds and interests in tax exempt bonds issued by state housing agencies to fund single family mortgage programs sponsored by the state agencies. These bonds are typically general obligations of the state housing agencies, which do not have taxing power but are typically rated entities and many of their bonds are insured by nationally recognized insurers of municipal bonds. The offering materials provided by the state agencies indicate that the single family loans they make with the proceeds of these bonds are long term fixed rate loans.

*Q: Does the company have exposure to the CDO market?*

*A: We said on our August 2, 2007 conference call that we do not own any CDO's. We do own two investments which are not described as CDO's in their offering materials, but which have many of the characteristics of a CDO. The debt instruments underlying these two investments are tax exempt revenue bonds issued by governmental agencies to finance a variety of government programs.* The instruments we own were rated AAA at issuance and we have not been notified of any rating change. These two investments comprise less than 1% of our assets.

The current market volatility may create buying opportunities for us and these opportunities may include CDO like instruments. We expect that any new investments will typically be tax exempt highly rated government agency issues, including revenue bonds and interests in revenue bonds, but we would not rule out any opportunity we perceive to be unusually attractive.

Q: During the conference call, you mentioned that the bond default rate fell to 12% from 16% (of original issue amount) and that the watchlist bonds fell to 14% from 19% (also of original issue amount). Are watchlist bonds inclusive of the 12% that are already in default, or are 26% of the bond portfolio either in default or on watchlist?

A: Watchlist bonds (14% of original issue amount) are inclusive of the bonds in default (12% of original issue amount),  not in addition to watchlist bonds.

Q: Can you provide a historical perspective on the longer term trend of these defaults?

A: As of the fourth quarter of 2004, defaults in the bond portfolio totaled approximately 12% of the portfolio. Defaults peaked at 16% of the portfolio in the second quarter of 2006 and were 12% as of the end of the second quarter of 2007.

*Q: How does the company view the credit risk and liquidity risk exposure on its private placement bond portfolio?*

A: *The credit risk associated with the company's private placement bond is largely dependent upon the performance of the each underlying multi-family housing property. The recent performance of this portfolio has been stable and improving modestly.*

*Weighted average debt service coverage for the non-defaulted, stabilized portfolio remains at 1.14 as of June 30, 2007, consistent with June 30, 2006. However, bonds in default and on our watch list, both in terms of number and as a percentage of the total portfolio, improved as of June 30, 2007 compared to one year earlier.*

*In addition, the composition of the bonds in the private placement portfolio has shifted over time to be more heavily weighted towards bonds associated tax credit equity. We believe these bonds to be of higher credit quality than 501(c)(3) or 80/20 bonds. As a result, we began to reduce our origination of 501(c)(3) bonds in 2001, and stopped altogether in 2003 Over time we also shifted toward bond deals in which there was tax credit equity. As a result, whereas at the end of 2000, 17% of our bonds were associated with tax credit equity transactions at June 30, 2007, 72% of our bonds were associated with tax credit equity transactions.*

Q: During the call you did not discuss occupancy trends in the tax exempt bond portfolio. Could you provide that information

A: The weighted occupancy rate in the company's tax exempt bond portfolio as of the end of the second quarter of 2007 was 91.8% compared with 91.5% as of the same date a year earlier.

Q: Does the recent market volatility affect the Company's business?

A: While we are not active lenders in the sectors that have given rise to recent market volatility, such market volatility can have unforeseen or unexpected effects in the financial markets generally, and we, like others, could well be affected in ways we cannot predict. For example, volatility in one sector can lead to rising interest rate spreads in other sectors. Rising spreads typically cause the value of our fixed rate assets to decline. This can lead to margin calls on fixed rate assets we have financed, and in fact we have received, and met, margin calls associated with some of our financed assets, and we could receive additional margin calls. Another example is market liquidity. If banks and other capital providers decide to withdraw or reprice capital in the marketplace, our borrowing costs could rise or capital might become unavailable.

(Emphasis added).

116.    On September 4, 2007, MuniMae filed with the SEC a Form 8-K, which disclosed, among other things, that the Company had received an extension from the NYSE through March 3, 2008 to file its Annual Report on Form 10-K for the 2006 fiscal year, and as such the Company's stock would continue to be listed on the exchange.

117.    Over the next few months, MuniMae announced several extensions of credit arrangements with lenders in which, as a result of the Company's delinquency in releasing its

financial statements, the Company was forced to assume additional obligations, including increases to the Company's interest rate for borrowed funds, provision of the additional collateral to secure existing obligations and the acceleration of repayment of the Company's outstanding debt.

118.    On November 8, 2007, certain of the Individual Defendants conducted a conference call. The prepared remarks for this conference call, which had no question and answer session, were attached to a Form 8-K filed with the SEC on November 8, 2007 and state, in relevant part:

> **Mike Falcone**:
> * * *
>
> Before we get into the review of each of our businesses, I would like to make three initial points. First, as the financial world continues to wrestle with a variety of factors including the ultimate impact on credit and financial markets of the ongoing repricing of risk and other economy-wide concerns, our businesses have been impacted in a variety of ways. Some of these are predictable, others are not. We are keeping a very close eye on both financial and real estate markets as we plan for 2008 and respond to the shifting environment in the fourth quarter. For us, the fourth quarter is usually a particularly busy and profitable quarter, as we typically generate roughly 40 – 60% of our annual revenue in the fourth quarter. Hence we must monitor the ongoing credit crisis very closely. As our team will describe in more detail shortly, ***we are pleased with the levels of production across all of our business units through September 30 and remain positive in our outlook for the commercial real estate, affordable rental housing and clean energy sectors our businesses operate in.*** Nonetheless, it is very difficult for us to predict how the broader issues in the economy will impact those sectors.
>
> Second, I should simply say again we are not in the single family lending business, nor in the subprime lending business.
>
> Third, I want to remind everyone what this call is, or rather is not. This is not an earnings call. Because of our pending restatement we cannot speak to earnings, only production. In that regard, we want to assure you that we are very focused on getting the restatement successfully completed. As an additional disclaimer regarding forward looking statements, the work that is being done to restate our financial statements could affect some of what we currently expect, as could a continuation or worsening of the current conditions in the capital markets.
>
> *As we have stated previously, assuming we can continue to execute on our capital plan and our business continues to perform as we expect, management plans to ask the Board to maintain the current dividend policy, and in that regard, I am very pleased to reiterate what was previously announced that on November 1, our Board of Directors declared a distribution of $0.5250 per common share payable on November 21, 2007 to shareholders of record on November 9, 2007. This represents a $0.0175 per share or 3.45% increase over the distribution for the comparable period last year and is our 43rd consecutive increase in the quarterly distribution.* However, due to the costs being incurred by the

Company in connection with the restatement the sum total of all of the dividends declared so far in 2007 represent a payout ratio in excess of the Company's net cash from operations through Q3 of this year. The final payout ratio for 2007 will, of course, not be known until year end but it is possible that the dividend payout ratio for the full fiscal year 2007 may exceed 100% of the Company's net cash from operations due to the costs being incurred by the Company from the restatement. Subject to my previous comments about uncertainty in markets today, we currently expect our business units to perform in the aggregate in line with our 2007 budgets. We hope upon completion of the restatement and normalization of our financial reporting situation to return to a more normal cost environment and to significantly improve our payout ratio. We are very proud of our more than 10 year history of consistent growth in cash distributions.

I will now move to a review of the highlights of our performance for the first three quarters of 2007, and after that Charlie will speak about our ongoing restatement effort. Following Charlie's presentation, Gary, Earl, Matt and Jenny will each speak briefly about the significant developments during the first three quarters of the year within their respective business units.

Overall our production for the first three quarters of the year exceeded our production for the first three quarters of 2006 . During the first three quarters of 2007, the dollar value of our total production across all business lines (which we'll break down in greater detail later) was approximately $2.8 billion, including approximately $483 million in production related to a business acquired during the period. During the first three quarters of 2006, the dollar value of our total production across all business lines was approximately $2.2 billion. Production in our affordable housing, commercial real estate finance and renewable energy finance businesses was up in comparison to last year, and Gary, Earl, Matt and Jenny will drill down further on 2007 performance metrics in a moment.

We are in constant contact with our capital partners and we have needed to ask them for extensions of deadlines. We expect this dialogue will continue until the restatement is completed. Some of our capital partners have granted waivers extending our November 30 audited financial statement delivery deadline and we are working with the others as deadlines approach. We have also had discussions with our capital partners about the impact of the broader credit market changes on our financing structures and continue to evaluate solutions to those issues as they arise. As we have mentioned in previous calls, there can be no assurance as to their future decisions.

The widening of spreads and other forces at work in the capital markets could have an impact on the valuation of assets on our balance sheet and we will be monitoring our assets accordingly. ***Fortunately, as Earl will discuss, we chose at the end of last year to reduce our balance sheet holdings in our MMA Realty Capital group and in MMA Financial, so far, municipal bonds of the type in which we invest seem to be holding up in value fairly well***. We cannot of course predict what may happen in the future.

\* \* \*

***Charlie Pinckney***:

Thanks, Mike. I want to take a few minutes to provide everyone with some reference points on our restatement progress as well as to provide an update on our expectations around the timing of filing our restated financials.

I have been working closely with the team from Navigant Consulting since our last update call and continue to believe that we are fortunate to have them on board to help us complete our restatement. Their track record with complex accounting and restatement issues continues to be an invaluable asset.

As Mike said, the major new development is that David Kay from Navigant has joined us as our new CFO. Dave brings a wealth of experience to the position and comes already knowing our company as a result of his time devoted to the restatement. While I will stay involved with the restatement until it is completed, Dave's arrival will eventually allow me to focus more time and effort on our overall operations. Prior to joining Navigant, where he served as co-leader of the Financial Services Practice, Dave was CFO at J.E. Robert Companies, a commercial finance and fund management company with operations across North America and Europe. Dave joined J.E. Robert after a 20 plus year career at Arthur Andersen where he ended his tenure as Managing Partner of the Mid-Atlantic Accounting, Audit and Risk Management Services.

Also joining us from Navigant is Lisa Roberts who will be our Senior Vice President, Business Unit Financial Operations. Lisa most recently served as a Managing Director at Navigant. Prior to joining Navigant she spent 12 years at Freddie Mac, where she ended her tenure as Vice President of Internal Financial Management.

We continue to devote significant resources to our restatement task. We have over 100 FTEs working on the restatement including company employees and consultants all working extremely hard every day to complete this process. The obvious downside to these efforts is expense. Our budget for the year did not contemplate external resources of nearly this magnitude and the cost will be very significant for this year and well into next year.

*We are devoting as many resources as we can to getting this done as soon as we can, and we continue to try hard to finish our efforts and file our 2006 10K within the first two months of 2008*.

*We remain encouraged that we are moving well toward completion of the restatement and that MMA has taken key steps to building a new finance organization that will take us to the next level as a company*.

* * *

*Gary Mentesana*:

Thanks, Charlie. As you may know, MMA Financial is responsible for all of the company's affordable housing finance, tax credit equity, tax-exempt bonds and taxable lending operations. We generate revenues through the origination, syndication, financing and management of debt and equity investments secured primarily by affordable multifamily housing projects.

During the first nine months of 2007, MMA Financial's total production, including both debt originations and equity placements, was $977 million, up somewhat from total production of $946 million during the same period in 2006:

- Debt originations during the period in 2007 totaled $355 million (which included $197 million in private placement bonds, $26 million in taxable construction loans and $132 million in taxable agency loans), as compared to approximately $247 million during the same period in 2006 (which included $182 million in private placement bonds, $27 million in taxable construction loans and $38 million in taxable agency loans).

- LIHTC equity syndications during the first nine months of 2007 totaled $398 million from 14 different capital partners. Of this amount, $183 million was syndicated through our guaranteed yield program. During the same period in 2006, approximately $481 million of equity was syndicated from 10 different capital partners, none of which was through our guaranteed program.

- The remaining $224 million of production through September 30 consisted of debt acquired within the Tender Option Bond (TOB) program as compared to $218 million during the same period in 2006 (however I should note that we began this program in April of 2006).

As I noted on our prior call, compared to prior periods, the debt business has experienced greater competition in 2007 resulting in lower origination fees and lower spreads over our cost of capital. However, we are benefiting from additional fees because a greater percentage of equity is being syndicated through our guaranteed yield program.

MMA Financial's production pipeline for the remainder of 2007 appears to be strong. Although we will continue to monitor the recent events within the capital markets that have the ability to impact our future production and profitability, we currently expect that the amount of equity we will syndicate this year will approach the amount syndicated in 2006 while the amount of debt that we expect to originate this year will materially exceed the volume originated in 2006.

*As for the credit quality within our $1.7 billion private placement bond portfolio, we have seen some meaningful improvement. Debt service coverage for the stabilized, fixed rate multifamily bonds in the portfolio remains stable at 1.14 as of September 30, 2007 (which is the same as the debt service coverage as of June 30, 2007 and up from 1.13 as of September 30, 2006). However, by original issue amount, bonds in default fell to 11% of the portfolio at September 30, 2007, down from 15% of the portfolio at September 30, 2006, and the bonds on our watch list fell to 15% of the portfolio at September 30, 2007, down from 17% of the portfolio at September 30, 2006.*

* * *

***Earl Cole***:
* * *

Today I want to tell you about the role of our group within MuniMae and how things have progressed in the first three quarters of 2007. It has been a rewarding year so far as disruptions in the capital markets this summer have validated our multi-year strategy of creating multiple origination platforms with diverse partners and driving the growth of recurring income.

MRC manages and directs most of the market rate real estate transactions pursued by MuniMae. We generally define these transactions as those that are not tax advantaged and do not generate tax credits or tax exempt income.

MRC conducts the majority of this activity through two primary business units of MRC, namely the Merchant Banking and Agency operations.

The Merchant Banking unit pursues debt and equity transactions on behalf of our investment partners as well as for our own account. In almost all situations we also act as asset managers, generating recurring income. These transactions cover a wide variety of investment types, from traditional commercial mortgages to B note and mezzanine debt investments. Underlying collateral can be virtually any commercial real estate type, from industrial and retail properties to office and multi family projects.

The other major segment of MRC, the Agency business, manages the multi family project debt that we originate and underwrite for sale to the government sponsored entities: Fannie Mae, Freddie Mac and Ginnie Mae. We make these loans and then resell them to these agencies after we ensure that they meet all Agency requirements. After the sale, we remain engaged as the loan servicer, for which we collect a fee.

Beginning in 2006 we began to better position MRC to respond to potential volatility in the US real estate markets. Specifically, we decided to reduce our reliance on transaction based income and establish a critical mass of recurring income in our investment management, asset management and servicing businesses. We began to shift our distribution focus to emphasize the efficient delivery of assets to our investment partners. This move both reduced credit risk and built our recurring income. As a result, as our third party origination has grown, we have established a larger base of asset management income, which will continue to become more important over time.

Along with this targeted production and delivery focus, in early 2007 we also established new investment funds and expanded our base of investment partners. As a result, and unlike many others, we remain in the market and continue to originate and close loans.

This being said, we are not totally unaffected by the disruption in the real estate capital markets over the past few months. We have seen spreads on many transactions widen, putting pressure on the underlying deal economics and reducing the number of feasible projects that we can finance. At the same time, financing for transactions has been harder to come by, putting further pressure on our asset origination efforts.

Despite these challenges, MRC has continued to originate and close loans as we leverage our

multiple origination channels and rely on numerous financing sources, some of which remain largely unaffected by the negative market forces referred to earlier. While we have seen a shift in our origination, we are still experiencing high volumes as evidenced as follows:

MRC generated gross loan production of $1.6 billion through the third quarter of 2007. Of this total, $1.12 billion in production came from the Merchant Banking business (including $483 million from a business we acquired at the beginning of 2007) and $476 million from the Agency business. Together, this production is an increase of 29% above the production seen through the third quarter of 2006.

Merchant Banking saw especially good results in third party originations, as assets originated on behalf of other investors totaled $619 million for the first three quarters, an increase of 187% over 2006. While this year's Agency production is 17% lower than production in the first three quarters of 2006, this is offset by the acquisition we made earlier this year and increases above 2006 levels elsewhere in MRC.

This high level of production would not be possible without the support of our capital partners. These include banks — who help us finance our investments through lines of credit and other debt facilities — and our investment partners — who purchase assets from us or fund them directly after we originate them.

Thus far in 2007 we have worked hard to increase the capacity and flexibility of our capital sources. In early 2007, we launched a new investment vehicle with a foreign pension fund that is already developing into one of our most promising new capital sources. Over the last ten months this fund has grown to become one of our most important sources of capital; by the end of this October, we expect to have delivered over $327 million in assets to this fund.

The net result of all of this activity is that we expect MRC to finish 2007 with higher production than that seen in 2006. While it is likely that some of our investment partners will pull back due to effects of the credit market turmoil on their availability of funds, we think the steps we have taken will substantially cushion the effects on us of those investor pull backs. Although the shift in origination sources will negatively impact margins on some assets, we will remain an active originator and maintain a steady presence in all of our markets by leveraging our multiple products and funding sources.

* * *

***Mike Falcone***:

As I said earlier, we are pleased with our production performance so far in 2007. Based on experience, the fourth quarter is busier than the first three but our outlook remains cautiously positive as we move towards closing out 2007. Our success has been, as it almost always is, in large measure due to the hard work of our employees, their dedication to our shared values and the strong support we have received from our capital partners and developer clients. We will continue to work hard to make this business grow and prosper, and we appreciate your

continued support as shareholders. Again, I'd like to assure you that we are very focused on getting the restatement successfully completed.

Even with less than 60 days left in the year, we have lots left to do. For us this is not so unusual. What is unusual is the highly volatile environment in which we now operate. ***We are pleased to have been able to announce our 43rd consecutive increase in the company's quarterly distribution***, and again we appreciate your support.

(Emphasis added).

119.    Then, on December 13, 2007, the Company issued a press release entitled

"MuniMae Provides Comment Regarding Stock Performance," which stated, in relevant part:

MuniMae & Equity, LLC ("MuniMae," NYSE:MMA) has been asked by its shareholders to comment on the recent market activity of the Company's stock. Management of the Company is not aware of any pending transaction or event that might give rise to the recent volatility in the Company's stock price. In addition, management wants to reiterate that the Company is not engaged in sub-prime or any other single family mortgage lending activities.

120.    Then on January 28, 2008, MuniMae announced that not only would the Company

fail to meet the NYSE imposed deadline of March 3, 2008 for filing the Company's restated financial

statements, which would result it the Company's stock being delisted from the exchange, the

Company also would be forced to severely cut its quarterly dividend from $0.525 per share to $0.33

per share.   Specifically, in a press release entitled, "MuniMae Announced Quarterly Dividend;

Provides Update on 2007 Production Numbers and on Restatement Process," the Company stated, in

relevant part:

MuniMae & Equity, LLC ("MuniMae" or "the Company," NYSE: MMA) announced today that its Board of Directors has declared a dividend distribution of $0.33 per common share payable on February 15, 2008 to shareholders of record as of February 5, 2008. The Company also announced that while it expects to have completed by the end of February, its substantive work required to prepare its 2006 financial statements and its restated audited financial statements for 2005 and 2004, the Company does not expect to be able to file its audited financial statements by its previously announced goal of March 3, 2008. Based on work done to date, the Company does not believe the results of the restatement will materially change the previously recorded cash balances of the Company and its subsidiaries.

***The reduction in the dividend distribution from $0.5250 to $0.33 per share is due to the cost of the Company's ongoing restatement of its financial statements***, the decision by the Company to conserve capital to protect the long-term prospects of the business given the

current volatility in the credit and capital markets, and the desire to dedicate additional capital to the high-growth Renewable Energy Finance business, an increasingly important part of the Company's business. A portion of this dividend will be paid from sources other than cash generated from operations. The Board of Directors will continue to review the Company's dividend payout on a quarterly basis based, among other factors, on the Company's net cash generation and the strategic needs of the business.

"Knowing the importance of the dividend to our shareholders, it was a difficult decision to reduce the dividend," stated Michael L. Falcone, Chief Executive Officer. "However, we believe that in this market it is important to be cautious in our approach to finding the balance between retaining capital to grow and to protect against uncertainty on the one hand, and distributing capital to shareholders as a dividend on the other. For 2007, our production numbers were solid, especially in our MMA Renewable Ventures unit which finished the year with a strong pipeline of additional solar and other renewable and clean energy opportunities. We believe the diversity of our various businesses helps us to succeed even in a tough marketplace. In these uncertain times, we will continue to be prudent in our management of the business, while remaining watchful for the opportunities that such markets usually present. We hope in the future to grow the dividend as we complete our restatement and as market conditions allow."

* * *

**Update on Restatement**

The Company also announced that it is filing with the Securities and Exchange Commission ("SEC") a Form 8-K, available at www.sec.gov , which discusses the nature of the changes in the Company's accounting policies that are being made as a result of the Company's ongoing restatement efforts covering its 2006 results. The overall impact of the restatement and the changes in the Company's accounting policies are still being quantified; however, the Company believes that the final result of the restatement will not materially change the previously recorded corporate cash balances of the Company and its subsidiaries. However, work on the restatement and the 2006 financial statements has not been completed and further work on the restatement or the audit of the 2006 financial statements could change these results.

The ultimate impact of the restatement is dependent on management finalizing all areas of the restatement and the completion of the external audit. *Although the Company continues to work to file its restated financial statements at the earliest possible time, the Company does not expect to meet the previously announced March 3, 2008, New York Stock Exchange ("NYSE") deadline for filing its 2006 Form 10-K. As a result, the Company expects that the NYSE will suspend trading shortly and commence delisting procedures. Upon suspension of trading on the NYSE, the Company's shares will begin to trade on the over the counter market pending a possible appeal and a final determination on the delisting.* If the Company is delisted from the NYSE, the Company will be able to apply for relisting on the NYSE when all its filings with the SEC are current.

*The Company currently expects to complete its unaudited financial statements for 2006 and its unaudited restated financial statements for 2005 and 2004 no later than mid-March 2008, and to file its Annual Report on Form 10-K for the year ended December 31, 2006, by*

***May 30, 2008***. The delay in completing the restatement and filing the Form 10-K is not expected to have any impact on the issuance of K-1's to shareholders in time for inclusion in their 2007 tax returns.

(Emphasis added).

121.    The Company attached the preceding press release to a Form 8-K filed with the SEC on January 29, 2008, which detailed the following changes in MuniMae's accounting policies:

- Inclusion in our consolidated financial statements of approximately 200 variable interest entities of which we are deemed the primary beneficiary even though we own only small minority equity interests. The impact of consolidating previously unconsolidated ventures results in a substantial increase in the total assets on our balance sheet, in which we have a minor ownership interest. The net income impact may be negatively affected by (i) inclusion of our share of losses of the consolidated entities, to the extent such losses are in excess of our general partner investments in those entities and (ii) inclusion of any amount by which the limited partners' shares of losses of consolidated entities exceeds their equity in those entities.

- Changes in the way we recognize revenue for our low income housing tax credit business, the largest impact of which is the deferral of revenue (syndication fees and asset management fees) related to guaranteed funds. In addition, the consolidation of these entities results in our eliminating asset management and guarantee fees, which we previously had recognized as a separate revenue item, and reflecting them instead as a component of the net income that results from the consolidation of these funds.

- Changes in the way we account for loans, including the fair value of our held-for-sale loans we used in determining the lower of cost or market value of these loans, changes in the way we determine which held-for-investment loans are impaired and the amount of the impairment, and changes in the recognition of loan origination costs.

- Changes with respect to our accounting for derivatives, including recognizing additional types of contracts as derivatives that must be marked to market, and other changes that affect the timing of profit and loss recognition.

- Recognition of additional guarantee obligations as liabilities and changing the way some recourse obligations are amortized to income.

- Changes to the estimated fair values of some of our bonds, derivatives, mortgage servicing rights and guarantee obligations, including increasing the value of some servicing rights we obtained through acquisitions or retained when loans were sold, which reduces the future income we will recognize with regard to those servicing rights.

- Other changes in accounting relating to bonds, mortgage servicing rights, equity investments, equipment, leases, including changes to the amortization and depreciation with regard to certain assets. In addition, we corrected our purchase accounting on some acquisitions, determination of our share of earnings and losses on investments accounted for under the equity method, and manner and timing of recognition of expenses with regard to share based compensation awards (none of which involved option backdating).

- Because neither the restatement nor the audit of our restated financial statements has been completed, it is possible that there will be additional changes as a result of the restatement. The changes as a result of the restatement will affect our financial statements for the year ended December 31, 2006 and subsequent years, as well as the financial statements that are being restated.

122.    Also on January 29, 2008, before the trading markets opened, MuniMae and certain of the Individual Defendants conducted a conference call.  A transcript of that call was attached to the Company's Form 8-K filed with the SEC on January 30, 2008, and stated, in relevant part:

**Mike Falcone** -*MuniMae & Equity LLC — CEO, President*

* * *

Our Board of Directors has declared a quarterly dividend distribution of $0.33 per common share payable on February 15, 2008 to shareholders of record as of February 5, 2008. ***This is approximately 37% less than the $0.525 quarterly dividend the Company paid in November of 2007. The reduction in the dividend distribution is due to the cost of the Company's ongoing restatement of its financial statements***, the decision by the Company to conserve capital to protect the long-term prospects of the business given the current volatility in the credit and capital markets and the desire to dedicate additional capital to the high-growth renewable energy finance business, an increasingly important part of our business.

A portion of this dividend will be paid from sources other than cash generated from operations. Our Board of Directors will continue to review the dividend payout quarterly based, among other factors, on our net cash generation and the strategic needs of the business.

It was a difficult decision to reduce our distribution as we know the importance of the dividend to our shareholder base. However, we believe that in this market environment it is prudent to be cautious in our approach to managing cash, balancing between retaining capital to grow and to protect against uncertainty on the one hand and distributing capital to shareholders as a dividend on the other. Over time we hope to grow the dividend as we complete the restatement and as market conditions improve.

* * *

**David Kay** -*MuniMae & Equity LLC — CFO*

\* \* \*

The overall impact of the restatement and the changes in our accounting policies are still being quantified. However, we believe that the final result of the restatement will not materially change our previously recorded corporate cash balances. The ultimate impact of the restatement is dependent on management finalizing all areas of the restatement in the completion of the external audit.

Although we continue to work to file our restated financial statements at the earliest possible time, we do not expect to meet the previously announced March 3, 2008 New York Stock Exchange deadline for filing our 2006 Form 10-K. As a result we will expect that the New York Stock Exchange will commence delisting procedures and suspend trading shortly. Upon suspension of trading on the New York Stock Exchange our shares will begin to trade on the over-the-counter market pending a possible appeal and a final determination on the delisting. If we are delisting from the New York Stock Exchange we will be able to apply for relisting when all of our filings with the SEC are current.

*We currently expect to have management prepared unaudited financial statements in compliance with GAAP for 2006 and unaudited restated financial statements for 2005 and 2004 no later than mid-March 2008. We will then file our annual report on Form 10-K for the year ended December 31, 2006 by May 30, 2008*.

In terms of our progress on the restatement, on the accounting policy front we have virtually completed our analysis of all of our accounting policy changes. As mentioned before, the overall corporate cash balances are not changing significantly; however the timing of the income and expense recognition related to some of our business transactions is changing as a result of the restatement.

For example, we are now consolidating all of the funds related to our tax credit equity business; we are deferring syndication and asset management fee income due to our guarantees on certain of these funds; and we have changes related to the recognition of costs and fees associated with our lending businesses. You can refer to our recently filed 8-K for a more comprehensive description of our accounting policy changes.

We are almost finished with the remeasurement aspect of the restatement; however until management finalizes its financial statements and the external audit is complete the expected outcome of both the nature of the restatement adjustments and the timing of the filing of the Form 10-K for 2006 cannot be known with certainty.

We continue to devote significant resources to our restatement task. We have over 100 employees and consultants working extremely hard every day to complete this restatement. As we have discussed in the past and as Mike touched on in his summary of the Board's decision regarding our dividend, the obvious downside to these efforts is expense. Our 2007 budget did not contemplate external resources of nearly this magnitude and the cost will continue into 2008.

\* \* \*

**Gary Mentesana** -*MuniMae & Equity LLC — EVP, Head of MMA Financial*
\* \* \*

***For the year ended December 31, 2007 MMA Financial's total production, including both debt originations and equity placements, was $1.7 billion, down approximately 10% from the total production of $1.9 billion for the year ended December 31, 2006.*** Debt originations for 2007 totaled $636 million which included $296 million in private placement bonds, $115 million in taxable construction loans and $225 million in taxable agency loans, as compared to approximately $392 million for 2006 which included $267 million in private placement bonds, $53 million in taxable construction loans and $72 million in taxable agency loans.

\* \* \*

As for the credit quality within our $1.7 billion private placement bond portfolio, we experienced a reduction in the debt service coverage as four highly performing bonds were redeemed for significant gains at the end of the year. But we continue to see meaningful improvement in the bonds that are in default and on our launch list. Debt service coverage for the stabilized fixed-rate multi-family bonds within the portfolio was 1.12 as of December 31, 2007 which is down from 1.14 as of September 30th and from 1.13 as of December 31, 2006.

By original issue amount bonds in default fell to 10% of the portfolio at December 31, 2007, down from 15% of the portfolio at December 31, 2006. And the bonds in our watchlist fell to 12% of the portfolio at December 31, 2007, down from 17% of the portfolio at December 31, 2006. At this point in time I'll turn the call over to Earl Cole for an update on our MRC business.

\* \* \*

**Josh Peters** -*Morningstar — Analyst*

Good morning. Looking at the line where you refer to the dividend needing in part to come from sources other than cash flow in the first quarter, is this a matter of seasonal timing in your earnings plus the cost of the restatement or are you going to be running at a pay out ratio for the full year that might be over 100%?

**Mike Falcone** -*MuniMae & Equity LLC — CEO, President*

We obviously can't fully speak to cash flows and expectations, but if you look at the seasonal timing and the restatement together that accounts for the majority of the reasons for that sentence being in there.

**Josh Peters** -*Morningstar — Analyst*

So you can't give much of an outlook about the remainder of the year?

**David Kay** -*MuniMae & Equity LLC — CFO*

Not at this point.

**Josh Peters** -*Morningstar — Analyst*

Is it fair to say that the projections that you have made internally, that that's been what the Board has decided to set the new dividend rate at going forward?

**Mike Falcone** -*MuniMae & Equity LLC — CEO, President*

Correct, we actually had a Board meeting that started on Thursday, we began a discussion of the topic, we adjourned that Board meeting, provided additional information to the Board in a Board meeting yesterday and concluded, based on the information that we had, that the right thing to do was to make the cut in the dividend that we proposed.

I should say that we've talked about three factors here — it's really no one factor but really the combination of all three factors that has led to this decision. So it's hard to speculate if there were only one factor would you have done it? But really it is the combination of the three right now that has led to the decision.

**Josh Peters** -*Morningstar — Analyst*

Okay. I know this is going to be kind of a numbers question, but can you give us any information about available liquidity over the next couple of quarters? If you are going to be paying out a dividend that's in excess of cash flow potentially in the first quarter, you've got enough access to capital to support that, can you put any numbers around that?

**Mike Falcone** -*MuniMae & Equity LLC — CEO, President*

Let me describe the process that we went through with the Board to make this decision. We looked at our starting liquidity availability, we looked at all of the sources and uses of capital that we would imagine needing to run our business and pay for the restatement over the course of the year, looked at that on a quarterly basis and used that in making our judgment that the smaller dividend would be prudent.

**Josh Peters** -*Morningstar — Analyst*

***Okay. Well, moving on to the restatement process, that's another numbers question, can you quantify the cost of the restatement thus far?***

**Mike Falcone** -*MuniMae & Equity LLC — CEO, President*

***We knew that this was going to be one of the key questions that folks were going to ask today and we really can't answer that question. It has been substantial and we look forward as we wrap-up the restatement in the coming months to be able to speak to that.***

**Josh Peters** -*Morningstar — Analyst*

Okay. And then assuming that you can hit this mid-March target for having unaudited financial statements — first, are you planning to release those figures when they're available or are you going to wait until they're audited and you're actually filing the 2006 10-K at the end of May?

\* \* \*

**Josh Peters** -*Morningstar — Analyst*

Okay. And then now that you're going to have to be consolidating all of these entities into the future are you looking at an accounting cost for the business going forward that's going to be much higher than it had been in the past when you didn't have to consolidate these entities?

**Mike Falcone** -*MuniMae & Equity LLC — CEO, President*

In the short-term the answer to that is, yes. Our plan is to move to automate as much of this consolidation as we can in relatively short order. But in the short-term we will need to throw some bodies at that to accomplish the accounting.

**Josh Peters** -*Morningstar — Analyst*

Okay. And can you give us any idea of how fast you'll be able to run through your 2007 quarters? Do you expect that you can become fully caught up at some point during 2008? I know it's kind of a moving target unfortunately, but I'd appreciate some guidance on that.

**Mike Falcone** -*MuniMae & Equity LLC — CEO, President*

We just had a little legal consult here, Josh, I'm sorry. We have a variety of options for finishing up the catch-up process. We could file '07 alone, we can file '07 and '08 together when we file '08. So right now we're not really in a position where we can answer that question.

**Josh Peters** -*Morningstar — Analyst*

Okay, but you seem to be saying that it could be all the way through into early 2009 before we get 2007 information.

**Mike Falcone** -*MuniMae & Equity LLC — CEO, President*

It could be to that time frame by the time you get audited 2007 financial information. We're going to look to provide information to our capital partners and others earlier in the year and we'll see which of that we can parse out and deliver publicly and maybe do the 8-K kind of

filing for 2007 as soon as we can do it. But it won't
— the odds of the — the audited 2007 will not come before late in the year.

* * *

**Josh Peters** *-Morningstar — Analyst*

Okay. I also want to talk about the potential for future dividend growth which you do mention in your press release. It seems to be contingent on the progress of the restatement process as well as some of the turbulence in the capital markets clearing up. Is it fair to say that you probably won't be looking to raise the dividend before you're fully caught up on your financial filings?

**Mike Falcone** *-MuniMae & Equity LLC — CEO, President*

I'm not sure I can answer that question directly, Josh, because we didn't talk about it at that level of detail at the Board. But I can tell you this exact sentence, "over time we hope to grow the dividend as we complete the restatement and as market conditions improve," was discussed at my request at the Board meeting because I wanted to give folks clear indication of our sense of what we want to do with the dividend in the future.

We can't be more specific than we've been here, but I think that it's a fairly good statement of our intent.

**Josh Peters** *-Morningstar — Analyst*

Okay. I guess the part of the sentence that I'm looking at is "as we complete", which might imply as you continue to make progress as opposed to saying when the restatement is completed. So I guess I'm looking to do some parsing of my own and see if you can give me a little additional clarity.

**Mike Falcone** *-MuniMae & Equity LLC — CEO, President*

I'm getting the nod here or the shake. I really can't be more specific than this sentence. This sentence is definitively what the Board talked about and approved.

**Josh Peters** *-Morningstar — Analyst*
Okay. And looking forward, would you be looking to try and take the dividend rate back to where it was prior to this cut as soon as possible once you are in a position to grow the dividend again? Or are we going to be looking at your old 2 to 4% type of growth rate off of this new base?

**Mike Falcone** *-MuniMae & Equity LLC — CEO, President*

I'm going to be evasive again which I really don't like, but the sentence here that we have gotten approved at the Board says "over time we hope to grow the dividend as we complete the restatement and as market conditions improve". I guess I could say that if you were to do the math and look at the way the business works previously in terms of the relatively high

payout ratios we've had and you look at the dividend cut we're making today you could do the math and conclude that once we "return to normal" that there should be significant cash generation above the dividend.

What the Board will decide to do with that cash at that point is embodied in this sentence right now. But I think there will be the opportunity, if markets recover in the way we expect them to, if our business develops in the way we expect it to I think we do have the opportunity to grow that — we would have the opportunity to grow the dividend faster, but the Board has made no commitment to do that and it will be a decision that we make in the future as we see what the competing needs are and what the market conditions are. We say the Board will continue to review the dividend based, among other factors, our net cash generation and the strategic needs of the business.

* * *

**James Sterling** -*A.G. Edwards — Analyst*

*Good morning, gentlemen. I guess I just have two questions if I may, and I'm approaching this more from a person who just manages other folks' money on their behalf, so it's a little bit from a layman's perspective. The one thing that I'm a little bit befuddled on is from your statements of two months ago you actually maintained your high-level of a dividend and I think actually increased it just very modestly in that last time frame. And so your statements today either illuminate that there was a substantial change in the marketplace over the last couple of months since that last statement or that you were unaware of the level of deterioration that had already taken place in the October/November time frame. I was just hoping first off if you could illuminate the change in your posture over the last two or three months regarding that?*

**Mike Falcone** -*MuniMae & Equity LLC — CEO, President*

Sure. They really are twofold. I think it was pretty predictable for us two or three months ago that we were going to need some additional working capital and long-term capital for the renewable energy business because the growth of that business last year and the projected growth this year; that was very predictable. What has changed in the last two months is really the first two elements of the three.

*We had expected, obviously until very, very recently, to be wrapping up the restatement in a matter of a couple of weeks, several weeks here in terms of the active work we had to do and then turning it over to the auditor. So it's the length of time that we will be spending on the restatement changes our views of what — or the increased length of time changes our view of what's going on in the cost side of the equation.*

And two, this market in terms of what's going on in the capital and credit markets I think — and in the third quarter, beginning of the fourth quarter we were beginning to feel like there was a recovery going on a little bit. Some of the spread indicators we might look at like CMBS which gives some sense of capital flowing into the real estate market — some of that stuff had gotten better about the time we made the dividend decision last time and we were thinking that

the worst was behind us.

At this point I think what we're saying is we don't know if the worst is behind us and we need to be cautious with our shareholders' capital as we go forward. And that's probably the big change in our view over the last two or three months.

**James Sterling** -*A.G. Edwards — Analyst*

***Okay. And the second question for you is just — it's very difficult for me, and if it's difficult for me I'm sure for the majority of the individual investors that are out there it's got to be very difficult for them to just understand the complexity of your financial restatements and why there's been multiple points where you've delayed it. And I'm just hoping that there's some way that you can sort of elaborate on that a little bit for us to help us understand the complexity and why it keeps getting pushed back as it has been?***

* * *

**David Kay** -*MuniMae & Equity LLC — CFO*

James, the complexity is huge and I kind of live it every day. And just to kind of give you and others a sense for it — ***probably the biggest area that's creating the most impact and time frame to get this done is this implementation of FIN 46 which revolves all-around consolidation accounting.***

We have so many different investments, significant ones through the LIHTC funds as well as other activities within the business. ***We had to analyze probably over 200 entities to determine consolidation or not.*** And at the end of the day on the Lytec side we're consolidating these entities. And we had no process really to do that before.

So you've got to basically build a process and implement it and do it — we're doing it really for three years which includes 10 periods. And a lot of this has to go back to look at the accounting before '03 in order to get the beginning balances right. So that's just one example where there's a significant amount of work. The other is we're consolidating properties where we've reassigned the GP interest. Again, we had no process to take care of that so that's a highly manual intensive rework to get that done. And as we go forward we'll automate that.

But the fact of the matter is to go through the complexity of the accounting and get that cleared with our external auditor, then to go through and do the remeasurement takes a significant amount of time. And quite frankly, we did change auditors over a year ago. They're looking through the three-year period and a substantial amount of the work is to prepare audit packages for them to basically get through the audit. So everything is being examined by them; there's no reliance, if you will, on the previous auditor's work.

So that in and of itself, even in areas where there's no restatements or remeasurement being done we have to do a significant amount of work to put together packages. So it is significant and it has made this time frame slip. We do feel that we're in relatively good shape to get the management financials done in that mid-March frame and then we're working side-by-side

with the external auditor to get them through the audit and hope, as I said, we want to file as soon as possible and we hope it's before May 30th, but we're putting that out there as the outside date just a give investors some type of time frame.

**Mike Falcone** -*MuniMae & Equity LLC — CEO, President*

James, just to put a number on that for a minute, if you look at the number of real estate partnerships that we had in — that we're now consolidating that we weren't set up to previously consolidate, there's more than 2,000 real estate partnerships that we will consolidate where we're a general partner with a 0.01% interest. And we have to do the accounting for that over, as Dave said, 10 periods. So it's 6,000 separate financial statements that has to go back and be done.

* * *

**Bob Peters**

I appreciate the call. I wanted to get back to something the other gentlemen had mentioned. On the last dividend you've raised it modestly and you had said this was not an earnings call, it was a production call. And based on production and, as I was led to understand, cash flow there was room to raise that dividend. So I have two questions.

One is, again have things changed that drastically in the last few months? I think you answered that in part. And the second question is you indicated that this new lowered dividend rate is not going to be paid from production but is also going to be paid from some working capital and if you could expand on the relative components of that dividend it will I hope clarify your ability to maintain it. Which is really another way of saying how long can you keep paying it before you make damaging incursions into your working capital?

**Mike Falcone** -*MuniMae & Equity LLC — CEO, President*

Bob, I'm afraid I can't answer that as fully as you would like. I can go back to the process that the Board went through which was looked at our expectations around sources and uses of capital over the 12-month period in front of us. And I can tell you that an important element of the discussion was we wanted to find a place where we thought we could do — where we would only have to do this once. But there's nothing about that that can be an assurance that our projections and our expectations about the market going forward are going to come true.

Fundamentally we I think in the second bullet around the decision, we are a little nervous about going on in the marketplace right now. We just — I think in November — was it November when we declared the dividend? October — we had a sense that the bottom being down in the market and as we sit here today we're not nearly as confident that we're near the bottom as we were three or four months ago.
And you can see all of the activities that have gone on that made us nervous. It's the subprime losses that folks are taking and I should say we're not, again, we're not in the

93

subprime business, but all of those losses that folks are taking — the collapse of the commercial paper market in Canada, the collapse of the SIV market in London, the sort of global flows of capital are quite constrained.

We are hopeful that the actions by the Fed last week and whatever they may do today will start to reopen the channels with the banks in terms of desire to take on credit and make investments and that that will really support prices in the real estate market outside of the home market. We've seen some modest change in real estate values (technical difficulty) for commercial and the underlying performance of those properties would indicate values should be pretty steady.

So there's a change in capital markets will change values around capitalization rates or price times earnings ratios is something that we have become much more conscious about in the intervening three months, and that's four months and that's why we've made this change today.

**Bob Peters**

Let me ask the question a different way in terms of the dividend where it is now. Assuming that your distributable cash flow that you don't want to allocate to the other businesses does not improve, do you have any time frame for how long you can keep this dividend rate?

**Mike Falcone** -*MuniMae & Equity LLC — CEO, President*

I'm afraid I'm getting the wave here. I can't predict the future. I can tell you the process that the Board went through, what they looked at and how they made this decision. We will change our expense profile dramatically when we get the restatement behind us in that.

**Bob Peters**

I look forward to it.

**Mike Falcone** -*MuniMae & Equity LLC — CEO, President*

As do we.

(Emphasis added).

123.    Following these revelations, MuniMae's stock price collapsed, plummeting from a

closing price of $17.20 on January 28, 2008 to close at $9.19 on January 29, 2008 – a decline of

47%.   More significantly, the Company's stock price declined by over 65% between the

Company's announcement on September 14, 2006 of the second restatement and the Company's

late January 28, 2008 announcement.   This drop was due, at least in part, to the Company's

continual failure to completed the restatement process in a timely manner while continually announcing additional material deficiencies in the Company's financial accounting and disclosure controls and procedures.

124.    On March 3, 2008, MuniMae filed with the SEC a Form 15-NSE acknowledging that the NYSE would remove the Company's stock from listing and registration on the exchange effective March 13, 2008 for the Company's failure to file timely financial reports.

125.    Finally, on April 9, 2008, MuniMae filed a Form 8-K with the SEC disclosing preliminary unaudited results of the restatement.   As a result of the Company's incorrect accounting treatment of numerous issues, shareholder equity for the fiscal year ended December 31, 2005 was reduced by $44.9 million.  In the April 8, 2008 8-K, MuniMae made the following statements regarding the Company's accounting corrections:

> The restatement process has changed our previous accounting across many areas of our activities.  However, it has not resulted in any significant adjustments to our corporate cash accounts.  The restatement did affect three areas more than others.  Those three areas, and their effects as compared to our previously reported December 31, 2005 financial statements, are as follows:
>
> - We have consolidated over 230 entities, in which we have little to no ownership interest, that were not previously consolidated. The consolidation of these entities resulted in our including in our total assets as of December 31, 2005 approximately $4.6 billion of assets in which we had little or no economic interest and including in our total liabilities at that date $1.9 billion of liabilities as to which neither we nor any of our majority owned subsidiaries have any obligations as well as $2.7 billion of non-controlling interests in consolidated funds and ventures. It also resulted in our recording cumulative losses of $78.3 million (primarily the result of property depreciation charges), which we have no financial obligation to fund. To the extent these charges are attributable to consolidation, we expect these charges to reverse upon disposition of the entity. Our only economic interest in these entities is through bonds and loans secured by these properties, which had an asset value of $154.0 million at December 31, 2005.
>
> - We made significant changes in accounting policies related to tax credit equity funds sponsored by our Affordable Housing Division. These changes resulted in an overall reduction of Shareholders' Equity totaling $55.2 million at December

31, 2005. The three largest components of this reduction involved the deferral of syndication fees that were not previously deferred, the expensing of start-up costs that were previously capitalized and the remeasurement of recorded losses related to the real estate sale aspect of our syndication activities. These reductions were slightly offset by positive impacts of changes to our asset management fee recognition policy.

- We made numerous changes to the valuation of financial instruments including valuations of the Company's bond portfolio, loans, derivatives, mortgage servicing rights, and certain guarantee obligations, resulting in an overall net increase of Shareholders' Equity totaling $78.8 million at December 31, 2005. The majority of this change is directly attributable to the revaluation of the bond portfolio, which resulted in an increase in the carrying value of such bonds of $67.7 million. This positive valuation impact relates to values at December 31, 2005. Market changes in 2008 have resulted in substantial adverse changes to the values of our tax-exempt bonds.

126.    Moreover, MuniMae disclosed that in 2007 alone, the Company *spent more than $54.1 million for costs related to the restatement*.  As of the filing of this Complaint, MuniMae's stock has been trading over the counter at an approximate price of $0.25, down 99% from the stock's high closing price during the relevant period of $32.20 per share on December 29, 2006.

127.    On May 27, 2008, the Company announced that its audited 2006 financial statements and restated 2005 and 2004 financial statements would not be available by May 30, 2008 as planned.

128.    On August 15, 2008, the Company announced that it would not be paying a dividend with regard to the second quarter of 2008.

129.    Having yet to file its audited restated 2004 and 2005 financial statements, nor the audited 2006 or 2007 financial statements, the Company filed a Current Report on Form 8-K on August 15, 2008.  In this report, the Company stated that "[w]e have resolved most of the open accounting issues and significant progress has been made on the audit, both of which have resulted in further adjustments to our previously reported financial information."  The report then stated that *the requisite adjustments would reduce the December 31, 2006 shareholders' equity*

*by approximately $80 million – almost double what the Company had announced on April 9, 2008.*  Further, the Company disclosed that the value of its portfolio of assets had declined to $2.8 billion as of June 30, 2008 compared with $3.6 billion, the value announced as of June 30, 2007.

130.    As of November 11, 2008, the Company has not yet filed its audited restated 2004 and 2005 financial statements, nor its audited 2006 or 2007 financial statements.

### FIRST CAUSE OF ACTION

### Against Individual Defendants
### For Breach of Fiduciary Duty

131.    Derivative Plaintiffs incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

132.    The Individual Defendants owed and owe MuniMae fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe MuniMae the highest obligation of good faith, fair dealing, loyalty and due care.

133.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

134.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial condition and business prospects of the Company and failed to correct the Company's publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

135.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, MuniMae has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

136.     Derivative Plaintiffs, on behalf of MuniMae, has no adequate remedy at law.

## SECOND CAUSE OF ACTION

### Against The Individual Defendants
### For Abuse of Control

137.     Derivative Plaintiffs incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

138.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence MuniMae, for which they are legally responsible.

139.     As a direct and proximate result of the Individual Defendants' abuse of control, MuniMae has sustained significant damages.

140.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

141.     Derivative Plaintiffs, on behalf of MuniMae, has no adequate remedy at law.

## THIRD CAUSE OF ACTION

### Against The Individual Defendants
### For Gross Mismanagement

142.     Derivative Plaintiffs incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

143.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of MuniMae in a manner consistent with the operations of a publicly held corporation.

144.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, MuniMae has sustained significant damages in excess of millions of dollars.

145.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

146.    Derivative Plaintiffs, on behalf of MuniMae, has no adequate remedy at law.

## FOURTH CAUSE OF ACTION

### Against The Individual Defendants
### For Waste of Corporate Assets

147.    Derivative Plaintiffs incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

148.    As a result of the Individual Defendants' improper conduct and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, Individual Defendants have caused MuniMae to waste valuable corporate assets by paying bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

149.    As a result of the waste of corporate assets, Individual Defendants are liable to the Company.

150.    Derivative Plaintiffs, on behalf of MuniMae, has no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### Against The Individual Defendants
### For Unjust Enrichment

151.    Derivative Plaintiffs incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

152.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of MuniMae.

153.    Derivative Plaintiffs, as a shareholder and representatives of MuniMae, seek restitution from the Individual Defendants, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendants, from their wrongful conduct and fiduciary breaches.

### SIXTH CAUSE OF ACTION

**Against The Individual Defendants
For Contribution and Indemnification**

154.    Derivative Plaintiffs incorporates by reference and reallege each and every allegation set forth above as if set forth fully herein.

155.    MuniMae is alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein to give rise to Individual Defendants' liability to MuniMae.

156.    MuniMae's alleged liability on account of the wrongful acts and practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of the Individual Defendants as alleged above, and MuniMae is entitled to contribution and indemnification from each of the Individual Defendants in connection with all such claims that have been, are or may in the future be asserted against MuniMae by virtue of the Defendants' misconduct.

### PRAYER FOR RELIEF

WHEREFORE, Derivative Plaintiffs prays for relief and judgment, as follows:

A.    Against the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of

fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of the Individual Defendants' trading activities or their other assets so as to ensure that Derivative Plaintiffs has an effective remedy;

C.      Awarding to MuniMae restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by these Defendants;

D.      Awarding to Derivative Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

### JURY TRIAL DEMANDED

Derivative Plaintiffs hereby demands a trial by jury.

Dated: December 12, 2008                    Respectfully submitted,


_____/s/_____
Donald Enright (MD013551)
**FINKELSTEIN THOMPSON LLP**
1050 30th Street, NW
Washington, D.C. 20007
Telephone: (202) 337-8000
Fax: (202) 337-8090
*Local Counsel for Derivative Plaintiffs*

-and-

William B. Federman, Esq.
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania
Oklahoma City, OK 73120

Telephone:  (405) 235-1560
Fax:  (405) 239-2112

Marc S. Henzel
**THE LAW OFFICES OF MARC HENZEL**
273 Montgomery Avenue, Suite 202
Bala Cynwyd, PA 19004
Telephone: (610) 660-8000
Fax: (610) 660-8080

 Ronen Sarraf
Joseph Gentile
**SARRAF GENTILE LLP**
11 Hanover Square
New York, NY
Telephone:(212) 868-3610
Facsimile:        (212) 918-7967

*Attorneys for Derivative Plaintiffs*