ENTERED
LODGED ____ RECEIVED

JUN 1 9 2009

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
RIGHT DEPUTY

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

IN RE:

MUNICIPAL MORTGAGE & EQUITY, LLC
SECURITIES & DERIVATIVE LITIGATION

Case No. 08-MDL-1961

**ALL CLASS ACTIONS**

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
MUNICIPAL MORTGAGE & EQUITY, LLC AND
THE INDIVIDUAL DEFENDANTS' MOTION TO DISMISS
THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

MILES & STOCKBRIDGE P.C.
10 Light Street
Baltimore, Maryland 21202
(410) 727-6464

and

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
(212) 455-2000

*Attorneys for Defendants
Charles C. Baum, Richard O. Berndt,
Eddie C. Brown, Robert S. Hillman,
Douglas A. McGregor, Arthur S. Mehlman, and
Fred N. Pratt, Jr.*

SAUL EWING LLP
Lockwood Place, 8th Floor
500 East Pratt Street
Baltimore, Maryland 21202
(410) 332-8668

*Attorneys for Defendant
Michael L. Falcone*

Dated: June 19, 2009

GALLAGHER EVELIUS & JONES LLP
218 North Charles Street, Suite 400
Baltimore, Maryland 21201
(410) 727-7702

GOODWIN PROCTER LLP
620 Eighth Avenue
New York, New York 10018
(212) 813-8800

and

CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, New York 10019
(212) 878-8000

*Attorneys for Defendants
Municipal Mortgage & Equity, LLC,
Mark K. Joseph, William S. Harrison,
Charles M. Pinckney, and David Kay*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...........................................................................................................1

ARGUMENT ..........................................................................................................................................5

I.   THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 10(b) ..................5

    A.   The Complaint Fails to Plead Loss Causation ...........................................................5

        1.   Plaintiffs Have Not Pleaded Loss Causation Respecting MMA's Failure to Comply with FIN 46R. .................................................................6

        2.   Plaintiffs Have Not Pleaded Loss Causation Respecting MMA's Statements Concerning Cash Available for Distribution. ..........................7

        3.   Failure to Plead Loss Causation Is Not a "Truth on the Market" Defense ...............................................................................................12

    B.   The Complaint Does Not Plead Sufficient Facts to Support an Inference That Defendants Acted with Fraudulent Intent or Severe Recklessness. .............14

        1.   The Purported "Disagreement" between MMA and PwC Does Not Support Plaintiffs' Allegations of Scienter ...............................................15

        2.   Plaintiffs' Scienter Allegations Concerning the Costs of the Restatement and the Consequent Impact on the Dividend Are Conclusory and Boilerplate. ........................................................................18

        3.   Plaintiffs' Generic Corporate and Individual Motive Allegations Add Little, if Anything, to the Scienter Calculus ......................................21

II.  PLAINTIFFS' SECURITIES ACT CLAIMS ALSO SHOULD BE DISMISSED ..........23

    A.   Plaintiffs' Securities Act Claims Fail Because They Sound in Fraud and Are Not Pleaded with Particularity as Required by Rule 9(b). ...............................23

    B.   Plaintiffs Have Failed to Plead Standing to Bring Claims Under Sections 11 or 12(a)(2) Relating to the Secondary Public Offering. ......................................26

    C.   Plaintiffs' Securities Act Claims Are Barred by Section 13's One-Year Statute of Limitations. ..............................................................................................28

        1.   The Statute of Limitations Began to Run When MMA Announced Its Restatement in September 2006. .......................................................29

Page

    2.    Plaintiffs Unquestionably Were on Inquiry Notice by the End of January 2007 ........................................................................................................ 31

  D.    Plaintiffs' Section 11 Claim Relating to the Secondary Public Offering Is Barred by the Three-Year Statute Of Repose ...................................................... 33

III.    PLAINTIFFS' "CONTROL PERSON" CLAIMS SHOULD BE DISMISSED ............... 35

CONCLUSION ..................................................................................................................... 35

# TABLE OF AUTHORITIES

## Cases

Page(s)

*Ashcroft v. Iqbal,*
129 S. Ct. 1937 (2009) ........................................................................................................27

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007) ......................................................................................................26, 27

*Bowen v. Georgetown Univ. Hosp.,*
488 U.S. 204 (1988) ..........................................................................................................35

*Brumbaugh v. Princeton Partners,*
985 F.2d 157 (4th Cir. 1993) ...........................................................................................29

*Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.,*
394 F.3d 126 (3d Cir. 2004) .............................................................................................24

*Congregation of Ezra Sholom v. Blockbuster,*
504 F. Supp. 2d 151 (N.D. Tex. 2007) .............................................................................26

*Cozzarelli v. Inspire Pharms., Inc.,*
549 F.3d 618 (4th Cir. 2008) .........................................................................23, 24, 25, 35

*DeBenedictis v. Merrill Lynch & Co., Inc.,*
492 F.3d 209 (3d Cir. 2007) .............................................................................................31

*Donohoe v. Consol. Operating & Prod. Corp.,*
982 F.2d 1130 (7th Cir. 1992) .........................................................................................30

*Elam v. Neidorff,*
544 F.3d 921 (8th Cir. 2008) ......................................................................................20, 22

*Fort Worth Employers' Ret. Fund v. Biovail Corp.,*
2009 WL 1357229 (S.D.N.Y. May 8, 2009) ....................................................................23

*Finkel v. Stratton Corp.,*
962 F.2d 169 (2d Cir. 1992) .............................................................................................33

*Ganino v. Citizens Utils. Co.,*
228 F.3d 154 (2d Cir. 2000) .............................................................................................13

*Gustafson v. Alloyd Co.,*
513 U.S. 561 (1995) ..........................................................................................................26

*In re Adelphia Commc'n Corp. Sec. & Deriv. Litig.,*
2005 WL 1679540 (S.D.N.Y. July 18, 2005) ..................................................................33

Page(s)

*In re Alliance Pharm. Corp. Sec. Litig.*,
  279 F. Supp. 2d 171 (S.D.N.Y. 2003)...........................................................................11

*In re Convergent Techs. Sec. Litig.*,
  948 F.2d 507 (9th Cir. 1991) .......................................................................................10

*In re H&R Block Sec. Litig.*,
  527 F. Supp. 922 (W.D. Mo. 2007)..............................................................................20

*In re Northpoint Commc'ns Group, Inc. Sec. Litig.*,
  184 F. Supp. 2d 991 (N.D. Cal. 2001) ........................................................................21

*In re Prudential Sec. Ltd. P'ships Litig.*,
  930 F. Supp. 68 (S.D.N.Y. 1996)..................................................................................11

*In re Initial Pub. Offering Sec. Litig.*,
  227 F.R.D. 65 (S.D.N.Y. 2004) ....................................................................................27

*In re Radian Sec. Litig.*,
  2009 WL 974324 (E.D. Pa. Apr. 9, 2009) ...................................................15, 20, 23

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
  351 F. Supp. 2d 334 (D. Md. 2004)........................................................................25, 26

*In re Salomon Analyst Winstar Litig.*,
  2006 WL 510526 (S.D.N.Y. Feb. 28, 2006).................................................................33

*In re Sofamor Danel Group, Inc.*,
  123 F.3d 394 (6th Cir. 1997) .......................................................................................10

*In re Stac Elecs. Sec. Litig.*,
  89 F.3d 1399 (9th Cir. 1996) .......................................................................................24

*In re USEC Sec. Litig.*,
  190 F. Supp. 2d 808 (D. Md. 2002)...................................................................29, 30, 33

*In re Vantive Corp. Sec. Litig.*,
  283 F.3d 1079 (9th Cir. 2002) .....................................................................................22

*In re Veeco Instruments, Inc. Sec. Litig.*,
  235 F.R.D. 220 (S.D.N.Y. 2006)..............................................................................10, 11

*In re WorldCom, Inc. Sec. Litig.*,
  294 F. Supp. 2d 431 (S.D.N.Y. 2003)......................................................................30, 31

*Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*,
  432 F. Supp. 2d 571 (E.D. Va. 2006) ..........................................................................10

Page(s)

*Kauthar SDN BHD v. Sternberg,*
149 F.3d 659 (7th Cir. 1998) ........................................................................................29

*Kavowras v. N.Y. Times Co.,*
328 F.3d 50 (2d Cir. 2003).............................................................................................31

*Klein v. Computer Devices, Inc.,*
591 F. Supp. 270 (S.D.N.Y. 1984)..................................................................................27

*Kowalski v. Tesmer,*
543 U.S. 125 (2004)........................................................................................................26

*Kushner v. Beverly Enters., Inc.,*
317 F.3d 820 (8th Cir. 2003) .........................................................................................21

*LC Capital Partners, L.P. v. Frontier Ins. Group,*
318 F.3d 148 (2d Cir. 2003)...........................................................................................31

*Lone Star Ladies Inv. Club v. Schlotzsky's, Inc.,*
317 F.3d 820 (8th Cir. 2003) .........................................................................................24

*Marsh Group v. Graff,*
2002 WL 1997949 (4th Cir. 2002) ...............................................................9, 10, 11, 12

*Mills v. Polar Molecular Corp.,*
12 F.3d 1170 (2d Cir. 1993)...........................................................................................25

*Oran v. Stafford,*
226 F.3d 275 (3d Cir. 2000)............................................................................................10

*P. Stolz Family P'ship L.P. v. Daum,*
355 F.3d 92 (2d Cir. 2004).................................................................................11, 33, 34

*Pub. Employees Ret. Sys. Assoc. of Colo. v. Deloitte & Touche, LLP,*
551 F.3d 305 (4th Cir. 2009) .........................................................................................23

*Rombach v. Chang,*
355 F.3d 164 (2d Cir. 2004)...........................................................................................24

*Shah v. Meeker,*
435 F.3d 244 (2d Cir. 2006)...........................................................................................33

*Staehr v. Hartford Fin. Servs. Group,*
547 F.3d 406 (2d Cir. 2008)...........................................................................................31

*Teachers' Ret. Sys. of La. v. Hunter,*
477 F.3d 162 (4th Cir. 2007) ...................................................................................2, 3, 13

Page(s)

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
  127 S. Ct. 2499 (2007).................................................................................................15, 18, 23

*Wagner v. First Horizon Pharm. Corp.,*
  464 F.3d 1273 (11th Cir. 2006) ...................................................................................................24

*Wood v. Baum,*
  953 A.2d 136 (Del. 2008) .............................................................................................................32

## Statutes and Regulations

15 U.S.C. § 77d(3)(B)......................................................................................................................28

15 U.S.C. § 77m........................................................................................................................28, 33

15 U.S.C. § 78u-5(c)(1)(A)........................................................................................................10, 11

17 C.F.R § 229.303 (2009) .............................................................................................................10

17 C.F.R § 229.512 (2009) .............................................................................................................34

17 C.F.R. § 230.174 (2009) ............................................................................................................27

17 C.F.R. § 230.430(B) (2009) .......................................................................................................34

Securities Act Release No. 7606A, 63 Fed. Reg. 67,174 (1998)....................................................34

Securities Act Release No. 6672, 51 Fed. Reg. 39,868, 39,872 (1986)..........................................34

Securities Act Release No. 33-8591, 70 Fed. Reg. 44,722 (2005) .................................................35

## Miscellaneous

DELOITTE & TOUCHE LLP, FIN 46(R): A ROADMAP TO APPLYING THE NEW CONSOLIDATION
  GUIDANCE (2004)........................................................................................................................16

Laura Smitherman, *MuniMae Fires Auditor After Accounting Woes,* BALT. SUN (Oct. 27, 2006)...........32

Defendants respectfully submit this Reply Memorandum of Law in further support of their Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint, pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.[1]

## PRELIMINARY STATEMENT

Plaintiffs' 79-page Opposition is a studied attempt to sow confusion through the use of repetition, excess verbiage, and straw man arguments in the hope this Court will simply throw up its hands and allow this case to proceed to discovery. As this Court no doubt will discern, however, when Plaintiffs' arguments are stripped of their rhetorical devices, their case boils down to three allegations: (i) a claim that MMA misrepresented for over a year-and-a-half that it had "complied with FIN 46R"[2]; (ii) a claim that MMA repeatedly misrepresented that its restatement under GAAP accounting would "not impact cash available for distribution ("CAD") in any period"[3]; and (iii) a claim that in October 2006 — over a year before its stock dropped — MMA falsely announced when it reported that it had fired its outside auditor, PriceWaterhouseCoopers LLP ("PwC"), "there were no disagreements with PwC on any matter of accounting principles or practices, financial statement disclosures, or audit scope or procedure."[4]  Plaintiffs claim that MMA first revealed the alleged falsity of these statements in January 2008, in the midst of the worst financial crisis this country has seen since the Great Depression,

---

[1]  Defined terms in this brief have the same meaning as in the Memorandum of Law in Support of Municipal Mortgage & Equity, LLC and the Individual Defendants' Motion to Dismiss the Consolidated Class Complaint, dated March 12, 2009 ("Mem."). To the extent applicable, Defendants incorporate by reference the arguments in the Reply Memorandum of Law for Defendants Merrill Lynch, Pierce, Fenner & Smith Incorporated and RBC Capital Markets Corp. in Further Support of Their Motion to Dismiss, and the Reply Memorandum of Law of Ms. Lundquist in Further Support of Her Motion to Dismiss.

"Opp." or "Opposition" herein refers to Plaintiffs' Memorandum of Law in Opposition to MMA and the Individual Defendants' Motions to Dismiss the Securities Exchange Act of 1934 Claims in the Consolidated and Amended Class Action Complaint, dated May 12, 2009.

[2]  Opp. at 7.

[3]  Opp. at 8.

[4]  Opp. at 11.

and that these revelations precipitated a 30% drop in MMA's stock price. Plaintiffs argue that their three allegations suffice not only to satisfy the loss causation and scienter requirements of Rule 10b-5, but also to defeat the "truth on the market" defense — a defense Defendants did not even raise and do not rely upon, but to which Plaintiffs dedicate over 20 pages in their Opposition.

The three allegations upon which Plaintiffs rest their case fail to plead loss causation under Rule 10b-5. With respect to FIN 46R, which required low income housing tax credit funds ("LIHTC Funds") that were variable interest entities ("VIEs") to be consolidated on MMA's financial statements, the record indisputably demonstrates that after announcing its Second Restatement in June 2006, MMA repeatedly disclosed that it was "required to consolidate substantially all of the low income housing tax credit equity funds it has interests in."[5] Similarly, with respect to MMA's representation that its GAAP accounting restatement would "not impact cash available for distribution, a supplemental non-GAAP performance measure,"[6] the record demonstrates that MMA was referring to the *accounting* effects of the restatement, not its costs, and that in November 2007 — over two months before the January 2008 announcement that led to MMA's stock drop — the Company expressly warned investors that the restatement did, in fact, cost significant money, and that this could impair the Company's ability to pay dividends going forward. As the Fourth Circuit explained in *Teachers' Retirement System of Louisiana v. Hunter*, "[t]he problem with plaintiffs' theory . . . is that these facts had already been disclosed in public filings, so their revelation" just before the complained of stock drop "would not have caused [the company's] stock price to decline."[7] And with respect to any purported disagreement with PwC, MMA's January 2008 announcement did not mention, let alone "reveal the 'true facts'" of any alleged accounting dispute, and so, in the Fourth Circuit's words, any such disagreement "could not have *caused*

---

[5]   MMA Press Release (Jan. 31, 2007) (Holland Ex. 25).

[6]   Form 8-K, Ex. 99 (Sept. 13, 2006) (Holland Ex. 14).

[7]   477 F.3d 162, 187 (4th Cir. 2007).

the plaintiff's loss."[8]

Plaintiffs' three allegations also fail to allege scienter. Since MMA disclosed the need to consolidate the LIHTC Funds, and that the costs of the ongoing restatement could affect the dividend, well before January 2008, these purported misrepresentations could not possibly demonstrate the necessary intent to defraud.[9] As to the centerpiece of Plaintiffs' scienter argument — the allegation that a confidential witness, CW3, "stated that the PwC partner 'insisted' that the value of [various tax credit equity funds] be disclosed on [MMA's] books"[10] — the record makes clear that MMA did follow PwC's advice because the Company did disclose the assets and liabilities of the unconsolidated entities in its 2004 filings.[11] Moreover, PwC attested to MMA's financials (which included consolidation under FIN 46R), and when PwC's engagement later was terminated, PwC specifically stated that there had been no disagreements with the Company about any matter of accounting principles or practices that, if they had not been resolved to PwC's satisfaction, would have caused PwC to refer to the subject of the disagreement in its report on MMA's financial statements.

The historic change in economic circumstances brought on by the credit crisis ultimately led to a massive deterioration in the Company's business, and the Company cut its dividend. But Plaintiffs' alleged losses simply were not caused by any misrepresentation about FIN 46R consolidation or a failure to disclose the fact that the Company was incurring substantial costs in the restatement process, and there is nothing to support the notion that somehow MMA was acting to deceive investors about these points.

In addition, Plaintiffs' separate brief concerning their claims under the Securities Act ("Sec. Act

---

[8]   *Teachers' Ret. Sys.*, 477 F.3d at 187 (emphasis added).

[9]   *See* Mem. at 34-36.

[10]   Compl. ¶ 88 (emphasis removed).

[11]   *See* Form 10-Q (May 6, 2004) (Holland Ex. 5).

Br.") fails to raise any issue to preclude dismissal of those claims, which are defective for several independent reasons. *First*, Plaintiffs have failed to plead their claims with the specificity required by Rule 9(b), which applies here because their Securities Act claims are part and parcel of their theory that the Defendants engaged in some kind of fraud. *Second*, Plaintiffs have failed to allege facts sufficient to demonstrate that they have standing to assert claims relating to the registration statement for MMA's Secondary Public Offering, and resort instead to mischaracterizing recent Supreme Court decisions that unequivocally require more than the Complaint's barebones, conclusory allegations of standing. *Third*, all of Plaintiffs' Securities Act claims are untimely because Plaintiffs failed to bring those claims within the one-year limitations period that began when MMA announced on September 13, 2006 that its financial statements contained errors. Plaintiffs' response that they could not have been on notice of their claims until all the details of the alleged fraud were disclosed ignores well-established law, as well as the public information that was known more than a year before they filed their claims. Likewise, Plaintiffs' Section 11 claim relating to the Secondary Public Offering is also barred by the three-year statute of repose, which, under settled law, ran two weeks before they filed their claim. Plaintiffs' attempt to rescue this claim is based on SEC rules that *did not exist* at the time of the offering and are simply inapplicable here.

Finally, Plaintiffs do not dispute that their "control person" claims under the Exchange Act and the Securities Act cannot survive without a predicate violation, which they have failed to allege.

For all the foregoing reasons, and those set forth in Defendants' moving papers, the Complaint should be dismissed with prejudice.

ARGUMENT

## I.  THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 10(b).

### A.  The Complaint Fails to Plead Loss Causation.

Plaintiffs' loss causation arguments are notable as much for what they omit as for what they include.  Plaintiffs make no attempt to argue that several of the misrepresentations alleged in the Complaint caused Plaintiffs' losses.  For example, Plaintiffs expressly disavow any allegation "that [MMA's] announcements of consecutively increasing dividends were themselves false."[12]  The Opposition is completely silent concerning the issue of capitalization of start-up costs.[13]  Plaintiffs also now concede that the First Restatement corrected the treatment of syndication fees upon consolidation.[14]  And Plaintiffs no longer contest that MMA appropriately disclosed and corrected its recognition of syndication fees under FAS 91 in the First Restatement.[15]

The arguments that Plaintiffs do make — that MMA allegedly misrepresented that it was in compliance with FIN 46R, and that MMA allegedly misrepresented that the Second "[R]estatement will not impact cash available for distribution"[16] — ignore what MMA actually said to investors.

---

[12]  Opp. at 38.

[13]  See Compl. ¶ 274; see also id. ¶¶ 15, 137, 145, 149, 162, 172, 176, 184, 191, 244; compare with Mem. at 31-32.

[14]  Whereas MMA earlier had believed and stated that syndication fees should be eliminated upon consolidation, in the First Restatement the Company determined that they should not be (and this treatment did not change subsequently).  (Compare Opp. at 26-27 with Mem. at 30.)  Plaintiffs offer no response to the point that the allegedly "corrective" disclosure made on January 28 and 29, 2008 about the timing of recognition of syndication fees merely repeated what the Company told investors 18 months earlier in its September 13, 2006 Form 8-K filing.  In fact, Plaintiffs' only reference to this issue is a passing observation that MMA made disclosures about the timing issue in its February 13, 2009 filing, i.e., a filing made more than a year after the supposedly "corrective" disclosures in this case.  (Opp. at 26.)

[15]  See Compl. ¶ 270.

[16]  See Opp. at 20.  The first three items on Plaintiffs' list of purported misrepresentations at page 20 of the Opposition are simply different ways of saying the same thing, i.e., that MMA stated that it was in compliance with FIN 46R.  The last two also are of a kind, i.e., that MMA said that the restatement would not affect CAD.  The only other item on the list is Plaintiffs' claim that MMA misrepresented that it had "no disagreements" with PwC.  As discussed infra in Section II, this was no misrepresentation at all and, in any

- 5 -

### 1.   Plaintiffs Have Not Pleaded Loss Causation Respecting MMA's Failure to Comply with FIN 46R.

Beginning more than a year before the purportedly "corrective" disclosures of January 28 and

29, 2008, MMA repeatedly and unequivocally stated that it was required to consolidate substantially all

of its LIHTC Funds under FIN 46R:

- On January 31, 2007, MMA disclosed that it "will be required to consolidate substantially all of the low income housing tax credit equity funds it has interests in."[17]

- On May 4, 2007, MMA stated in an SEC filing that "we have determined that we are required to consolidate certain entities not previously consolidated. The determination to consolidate these entities, primarily tax credit equity funds of which we are the sponsor, results from our conclusion that we are the primary beneficiary of a variable interest entity, or, we are the general partner of a partnership and we do not overcome the presumption of control of the partnership . . . ."[18]

- Also on May 4, 2007, the Company reiterated "the need to consolidate the majority of the low income housing tax credit equity funds in which it holds interests."[19]

- On July 11, 2007, MMA repeated in an SEC filing that it was "required to consolidate certain entities not previously consolidated."[20]

Plaintiffs do not dispute that MMA made these disclosures, but argue that the market "did not

comprehend the import of this information" because these disclosures made "*no* mention of FIN 46."[21]

But Plaintiffs do not explain how simply saying "FIN 46R" would have added any material information

to the Company's disclosures.   FIN 46 is titled "Consolidation of Variable Interest Entities" and

concerns the determination of whether a company is a primary beneficiary of a VIE. Thus, when MMA

---

event, it is not the substantive basis of any of Plaintiffs' claims, *i.e.*, there is no claim that some "disagreement" with PwC was revealed on January 28 and 29, 2008. The "disagreement" issue is relevant, if at all, only to the issue of scienter (and is, in any event, not an issue at all).

[17]   MMA Press Release (Jan. 31, 2007) (Holland Ex. 25).

[18]   Form 12b-25 (May 4, 2007), at 2 (Holland Ex. 16).

[19]   MMA Press Release (May 4, 2007) (Holland Ex. 26).

[20]   Form 8-K (July 11, 2007) (Holland Ex. 17).

[21]   Opp. at 30 (emphasis in original).

said it was required to "consolidate" the LIHTC Funds because it had concluded "it was the primary beneficiary of a [VIE]," there was no ambiguity that the subject matter of FIN 46R was at issue.

Moreover, MMA's 2004 disclosures made it clear that the consolidation issue arose under FIN 46, expressly using the words "FIN 46." Specifically, MMA then explained that it had consolidated some and not other LIHTC Funds pursuant to FIN 46R based on its determination of whether it was the primary beneficiary of those VIEs.[22] Thus, when MMA later told investors that it was required to consolidate the previously unconsolidated LIHTC Funds because it had determined that it was in fact the primary beneficiary of those entities, the import of the Company's language was clear.[23]

Plaintiffs' observation that MMA's stock price went up on the day that it announced the need to consolidate is irrelevant.[24] The market was unconcerned about the effects of FIN 46R because FIN 46R consolidation did not reflect the underlying economics of the Company (*i.e.*, the assets the Company owned or the obligations it might be required to pay). Moreover, the market's reaction to that and other news of the day cannot change the hard facts and plain meaning of what MMA said.

### 2. Plaintiffs Have Not Pleaded Loss Causation Respecting MMA's Statements Concerning Cash Available for Distribution.

Plaintiffs' attempt to manufacture a misstatement out of MMA's disclosure that the restatement

---

[22] *See* Form 10-Q (May 6, 2004) (Holland Ex. 5) ("Upon adoption of FIN 46 in March 2004, the Company determined that it is the primary beneficiary in certain of the funds it originates . . . As a result, the Company consolidated these equity investments at March 31, 2004 . . . . The Company also has a general partner interest in certain other low-income housing tax credit equity funders where it has concluded that it is not the primary beneficiary. Accordingly, [these] funds . . . have not been consolidated . . . .").

[23] Citing Paragraph 34 of their Complaint, Plaintiffs mistakenly suggest that MMA's first quarter *2004* "disclosure of unconsolidated LIHTCFs with assets of $970.3 million and liabilities of $90.8 million *understated* the liabilities of the unconsolidated funds" because the Company's later restated financials showed liabilities of $1.9 billion as of December 31, *2005*. (*See* Opp. at 29.) Plaintiffs do not allege that the *2004* figure of $90.8 million of liabilities was incorrect as of that time, only that the statements as of December 31, 2005 should have reflected the unconsolidated funds. In addition, the two figures are apples and oranges: the 2004 figure represents liabilities for the then-unconsolidated funds, the 2005 figure for all consolidated funds, whether consolidated or not in 2004.

[24] *See* Opp. at 30.

would "not impact cash available for distribution" rests on no firmer ground. MMA's announcement that the Company's accounting restatement for past periods did not affect CAD plainly referred to the accounting effects of the restatement and the calculation of CAD, and not — as Plaintiffs erroneously suggest — any costs associated with doing the work of the restatement. The relevant portion of the statement at issue reads:

> MMA announced today that it will restate its previously filed consolidated financial statements for the three month period ended March 31, 2006 as well as the for the years ended December 31, 2005, 2004, and 2003. The restatement will not impact cash available for distribution, a supplemental non-GAAP performance measure reported by the Company in addition to net earnings, in any period, or the Company's ability to pay future distributions to common shareholders.[25]

Plaintiffs' interpretation of this disclosure disregards its plain meaning. To begin with, the notion that MMA's expenditure of cash to do the work of the restatement would not affect the Company's cash is illogical. Furthermore, that this disclosure concerns the *accounting effects* of the restatement on the calculation of past CAD amounts is made clear by the fact that the disclosure: (i) expressly relates to a restatement of "previously filed" financial statements for several periods; (ii) specifically notes that CAD would not be affected "in any period"; and (iii) expressly refers to CAD as a supplemental non-GAAP performance measure, *i.e.*, a separate *accounting* measure.

Even were MMA's disclosure ambiguous — and it was not — any ambiguity was conclusively dispelled by the Company's subsequent disclosures in November 2007 that the costs of the restatement were "very significant" and that "due to [those] costs," the Company's net cash from operations may not be sufficient to pay the level of dividends it had been paying to date.[26] These statements confirmed

---

[25]    Form 8-K, Ex. 99 (Sept. 13, 2006) (Holland Ex. 14). Plaintiffs also point to a similarly worded statement in MMA's March 10, 2006 Form 8-K filing. (*See* Opp. at 28.) That filing related, however, to the *First* Restatement, and is irrelevant to the restatement costs issues that Plaintiffs claim were correctively disclosed on January 28 and 29, 2008 (which relate to the *Second* Restatement).

[26]    *See* MMA Press Release (Nov. 2, 2007) (Holland Ex. 27); Form 8-K, Ex. 99.2 (Nov. 8, 2007) (Holland Ex. 19). Moreover, the purportedly corrective disclosures on January 28 and 29, 2008 that relate to the costs of

precisely the two points Plaintiffs erroneously claim were not clear in MMA's earlier statement that the restatement would not impact CAD. Following these November 2007 disclosures, no investor could doubt that: (i) the costs of carrying out the restatement affected the Company's net cash from operations (as discussed above, a self-evident point but nonetheless expressly stated in November 2007); and (ii) that the impact of those costs could affect the dividend.[27]

Thus, Plaintiffs simply miss the point when they argue that the November 2007 disclosures were "enigmatic" because MMA also then announced an increase in its dividend and that it would "ask the Board to maintain the current dividend policy."[28] Plaintiffs do not argue that these statements were in any way ambiguous on the relevant points, *i.e.*, that restatement costs affected net cash from operations and could affect the dividend. Rather, they suggest only that the fact that MMA increased its dividend in November 2007 gave investors some comfort about the payment of future dividends (despite the warning that the increased dividend had not been earned). But even if MMA had made a statement about its intention to declare dividends in the future, such forward-looking statements provide no legally cognizable basis for a securities law claim, as the Fourth Circuit held in *Marsh Group v. Graff*, 2002 WL 1997949 (4th Cir. Aug. 30, 2002).[29] *Marsh* made clear that even strongly worded statements expressing a "commitment to continue to pay the company's dividend" relate to future economic

---

the restatement are almost identical to the statements contained in these November 2007 disclosures. (*See* Form 8-K, Ex. 99.01 (Jan. 29, 2008) (Holland Ex. 21).) Plaintiffs' suggestion that MMA should have disclosed various other things under paragraph 24 of FIN 46R (*see* Opp. at 29) does not establish loss causation either. In addition, Plaintiffs' observation that MMA's 2004 disclosure of the liabilities of the unconsolidated funds did not match the liabilities those funds later had does not make the 2004 disclosures misleading (*see* Opp. at 29), and there is no allegation in the Complaint to suggest otherwise (indeed, Paragraph 34, cited by Plaintiffs, simply alleges the figures for the two different periods). Also, Plaintiffs overlook the fact that the two figures relate to the liabilities of different groups of companies.

[27]   In fact, Plaintiffs concede that they "do not allege that Defendants made a promise to pay future dividends" (Opp. at 39 n.16), and that their only point is that they did not know that "the [cost of the] restatement was having and would continue to have an impact on CAD and the dividend" (*id.*). But this is exactly what the Company's November 2007 disclosures stated.

[28]   *See* Opp. at 32.

[29]   *See* Mem. at 26-28 (discussing *Marsh*).

performance. As in *Marsh*, MMA's alleged (and much less strongly worded) statements "are not guarantees and lack the factual specificity necessary to make them actionable in this circuit. Therefore the statements are immaterial as a matter of law."[30]

Plaintiffs' attempt to distinguish *Marsh* rests on at least three untenable grounds.[31] *First*, even if the statement that MMA had declared an increased dividend had been forward-looking, there would have been no requirement under the PSLRA safe harbor provisions that it be "'identified' as such and 'accompanied by meaningful cautionary statements . . . .'"[32] The PSLRA safe harbor expressly applies where a forward-looking statement is *either* immaterial *or* "identified" as such, etc.[33] *See* 15 U.S.C. § 78u-5(c)(1)(A). In *Marsh*, the Fourth Circuit held that the statements concerning future dividend payments were "immaterial as a matter of law."[34] Thus, nothing in *Marsh* turned on whether the

---

[30]   2002 WL 1997949, at *6.

[31]   *See* Opp. at 38-40.

[32]   Opp. at 37.

[33]   Plaintiffs' suggestion that the disclosure requirements of Item 303 of Regulation S-K ("Reg. S-K"), 17 C.F.R § 229.303, might supply a relevant duty is simply incorrect. (*See* Opp. at 36-37.) There is no private right of action under Reg. S-K and "a violation of Regulation S-K does not lead to a failure to disclose under 10b-5." *Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 583 (E.D. Va. 2006) (citing *Oran v. Stafford*, 226 F.3d 275, 278 (3d Cir. 2000) & *In re Sofamor Danel Group, Inc.*, 123 F.3d 394, 403 (6th Cir. 1997)). Putting aside the fact that Item 303 applies only to a type of disclosure that MMA did not make between June 2006 and February 2009, MMA's disclosure that the costs of the restatement were "very significant" in 2007, and would continue to be so in 2008, more than satisfies any duty under Item 303 of Reg. S-K to "identify any known trends or . . . demands, commitments, events or uncertainties . . . reasonably likely" to affect liquidity. Reg. S-K does not alter the rule that projections are not required and does not require a separate line item for restatement costs. *See Iron Workers*, 432 F. Supp. 2d at 582; *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 516 (9th Cir. 1991) (noting Instruction 7 to Item 303(a) explicitly states that forward-looking information need not be disclosed in Reg. S-K filings).

[34]   *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220 (S.D.N.Y. 2006) is not to the contrary. *Veeco* cites the disjunctive language of the PSLRA safe harbor, and rests on the fact the misrepresentations in that case "are not forward looking; rather they are either affirmative representations about the current or historical performance" of the company or omissions concerning accounting improprieties. The statements at issue here concerning the dividend are neither.

Moreover, Plaintiffs' misreading of the PSLRA would require companies to include identifying and detailed cautionary statements about every forward-looking statement in their financial reports. Such a requirement would upend the current practice of every company in the United States and make them many times more lengthy, confusing, and less meaningful. Fortunately, there is no such requirement in the law.

company had issued cautionary language, let alone the sort of highly specific language Plaintiffs erroneously would have this Court require. Moreover, MMA *did* expressly qualify its November 2007 disclosures with the warning that "[s]tatements in this press release that are not historical fact may be deemed forward-looking statements . . . . Examples of forward looking statements include our projections for our payout ratio."[35]

*Second*, forward-looking statements do not become actionable simply because Plaintiffs add the rote allegation that defendants "knew of the falsity of the forward looking statements when they were made."[36] The PSLRA safe harbor expressly applies *disjunctively* where a forward-looking statement is *either* immaterial or identified as such, etc. *or* a plaintiff fails to prove it was made with actual knowledge that it was false or misleading.[37] Plaintiffs' reliance on *P. Stoltz Family Partnership L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004), and *In re Prudential Sec. Ltd. Partnerships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996), is misplaced. Those cases concern misrepresentations of presently-known facts or their analogues.[38] And *In re Alliance Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 192 (S.D.N.Y. 2003) — which involved an alleged misrepresentation about the company's present belief concerning future capital — is inapposite because the Fourth Circuit expressly rejected a similar attempt to so characterize the defendants' statements about future dividends in *Marsh*:

> We also reject the Appellants' attempt to distinguish *Raab, Malone*, and *Hillson* by arguing that [the company's] allegedly false statements were statements of present intention to pay dividends, rather than forward-looking projections of future dividends. All projections can be

---

[35]   MMA Press Release (Nov. 2, 2007) (Holland Ex. 27).

[36]   Opp. at 38-39.

[37]   *See* 15 U.S.C. § 78u-5(c)(1)(A) & (B). Plaintiffs' own cited case, *Veeco*, acknowledges that the PSLRA has a "two pronged analysis" in this regard. *See* 235 F.R.D. at 235.

[38]   *See Stoltz*, 355 F.3d at 97 (respecting the bespeaks caution doctrine, "[h]istorical or present fact-knowledge within the grasp of the offeror is a different matter. Such facts exist and are known; they are not unforeseen or contingent"); *In re Prudential*, 930 F. Supp. at 72 (future event known to company because it "border[ed] on certaint[y]").

> characterized as presently held beliefs.  The statements are forward-
> looking because they relate to "future economic performance" . . . .
> [Indeed, m]any of the statements in our prior cases could have been
> characterized as statements of present belief regarding future events.[39]

*Third*, the notion that MMA purportedly "knew of the falsity" of the relevant forward-looking statements when they were made lacks any factual support in Plaintiffs' Complaint. There simply are no allegations of specific facts in the Complaint to support the notion that MMA knew in September 2006 (or even in November 2007) — let alone earlier in the purported Class Period — what its dividend would be in January 2008, and Plaintiffs point to none.[40]

Plaintiffs rest their entire case concerning cost disclosure on the impression that MMA's statement concerning the restatements' lack of *accounting impact* on previously reported CAD somehow really was a "reassurance"[41] about the *costs* of performing the restatement and the availability of cash for future distributions.  And they ignore the fact that months before the complained of stock drop, MMA told investors precisely the two points Plaintiffs erroneously claim were hidden, *i.e.*, that the costs of the restatement could affect cash from operations, and that those costs could affect MMA's ability to pay the dividend.

### 3. Failure to Plead Loss Causation Is Not a "Truth on the Market" Defense.

Plaintiffs attempt to distract the Court from their inability to plead loss causation by arguing at

---

[39]  2002 WL 1997949, at *6.  *See also id.* (noting that "[t]he PSLRA explicitly defines forward looking statements as including 'a projection of dividends'").

[40]  Of course, MMA did know that spending money to do the work of the restatement would somewhat reduce its net cash from operations, but so would anyone with even a passing familiarity with what it costs to prepare financial statements. (*See* Opp. at 38.) But Plaintiffs allege no facts to support their statement that MMA knew early on how great the costs would be. As discussed *infra*, Plaintiffs' scienter allegations center on the theory that MMA somehow knew from the beginning of the purported Class Period that it was required to consolidate substantially all of its LIHTC Funds pursuant to FIN 46R, even though its independent auditor, PwC, had not disagreed with MMA's determination that many of the funds did not have to be consolidated. As discussed *infra*, Plaintiffs' entire scienter case rests on a single unsubstantiated statement about a purported disagreement between PwC and MMA about a different matter (*i.e.*, about what to disclose respecting the funds that did not have to be consolidated), which, if there was a disagreement, resulted in MMA doing exactly what PwC recommended.

[41]  Opp. at 35.

length that Defendants have failed to establish a "truth on the market" defense.[42] Defendants have not — and do not — assert that defense. The truth on the market doctrine provides that "a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market."[43] Defendants do not contend that their alleged misrepresentations concerning FIN 46R and the effect of the restatement on CAD were immaterial because the market somehow already knew the "true facts" regarding these issues.  Plaintiffs' 20 pages of argument attempting to prove the contrary are therefore irrelevant to this Motion.

Plaintiffs' belabored effort to rebut their own straw man also fails to deal with the Fourth Circuit's holding in *Teachers' Retirement System*, which makes clear that the relevant issue here is loss causation.  In *Teachers'*, which affirmed the dismissal of a securities fraud complaint, the Fourth Circuit explained that "the problem with plaintiffs' theory . . . is that [the relevant] facts had already been disclosed in public filings, so their revelation [by the allegedly corrective disclosure] . . . could not have caused [the company's] stock price to decline . . . .  To allege loss causation in this case, plaintiffs would have to allege that the market reacted to *new* facts . . . ."[44]  That is exactly what MMA has shown here. Plaintiffs simply fail to allege any *new facts*, other than the reduction in MMA's dividend that had just occurred, that the market learned for the first time in MMA's January 2008 disclosures.  And Plaintiffs have conceded that the mere reduction of the dividend — without the correction of a prior misrepresentation — fails to state a claim under Rule 10b-5.[45]  Since MMA's prior failure to comply

---

[42]  Opp. at 21-40.

[43]  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000).

[44]  477 F.3d at 187 (emphasis added).  Plaintiffs argue that loss causation also can be established by the materialization of a risk that was previously concealed by a prior misstatement or misleading disclosure (*i.e.*, as opposed to having the truth revealed by a corrective statement), which is true as far as it goes.  (*See* Opp. at 74-77.)  But that is to say only that the predicate misstatement might be revealed by words *or* by events and does not change the fact that in this case all the true facts underlying the relevant alleged predicate misstatements were revealed *before* January 28 and 29, 2008.

[45]  Opp. at 38.

with FIN 46R and the fact that its Second Restatement could affect the dividend were both disclosed to investors well before January 2008, these purported misrepresentations could not have caused Plaintiffs' alleged losses.

In the end, Plaintiffs' Opposition rests on the implicit plea that some misrepresentation must have caused MMA's stock to drop, even though all the relevant facts that Plaintiffs claim were hidden were plainly disclosed. The elephant in the room is that the beginnings of the credit crisis rapidly decimated MMA's business because of, among other things, a reduced willingness of investors to purchase interests in the funds MMA formed,[46] the need to post additional collateral with lenders, and the reluctance of lenders to advance new funds.[47] Thus, the reasons MMA had to cut its dividend (and cause of MMA's stock drop) are clear, they just are not what Plaintiffs now would like them to be, and Plaintiffs have not adequately pled otherwise.[48]

### B.   The Complaint Does Not Plead Sufficient Facts to Support an Inference That Defendants Acted with Fraudulent Intent or Severe Recklessness.

Plaintiffs concede that they cannot point to any single factual allegation that adequately alleges scienter. They therefore request this Court to take a "holistic" approach and consider their laundry list of allegations "collectively."[49] Some of these allegations are mundane (i.e., "Defendants were the most senior executive and financial officers of [MMA]"); others are conclusory statements that lack any specific facts to support them (e.g., "[t]he Individual Defendants knew about the Company's noncompliance with FIN 46R as early as . . . March 2006"); and others were disclosed by MMA long

---

[46]   Two of MMA's largest investors also were experiencing severe financial problems during this time period because of the credit crisis. See, e.g., Federal National Mortgage Association, Form 8-K (Dec. 4, 2007) (announcing Fannie Mae's plan to reduce its dividend by 30%); Federal Home Loan Mortgage Corp. Press Release (Nov. 27, 2007) (announcing Freddie Mac's decision to reduce its dividend by 50%).

[47]   See Form 8-K (Apr. 9, 2008) (Holland Ex. 22).

[48]   On January 28 and 29, 2008, MMA also announced that its stock would be de-listed from the NYSE. Plaintiffs assert no claim relating to this significant announcement.

[49]   Opp. at 42.

before January 2008 (*e.g.*, MMA "did not have the automated systems in place to accomplish the consolidations, which required vast amounts of manual labor").[50]  Even taken collectively, however, these facts hardly present the "cogent and compelling" inference of scienter that *Tellabs* requires.[51]  An equally "plausible nonculpable explanation[]" for Defendants' conduct is that MMA struggled for a long period with the application of new and complex accounting principles and theory (*i.e.*, how to apply FIN 46R to its business), made every effort to comply with FIN 46R despite enormous difficulty and expense, and kept investors informed of new and often unanticipated events in connection with that compliance effort as they occurred.  Under *Tellabs* and its progeny, the Complaint therefore should be dismissed for failure to plead scienter.[52]

### 1. The Purported "Disagreement" between MMA and PwC Does Not Support Plaintiffs' Allegations of Scienter.

Fundamentally, Plaintiffs rest their case for scienter on the allegation that MMA hid the need to consolidate under FIN 46R despite the advice of its outside auditor, PwC.  The Complaint alleges that "CW3 stated that the PwC partner 'insisted' that the value of [various tax credit equity funds] be disclosed on [MMA's] books."[53]  Plaintiffs contend in their Opposition that this allegation supports an entirely different proposition, *i.e.*, that PwC insisted that those entities be *consolidated* under FIN 46R.[54]  But there is a huge gulf between the two, and the only possible inference to draw from the actual facts is that PwC agreed with MMA about its decisions regarding consolidation of the various relevant funds.

---

[50]   Opp. at 41-42.

[51]   127 S. Ct. 2499, 2509 (2007).

[52]   *See, e.g., In re Radian Sec. Litig.*, 2009 WL 974324, at *23 (E.D. Pa. Apr. 9, 2009) ("[T]he mere representation that a filing was prepared in compliance with GAAP does not imply culpability.").

[53]   Compl. ¶ 88 (emphasis removed).

[54]   *See, e.g.*, Opp. at 41, 65.  Plaintiffs assert that "The Complaint alleges, inter alia, that . . . PwC insisted on the consolidation of the LIHTCFs prior to the first restatement in March 2006." (Opp. at 41.)  Tellingly, Plaintiffs offer no citation for this proposition, and the only specific facts alleged in the Complaint concerning a disagreement are Paragraph 88's allegation that PwC insisted on *disclosure*.

*First*, the issue of what had to be disclosed about entities that did not have to be consolidated (the issue actually alleged to have been the subject of disagreement) is entirely different from the issue of what entities had to be consolidated under FIN 46R. In 2006, FIN 46 was a recently adopted, highly complex accounting pronouncement about which there was considerable uncertainty within the accounting profession.   Indeed, FIN 46 had to be revised shortly after its adoption, and national accounting firms publically issued their own interpretations and re-interpretations of the relevant standards.[55]   Paragraphs 23 and 24 of FIN 46R expressly require various disclosures regardless of whether a VIE must be consolidated, including the size of the VIE and its maximum exposure to loss. There is no indication of any disagreement between PwC and MMA about what funds had to be consolidated.   MMA's financial statements contained a detailed description of how MMA applied FIN 46, and PwC certified those financial statements without qualification.[56]

*Second*, whatever disagreement there might have been about what must be disclosed about the funds that did not have to be consolidated (and the Complaint offers next to no detail as to what that disagreement might have been),[57] PwC must have ultimately convinced MMA, because in the notes to its March 31, 2004 financial statements (its first financial statements to which FIN 46 applied), MMA specifically disclosed the assets and liabilities of the unconsolidated funds:

> The Company also has a general partner interest in certain other [Funds] where it has concluded that it is not the primary beneficiary. Accordingly,

---

[55]   *See, e.g.,* DELOITTE & TOUCHE LLP, FIN 46(R): A ROADMAP TO APPLYING THE NEW CONSOLIDATION GUIDANCE (2004),
http://www.deloitte.com/dtt/cda/doc/content/us_assur_FIN46(R)InterpretationsMar2004.pdf.

[56]   *See* Form 8-K, Ex. 16 (Oct. 26, 2006) (Holland Ex. 15).

[57]   As a general matter, the vague allegations attributed to the three confidential witnesses lack the corroborating detail necessary to sustain the inferences Plaintiffs seek to draw from them. (*See* Mem. at 42-45.) Moreover, Plaintiffs have essentially abandoned any reliance on the allegations purportedly attributed to CW1, which amounted to little more than unsurprising (and far from damning) reports of frustration with the complicated FIN 46R consolidation process. (*See* Mem. at 43.) In addition, events discussed in meetings with CW3, who left MMA in March 2006, and Mr. Harrison, who left at the end of 2005, have no bearing on the circumstances surrounding PwC's dismissal in the Fall of 2006.

> funds with assets of $970.3 million and liabilities of $90.8 million at
> March 31, 2004 have not been consolidated . . . .[58]

Moreover, MMA's audited financial statements for the year ended December 31, 2004, which PwC

certified — without qualification — to have been prepared in accordance with GAAP (which includes

FIN 46R) contained the same application of FIN 46R.[59]

*Third,* MMA's October 2006 Form 8-K (disclosing the change of auditors) reported that the

Company had filed audited financials, which PwC had certified without qualification, and that

> [d]uring the years ended December 31, 2005 and December 31, 2004 and
> through October 20, 2006, there were no disagreements with PwC on any
> matter of accounting principles or practices, financial statement disclosure
> or audit scope or procedure, which disagreements if not resolved to the
> satisfaction of PwC would have caused them to make reference thereto in
> their reports on [the Company's] financial statements.[60]

PwC filed a statement with the SEC agreeing with this statement.[61]   Plaintiffs do not allege that PwC

was lying when it made this statement, or was otherwise somehow complicit with MMA.

For these reasons, there is no basis for Plaintiffs' attempt to bootstrap the asserted disagreement

between MMA and PwC over what to disclose about VIEs that did not have to be consolidated into

evidence that MMA knew it should have consolidated a large number of additional entities.

Plaintiffs' only effort to confront the fact that PwC agreed with MMA's application of FIN 46R

is the unsupported statement that "[a]lthough PwC may have failed to detect [MMA's] fraudulent

accounting, there is no evidence that [MMA] ever provided PwC with sufficient documents and material

to determine whether [MMA] had properly consolidated all VIEs pursuant to FIN 46R."[62]   However, the

---

[58]   Form 10-Q (May 6, 2004) (Holland Ex. 5).

[59]   *See* Form 10-K (Mar. 16, 2005), at 63-64 (Holland Ex. 10).

[60]   *See* Form 8-K (Oct. 26, 2006) (Holland Ex. 15).

[61]   *See* Holland Ex. 16.

[62]   Opp. at 64. Similarly, Plaintiffs assert that "Defendants *knew* they were not in compliance with FIN 46R and *disagreed* with PwC," (Opp. at 63-64 (emphasis in original)), *i.e.*, that in this breath at least, Plaintiffs are

change of mind about what entities had to be consolidated under FIN 46R was not based on discovery of additional facts. It was based on a different view of accounting theory. Plaintiffs cannot change this by baldly speculating that there were facts that MMA withheld from PwC without even suggesting what these facts were, or why MMA's new auditor, KPMG, apparently had no difficulty uncovering them. [63] In addition, Plaintiffs' argument fails because there are no allegations in the Complaint that MMA ever failed to give PwC any information that it asked for, or concealed anything from its auditors. [64]

### 2.   Plaintiffs' Scienter Allegations Concerning the Costs of the Restatement and the Consequent Impact on the Dividend Are Conclusory and Boilerplate.

Plaintiffs' argument for scienter as it concerns the costs of the restatement and their impact on the January 2008 dividend rests principally on innuendo that MMA "must have known" what the costs were. Yet Plaintiffs fail to identify, as *Tellabs* requires they must, any specific facts about the critical issue of *when* MMA had such knowledge. Plaintiffs' suggested inferences are far less plausible than the alternative: that MMA's knowledge about the costs of the restatement evolved over time, and basically tracked what it disclosed to investors during the relevant period.

*First,* Plaintiffs' suggestion that the magnitude of the restatement costs "should have been obvious" to MMA because they had "intimate knowledge of the VIEs and [MMA's] lack of internal

---

claiming that PwC was telling MMA that it was not in compliance with FIN 46R. Plaintiffs cannot coherently claim in the next breath that PwC was telling MMA the opposite.

[63]   Plaintiffs also fail in their attempt to have it both ways with the allegation that "CW2 states that at the time of the first restatement (by mid-2006), [Ms. Lundquist and Mr. Thor of MMA] had concluded that the primary beneficiary determinations for the tax credit equity funds had been done incorrectly and that most the funds should have been consolidated." (Compl. ¶ 82.) Plaintiffs make no effort to square the allegation that two MMA accountants concluded MMA had to consolidate only in mid-2006 (shortly before it terminated PwC, and thereafter disclosed the need to consolidate substantially all of the LIHTC Funds) with the argument that MMA knew that as early as 2004.

[64]   Plaintiffs' suggestion that MMA "knew that they could not rely on PwC's previous work, so all prior auditing word had to be re-done, as well as work on consolidating the unconsolidated VIEs" (Opp. at 51; *see also* Opp. at 3), is in similar tension with Plaintiffs' reliance on some supposed disagreement with PwC about whether to consolidate substantially all the LIHTC Funds. Moreover, it is a standard Form 8-K disclosure in every accounting restatement that the prior financial statements "should no longer be relied upon" and such statements are, accordingly, of no weight in the scienter calculus. (*See, e.g.,* Form 8-K (Sept. 7, 2006).)

controls or systems"[65] presupposes that MMA knew that it had to consolidate those VIEs under FIN 46R. MMA simply had no reason to implement controls over or acquire "intimate knowledge" about funds the Company believed it did not have to consolidate. And as discussed *supra*, Plaintiffs advance no good reason to think MMA somehow knew it had to consolidate substantially all of its LIHTC Funds before it disclosed precisely that to investors.

*Second*, neither the Complaint nor the Opposition identify any particularized facts demonstrating *when* the restatement costs rose to such a level that they might impact MMA's ability to pay the dividend.[66] Even Plaintiffs concede that the bulk of those costs were incurred after outside consultants were hired in the summer of 2007.[67] Nowhere do Plaintiffs describe a single meeting, report or other source that forecast the ultimate costs, much less one that predicted the credit crisis and suggested how the accounting costs would impact the dividend in light of MMA's major decline in business and loss of liquidity flowing from the credit crisis.

*Third*, Plaintiffs allege, without support, that MMA knew more than it told investors about its restatement costs because Defendants purportedly knew the magnitude of the unconsolidated funds and that MMA had "no automated systems or qualified staff to accomplish the tasks."[68]   Plaintiffs' contention that these "pivotal facts . . . would have alerted investors to the impact of the costs inherent in the restatement [and] were not disclosed until the end of the Class Period" is simply untrue. Well before January 2008, MMA expressly disclosed the relevant facts, including, for example:

- The size of the unconsolidated funds, *i.e.*, that they had "assets of $970.3 million and liabilities of $90.8 million at March 31, 2004."[69]

---

[65]   Opp. at 47.

[66]   *See* Mem. at 34, 35.

[67]   *See* Opp. at 51.

[68]   Opp. at 46.

[69]   Form 10-Q (May 6, 2004) (Holland Ex. 5), at 9.

- Repeatedly, that the Company "did not maintain effective policies and procedures over the identification of entities requiring consolidation."[70]

- The specific resources the Company was using to accomplish the task of the restatement: "To give you a sense of our dedication to the restatement task, there are approximately 92 people currently working on the restatement. This includes 20 company employees and 72 consultants."[71]

For the same reason, Plaintiffs' related suggestion — that Defendants must have known the restatement costs because the GAAP violation concerned a large dollar figure adjustment and took a long time to complete[72] — falls flat. As shown *supra*, those facts were known to investors, and again, Plaintiffs have not adequately alleged *when* those costs rose to such a level that it could have put the dividend payment at risk, or whether even the major costs of the restatement would have caused MMA to cut its dividend if the credit crisis had not significantly reduced MMA's revenues and severely impacted its liquidity.

*Fourth*, the fact that the Individual Defendants were senior executives of the Company or that the relevant business was allegedly part of MMA's "core operations"[73] adds little, if anything, to Plaintiffs' side of the ledger. Any allegation that Defendants must have been aware of the growing costs of the restatement process necessarily depends on the sufficiency of the underlying predicate allegations regarding the timing and extent of those costs. *See Radian*, 2009 WL 974324, at *19 (E.D. Pa. Apr. 9, 2009). Where, as here, the Complaint fails to establish those details, there is no basis for imputing such "information" to senior management.[74] *See, e.g., Elam v. Neidorf*, 544 F.3d 921, 929 (8th Cir. 2008)

---

[70] *See, e.g.*, Form 12b-25 (May 4, 2007) (Holland Ex. 16), at 2; Form 8-K (July 11, 2007) (Holland Ex. 17).

[71] Form 8-K, Ex. 99.1 (Aug. 7, 2007) (Holland Ex. 18); *see also* Form 8-K, Ex. 99-2 (Nov. 8, 2007) (Holland Ex. 19).

[72] *See* Opp. at 49-50. The mere length of time to complete the restatement does not support an inference of scienter particularly where it was conducted with the help of outside consultants (and investors were apprised of its progress). *See In re H&R Block Sec. Litig.*, 527 F. Supp. 2d 922, 930 (W.D. Mo. 2007) (rejecting plaintiffs' claim that a two-year process to restate financials supported scienter and holding instead that investigation undertaken with help of outside auditor refuted scienter).

[73] Opp. at 48-49.

[74] Likewise, Plaintiffs' conjecture that "only the CEO and CFO could have approved" the restatement costs (Opp. at 51) lacks the necessary foundation of specific facts concerning the progress of the restatement

(refusing to impute knowledge of increased medical costs to management where plaintiffs merely alleged that the information "must have existed" and "must have been known").[75]

*And fifth*, Plaintiffs' reference to an alleged Fall 2006 memo — "noting that the restatement would be the Company's main focus, that overtime would be mandatory, and that excuses for delayed responses to the audit department's request for documents would not be tolerated"[76] — only supports MMA's case. That MMA devoted extraordinary resources to the restatement was exactly what it should have done. That MMA instructed its personnel that the restatement was its "main focus" and that any delayed response to its audit team "would not be tolerated" shows only the strength of MMA's commitment to getting the restatement right.

### 3.   Plaintiffs' Generic Corporate and Individual Motive Allegations Add Little, if Anything, to the Scienter Calculus.

What remains of Plaintiffs' scienter argument is a hodgepodge of generic allegations of motives that courts recognize are shared by almost every public company and are thus inadequate to satisfy the PSLRA's heightened pleading requirements.[77]  None of those allegations is backed by the sort of specific allegations of fact necessary to make them meaningful in the scienter calculus.

Plaintiffs suggest that MMA might have favored not consolidating because it wanted to avoid having liabilities on its books. But Plaintiffs overlook the fact that the *assets* of the partnerships were far greater than their liabilities, specifically $4.6 billion versus $1.9 billion.

---

process and when those costs were incurred, especially because it is clear that the bulk were associated with outside consultants hired in the Summer of 2007.

[75]   *See also In re Northpoint Commc'ns Group, Inc. Sec. Litig.*, 184 F. Supp. 2d 991, 998 (N.D. Cal. 2001) (proper foundation for core business inference requires "at a minimum a showing that (with all requisite particularity that the defendants had knowledge of contradictory information at the time that they made their statements."); *Kushner v. Beverly Enters. Inc.*, 317 F.3d 820, 828-29 (8th Cir. 2003) (rejecting "investors attempt to make out a strong inference of scienter based upon circumstantial evidence-namely that is it was reckless for the defendants not to know of a scheme given its sheer size "absent a showing that the defendants had knowledge of contradictory crucial information at the time that they made their statements.")

[76]   Compl. ¶ 81.

[77]   *See* Mem. at 53.

Plaintiffs assert that MMA did not want to consolidate the LIHTC Funds under FIN 46R because of a purported desire to avoid defaulting on certain unidentified bank covenants. The only specifics in the Complaint, however, concern the fact that MMA obtained a *waiver* respecting the requirements of one covenant.[78] Plaintiffs have not identified a single debt covenant at risk of default but for the alleged effects of non-consolidation.

Plaintiffs' insider trading allegations are similarly unavailing. That the alleged insider sales *all* took place at the beginning of a lengthy class period weakens any inference of scienter potentially flowing from them.[79] And Plaintiffs' argument that the timing of the alleged insider trading is suspicious because certain Defendants had "actual knowledge" of the failure to comply with FIN 46R as early as March 2006 falls apart with Plaintiffs' failure to support the allegation of such actual knowledge (as shown *supra*).[80]

---

[78] *See* Compl. ¶¶ 254-55. That MMA's lenders might be willing to waive the requirements of covenants as they pertained to the impact of FIN 46R is not surprising because the assets and liabilities of the Funds placed on MMA's books as a result of FIN 46R were not assets that MMA owned or liabilities that it could be called upon to pay.

[79] *See* Mem. at 46-47; *see also In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1093 (9th Cir. 2002) (holding that "unusually long class period" of 15 months "operates to the detriment of plaintiffs" in pleading scienter based on stock sales).

[80] *See* Opp. at 58. Plaintiffs' theory of "actual knowledge in March 2006" is of no relevance to Mr. Harrison's alleged trading activity, all of which took place in 2004. In addition, Mr. Falcone and Mr. Joseph's trades were made pursuant to non-discretionary 10b5-1 plans entered into well before March 2006 (and in Mr. Falcone's case before the start of the Class Period). (*See* Mem. at n.98). Indeed, Plaintiffs identify no specific facts to support their conjecture that perhaps those plans were entered into with scienter. Nor can Plaintiffs avoid the import of the 10b5-1 plans — *i.e.*, that the sales were not discretionary — by calling it an "affirmative defense." *See, e.g., Elam*, 544 F.3d at 928-29 (considering timing of 10b5-1 plans at motion to dismiss stage and holding that "stock sales pursuant to Rule 10b-5 trading plans 'can raise an inference that the sales were prescheduled and not suspicious'") (citation omitted).

Plaintiffs' argument that the sales might still be suspicious because there is no "per se" rule concerning the percentage of stock considered sufficiently "unusual" misses the point. (*See* Opp. at 57.) That Messrs. Falcone and Joseph left a substantial majority of their holdings exposed to market fluctuations and made no effort to capitalize on their alleged informational advantage for over a year and a half is not consistent with Plaintiffs' theory that they sought to conceal the need to consolidate under FIN 46R and the effects of that process until January 2008. It is similarly difficult to see how Mr. Harrison's sales could be consistent with Plaintiffs' theory when all of his sales took place in 2004, and he left the Company at the end of 2005.

Finally, Plaintiffs' attempt to analogize the corporate stock sales (*i.e.*, pursuant to the offering and acquisitions) to insider trading is particularly unpersuasive as Plaintiffs allege nothing about the corporate stock sales that was unusual or suspicious.

In short, Plaintiffs identify no specific facts showing that MMA allegedly knew material facts about the costs of the restatement that were not disclosed. Moreover, the fact that MMA disclosed the relevant developments concerning the restatement as they occurred itself strongly supports an inference of good faith. Plaintiffs contend that the Court should disregard these inferences favoring MMA because they are "affirmative defenses."[81] This simply ignores the holding of *Tellabs*. Courts repeatedly have rejected as incorrect under *Tellabs* efforts like Plaintiffs' to characterize the proffering of competing inferences as improperly raising issues of fact.[82] Simply put, *Tellabs requires* the Court to consider "competing non-culpable inferences by the defendants."[83] The fact that those inferences overwhelmingly favor Defendants does not make them "affirmative defenses."[84]

## II.    PLAINTIFFS' SECURITIES ACT CLAIMS ALSO SHOULD BE DISMISSED.

### A.    Plaintiffs' Securities Act Claims Fail Because They Sound in Fraud and Are Not Pleaded with Particularity as Required by Rule 9(b).

Plaintiffs' Securities Act claims are subject to the heightened pleading requirements of Rule 9(b)

---

[81]    Opp. at 63-67.

[82]    *See, e.g., Radian*, 2009 WL 974324, at *15 n.18, *18 n.21 (taking judicial notice of the auditor letter filed with the SEC and rejecting argument that the letter prematurely raised an issue of fact) (citing *Tellabs*); *Fort Worth Employers' Ret. Fund v. Biovail Corp.*, 2009 WL 1357229, at *7-*9 (S.D.N.Y. May 8, 2009) (taking judicial notice of FDA letter regarding drug application).

[83]    *Radian*, 2009 WL 974324, at *15 n.18.

[84]    Plaintiffs also erroneously suggest that only allegations in the Complaint may be considered in the *Tellabs* analysis. (*See* Opp. at 61-62.) Courts applying *Tellabs*, including those in the Fourth Circuit, have widely recognized that *Tellabs requires* that the Court conduct a "comparative analysis" of inferences drawn from facts, like those here, alleged in the Complaint, *as well as those* drawn from judicially noticeable documents, and documents incorporated by reference in the Complaint. *See, e.g., Cozzarelli v. Inspire Pharms. Corp.*, 549 F.3d 618, 625 (4th Cir. 2008) (rejecting plaintiffs' argument that it "not look beyond complaint for additional facts" as inconsistent with *Tellabs*); *Pub. Employees Ret. Sys. Assoc. of Colo. v. Deloitte & Touche, LLP*, 551 F.3d 305, 312-13 (4th Cir. 2009).

because their claims unquestionably "sound in fraud."[85] For their Securities Act claims, Plaintiffs incorporate by reference and repeat all of the same allegations that they rely upon for their fraud claims under the Exchange Act, including, for example:

- "Defendants falsely represented to investors during the Class Period that [MMA] had consolidated its off-the-book partnerships and was in compliance with GAAP and FIN46R";[86]

- "By failing to consolidate the partnerships on an on-going basis, Defendants knowingly postponed and concealed this task";[87] and

- "Defendants orchestrated the false appearance of successful financial performance."[88]

These are quintessential allegations of fraud. As the Fourth Circuit recently explained in *Cozzarelli*, "[w]hen a plaintiff makes an allegation that has the substance of fraud, therefore, he cannot escape the requirements of Rule 9(b) by adding a superficial label of negligence or strict liability." *Id.* at 629. Likewise, courts throughout the country have held plaintiffs to the heightened pleading requirements of Rule 9(b) when the theory of their case is that the defendants committed fraud.[89]

Plaintiffs spend much of their brief futilely trying to convince the Court to ignore the fact that their Securities Act claims are based on the same theory of liability as their fraud claims under the Exchange Act. Because their theory is the same, Plaintiffs' argument makes no sense. Even in their opposition brief, Plaintiffs argue that "defendants *continually reassured investors* and *concealed the gravity* of [MMA]'s restatement."[90] Thus, even while arguing otherwise, Plaintiffs cannot help but

---

[85] *See* Mem. at 50-51.

[86] Compl. ¶ 8.

[87] *Id.* ¶ 10.

[88] *Id.* ¶ 12.

[89] *See, e.g., Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004); *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 160 n.24 (3d Cir. 2004); *Lone Star Ladies Inv. Club v. Schlotzsky's, Inc.*, 238 F.3d 363, 368 (5th Cir. 2001); *In re Stac Elecs. Sec. Litig*, 89 F.3d 1399, 1404 (9th Cir. 1996); *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1278 (11th Cir. 2006).

[90] Sec. Act Br. at 33 (emphasis added).

acknowledge that their Securities Act claims are based on the same allegations of fraud as their Exchange Act claims. These are the same circumstances that led the Fourth Circuit in *Cozzarelli* to apply Rule 9(b) in that case:

> Here, plaintiffs' allegations sound in fraud and thus are subject to Rule 9(b). The complaint treats the allegedly false statements in Inspire's prospectuses as part of a single, coordinated scheme to defraud investors. *Indeed, plaintiffs' allegations regarding the prospectuses — that they were misleading because they failed to disclose the primary endpoint of Study 109 — are exactly the same as plaintiffs' allegations of fraud under the Exchange Act.*

549 F.3d at 629 (emphasis added). The same logic applies here.

Failing to make a convincing argument that their Securities Act claims are not subject to Rule 9(b), Plaintiffs resort to arguing that they have nonetheless satisfied their heightened pleading burden.[91]  Plaintiffs are wrong. Plaintiffs themselves acknowledge that Rule 9(b) "requires that the Complaint specify the time, place, speaker and contents of the allegedly false statements, as well as the manner in which the statements were false and generally allege the defendants' requisite state of mind."[92]  For all the reasons discussed above with respect to their Exchange Act claims, however, Plaintiffs have failed to allege that any of the Defendants acted with intent to defraud.[93]  In addition, Plaintiffs have not met their burden under Rule 9(b) to "explain why the statements were fraudulent."[94] Tellingly, Plaintiffs fail to cite a single allegation in the Complaint to support their offhand assertion that they have alleged why the statements at issue were fraudulent[95] — because the Complaint is devoid of any. For these reasons, their Securities Act claims are just as deficient as their Exchange Act claims.

---

[91]  *See* Sec. Act Br. at 17-19.

[92]  Sec. Act Br. at 17.

[93]  *See supra* Section I.B.

[94]  *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993); *see also In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp.2d 334, 368 (D. Md. 2004).

[95]  Sec. Act Br. at 18-19.

**B.      Plaintiffs Have Failed to Plead Standing to Bring Claims Under Sections 11 or 12(a)(2) Relating to the Secondary Public Offering.**

As explained in more detail in the reply brief submitted by the Underwriter Defendants, which is incorporated by reference, Plaintiffs' Section 11 and 12(a)(2) claims relating to the SPO Statement and 2005 Secondary Public Offering should be dismissed because the Complaint does not allege facts sufficient to show that Plaintiff Dammeyer — the only named plaintiff who is asserting any claims relating to the SPO Statement — bought any shares in or traceable to that offering.[96] The Complaint's boilerplate, conclusory allegation that Dammeyer "purchased [MMA]'s common stock pursuant and/or traceable to the SPO Registration Statement and Prospectus"[97] is insufficient as a matter of law to satisfy Plaintiffs' obligation to plead actual facts that establish Dammeyer's standing to assert these claims on behalf of a class.[98] As a result, Plaintiffs' claims relating to the SPO Statement must be dismissed.

In response, Plaintiffs argue that the Complaint's single fact-less allegation quoted above is all that is required to establish standing under the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).[99] But Plaintiffs misread *Twombly*, which the Supreme Court recently

---

[96]   *See* Sec. Act Br. at 21-25.  As explained in Defendants' opening brief at page 51, Section 11 claims may be brought only by plaintiffs who are able to allege facts sufficient to show that they bought their shares directly in a challenged offering or who "can trace their shares to the particular false or misleading registration statement . . . ." *Royal Ahold*, 351 F. Supp. 2d at 400.  The standing requirements under Section 12(a)(2) are even more strict, and require a plaintiff to allege facts sufficient to show that it actually purchased shares in the subject public offering, not in the secondary market. *See, e.g.*, *Gustafson v. Alloyd Co.*, 513 U.S. 561, 578 (1995).

[97]   Compl. ¶ 103.

[98]   *See* Sec. Act Br. at 51-52.

[99]   Plaintiffs' attempt to argue that Dammeyer's lack of standing does not deprive the Court of jurisdiction because his claims arise under federal law should be given short shrift.  It is hornbook law that "[i]f a party lacks standing, a court lacks the authority to render a judgment." *Congregation of Ezra Sholom v. Blockbuster*, 504 F. Supp. 2d 151, 160 (N.D. Tex. 2007) (citing U.S. Const. art. III, § 2, cl. 1); *see also Kowalski v. Tesmer*, 543 U.S. 125, 128 (2004) ("The doctrine of standing asks whether a litigant is entitled to have a federal court resolve his grievance.  This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.") (citations and quotations omitted).

addressed in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).[100]   In *Iqbal*, the Court reconfirmed *Twombly*'s central holding that "[t]hreadbare recitals of the elements of a cause of action" — as Plaintiffs have alleged here — "*do not suffice*." 129 S. Ct. at 1949 (emphasis added). The only facts that are clear from the Complaint and Dammeyer's certification are that he purchased his shares *after* the offering date and at a *different* price than the offering price.[101]

Plaintiffs do not dispute that the Common Shares issued under the SPO made up less than 7% of MMA's outstanding shares at the time.[102]   In simple terms, that means that absent any factual allegations showing that Dammeyer purchased in the offering — and there are none — the odds say that there is a 93% chance that the shares he purchased in the open market are not traceable to the SPO Statement. This is precisely why the Supreme Court reiterated in *Iqbal* that boilerplate recitations unsupported by factual allegations are insufficient to sustain a complaint. Under the circumstances Plaintiffs have alleged, it is virtually impossible to trace the purchase of any of Dammeyer's alleged purchases to the shares issued in the SPO.[103]

Plaintiffs' argument that the words "PROS UNDER SEP COVER" appearing on the confirmation of Dammeyer's share purchases somehow establishes that he purchased his shares in the Secondary Offering is simply incorrect. The securities laws require that a prospectus be delivered for *all* purchases made during the statutory period defined by Section 4(3) of the Securities Act (*see* 17 C.F.R. § 230.174 (2009)), which can extend for up to forty days after a secondary offering such as the one at

---

[100]  Plaintiffs rely almost exclusively on cases that predate *Twombly* and *Iqbal*, and that therefore did not apply the principles of those cases.

[101]  Plaintiffs allege that the SPO applied to "2,575,000 Common Shares at $26.51 per share." Compl. ¶ 360. However, Dammeyer alleges that he purchased his shares on February 3, 2005 at $26.32 per share, less than the price that shares were issued at under the SPO. Dammeyer Cert. ¶ 4 (Nov. 20, 2008).

[102]  Plaintiffs allege that the SPO applied to "2,575,000 Common Shares at $26.51 per share." Compl. ¶ 360. Yet as of November 3, 2004, well before the effective date of the SPO, MMA already had 35,015,253 common shares outstanding. *See* Form S-3/A (Jan. 5, 2005), at 2.

[103]  *See In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65, 118 (S.D.N.Y. 2004), *vacated on other grounds by* 471 F.3d 24 (2d Cir. 2006); *Klein v. Computer Devices, Inc.*, 591 F. Supp. 270, 273 n.7 (S.D.N.Y. 1984).

issue here. *See* 15 U.S.C. § 77d(3)(B). Accordingly, the fact that Dammeyer's broker sent him a prospectus in no way indicates that he purchased his shares in the Secondary Offering. Likewise, Plaintiffs misinterpret the notion in the SPO Statement that shares will be sold "at prices related to prevailing market prices at the time of sale," which simply meant that the price would be fixed at the time of the offering. When the offering took place on February 2, 2005, the offering price was set at $26.51 per share.[104] Dammeyer's purchases at a different price show that he has no standing.

### C.     Plaintiffs' Securities Act Claims Are Barred by Section 13's One-Year Statute of Limitations.

Irrespective of which pleading standard applies, all of Plaintiffs' Securities Act claims must be dismissed because they are untimely. Section 13 of the Securities Act requires plaintiffs to bring claims under Section 11 or Section 12(a)(2) "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. As established in Defendants' opening brief, Plaintiffs failed to bring their claims within the one-year limitations period that expired on September 13, 2007, a year after MMA announced that its financial statements contained errors and that it needed to file a restatement.[105] When MMA made that announcement on September 13, 2006, it placed shareholders on notice that the Registration Statements contained errors. Under Section 13, Plaintiffs had until September 13, 2007 — one year from the date of the restatement announcement — to bring their claims, but failed to do so until February 1, 2008, when the first Securities Act claims in this case were filed in *Engle v. Municipal Mortgage & Equity, LLC, et al.*, No. 08-CV-00292 (D. Md. filed Feb. 1, 2008). Alternatively, Plaintiffs were at least on *inquiry* notice more than one year before they filed their claims in light of the information already made public by that point concerning the Company and its accounting issues, none

---

[104]   *See* Sec. Act Br. at Ex. F.

[105]   *See* Mem. at 53-57.

of which is in dispute.[106]

As expected, Plaintiffs respond that they were not on notice of their claims as of the date of MMA's restatement announcement on September 13, 2006 because the announcement did not specifically discuss "the scope of the task that [MMA] faced, its lack of systems, processes or personnel to accomplish that task, the enormous cost it would entail, or its potential impact on CAD and, consequently, its dividend — the omissions at the heart of Plaintiffs' Securities Act claims."[107]   In essence, Plaintiffs argue that they could not have been on notice until all of the details concerning the specific errors that they happen to have chosen to use as the basis for their claims were publicly announced by MMA. This argument ignores the law and the undisputed, publicly available facts and would render the inquiry notice rule meaningless.

### 1.   The Statute of Limitations Began to Run When MMA Announced Its Restatement in September 2006.

Once a plaintiff is on inquiry or actual notice of one alleged false or misleading statement in a registration statement, they are on inquiry notice that others might also exist and that the registration statement in general is allegedly false or misleading.[108]  The statute of limitations does *not* restart in the event plaintiffs happen to discover additional errors in the registration statement at a later date. Once Plaintiffs were on notice of errors in the Registration Statements as a result of MMA's restatement

---

[106]  Contrary to Plaintiffs' claim that the date of notice is a question of fact that cannot be decided on a motion to dismiss (Sec. Act Br. at 30), it is settled law in this circuit that "[w]here . . . the underlying facts are undisputed, the issue of whether a plaintiff has been put on notice can be decided as a matter of law." *In re USEC Sec. Litig.*, 190 F. Supp. 2d 808, 817 (D. Md. 2002); *see also Brumbaugh v. Princeton Partners*, 985 F.2d 157, 162 (4th Cir. 1993) (dismissing claims as time barred).  Plaintiffs do not dispute any of the publicly available information discussed below that demonstrates they were on notice of their claims more than a year before they filed suit.

[107]  Sec. Act Br. at 31.

[108]  *See In re USEC*, 190 F. Supp. 2d at 818 (finding that "[s]ince plaintiffs, less than eleven months after the IPO date had actual or constructive notice of a false or misleading statement in the prospectus . . . they were on notice at the same time that the other statements in the prospectus relied upon were also false or misleading" and dismissing the plaintiffs' claims as time-bared) (citing *Kauthar SDN BHD v. Sternberg*, 149 F.3d 659, 671 (7th Cir. 1998)).

announcement, they were on inquiry notice that there might be additional errors and had one year to investigate and bring their claims. They failed to do so.

Indeed, courts in the Fourth Circuit and elsewhere have soundly rejected the argument Plaintiffs advance here because inquiry notice "is triggered by evidence of the '*possibility*' of untrue statements or omissions, and not by complete exposure of the wrongful conduct."[109]  Contrary to Plaintiffs' position, they are "not entitled to nail down 'every last detail of a transaction' before they may be charged with knowledge sufficient to start the running of the limitations period."[110]  Instead, "[o]nce a plaintiff is in possession of facts sufficient to make him suspicious, or that ought to make him suspicious, he is deemed to be on inquiry notice." *In re USEC*, 190 F. Supp. 2d at 817.  Here, it is undisputed that Plaintiffs were aware of errors in the Registration Statements more than a year before they filed suit because MMA told them so when it announced the restatement in September 2006.

In a failed attempt to distinguish this case, Plaintiffs mischaracterize *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 431 (S.D.N.Y. 2003), *rev'd in part on other grounds*, 496 F.3d 245 (2d Cir. 2007), in which the court held — as this Court should — that the announcement of a restatement puts potential plaintiffs on notice of possible Securities Act claims and triggers the running of the one-year limitations period.  Plaintiffs misquote the decision and fail to attribute the language they rely upon for their position to its actual source — the *WorldCom* plaintiffs.  Contrary to Plaintiffs' misleading characterization, the *WorldCom* court did not hold that "WorldCom admitted it had engaged in one of the largest financial falsifications in history" or that inquiry notice was triggered by this admission;[111] that is merely what the plaintiffs in that case *alleged* in their complaint to characterize WorldCom's

---

[109]  *In re USEC*, 190 F. Supp. 2d at 817 ("Inquiry notice is triggered by evidence of the *possibility* of fraud.") (emphasis added; citation omitted).

[110]  *Donohoe v. Consol. Operating & Prod. Corp.*, 982 F.2d 1130, 1141 (7th Cir. 1992) (emphasis added); *see also Brumbaugh*, 985 F.2d at 162 ("Commencement of a limitations period need not . . . await the dawn of complete awareness.").

[111]  Sec. Act Br. at 33.

restatement announcement.[112]   The *WorldCom* court's actual holding could not have been more clear: "*There can be no doubt* that at least as of WorldCom's announcement on June 25, 2002 — that it would have to restate its publicly reported financial results for 2001 and the first quarter of 2002 by $3.8 billion — plaintiffs were on inquiry notice of their Sections 11 and 12(a)(2) claims." 294 F. Supp. 2d. at 449 (emphasis added).[113]   Likewise, there can be no doubt in this case that MMA's September 2006 restatement announcement put Plaintiffs here on notice of their Securities Act claims too.

## 2.   Plaintiffs Unquestionably Were on Inquiry Notice by the End of January 2007.

Plaintiffs focus exclusively on the September 2006 restatement announcement and completely ignore all of the other information that was public more than a year before they filed suit.[114]   Even if the restatement announcement itself were not enough to put Plaintiffs on notice (and the *WorldCom* case makes clear that it was), this information was more than sufficient to do so. The information available to Plaintiffs more than a year before they filed their Securities Act claims included the following:

---

[112]   Again without proper attribution, Plaintiffs also emphasize the *WorldCom* plaintiffs' allegation that "the SEC sued WorldCom for fraud" to support their argument that inquiry notice was not triggered by WorldCom's restatement announcement. (*See* Sec. Act Br. at 33.)   But the SEC complaint referred to by the *WorldCom* plaintiffs was not filed until June 26, 2002, *after* the date that the *WorldCom* court found the plaintiffs to be on inquiry notice as a result the restatement announcement. *See S.E.C. v. WorldCom, Inc.*, No. 02-CV-04963-JSR (S.D.N.Y. filed June 26, 2002).

[113]   Plaintiffs again misquote the *WorldCom* decision in a footnote by claiming that the court found that the allegations of the complaint and the publicly available documents did not establish as a matter of law that the plaintiffs were on inquiry notice. (*See* Sec. Act Br. at 33 n.19.)   The text that Plaintiffs fail to quote in its entirety actually reads as follows: "The allegations in the Complaint and the publicly available documents to which the parties have pointed do not establish as a matter of law that the Alaska Plaintiffs were on inquiry notice of their claims *as of April 20, 2002.*"  *WorldCom*, 294 F. Supp. 2d at 447 (emphasis added to text omitted by Plaintiffs).   As noted above, the *WorldCom* court held that the plaintiffs were unquestionably on notice as a matter of law by the time WorldCom announced its restatement two months later in June 2002.

[114]   *See* Sec. Act Br. at 57 n.109.  For the purpose of Section 13 of the Securities Act, a plaintiff is deemed to have constructive notice of facts that have been publicly disclosed, including in sources such as SEC filings, press releases, or news reports. *See, e.g., Staehr v. Hartford Fin. Servs. Group*, 547 F.3d 406, 425-26 (2d Cir. 2008) (finding that a wide range of information, when available, is subject to review by the court) (citing *Kavowras v. N.Y. Times Co.*, 328 F.3d 50, 57 (2d Cir. 2003) (SEC filings); *LC Capital Partners, L.P. v. Frontier Ins. Group*, 318 F.3d 148, 155 (2d Cir. 2003) (press coverage and prior litigation); *DeBenedictis v. Merrill Lynch & Co., Inc.*, 492 F.3d 209, 214 (3d Cir. 2007) (press articles)).

- On January 31, 2007, MMA announced that, "[i]n addition to the matters previously disclosed that required the restatements, the Company has concluded, among other things, that it will be required to consolidate substantially all of the low income housing tax credit equity funds it has interests in."[115]

And even well before then:

- On March 10, 2006, MMA announced that it would be restating its audited financial statements for 2003, 2004 and interim periods through September 30, 2005 because those accounting statements were prepared applying accounting practices that did not comply with GAAP and therefore could not be relied upon.[116]

- On June 22, 2006, MMA filed its Form 10-K annual report for fiscal year 2005 containing the restated financials for 2003 and 2004.[117] The 2005 Annual Report detailed seven existing material weaknesses in the Company's internal controls, including an "[i]neffective control environment," an "[i]neffective financial reporting process," and material weaknesses relating to the company's accounting for several areas of its business, including the tax credit equity business and "accounting for investments in certain partnerships."[118]

- On September 7, 2006, a derivative lawsuit was filed on behalf of MMA in Delaware. *See Wood v. Baum*, 953 A.2d 136 (Del. 2008). The plaintiff alleged, among other claims, that the Company's officers and directors "caus[ed] [MMA] to improperly value certain non-performing assets in violation of [MMA's] internal policies, GAAP and SEC standards" and "breached their *Caremark* duties by 'fail[ing] properly to institute, administer and maintain adequate accounting and reporting controls, practices and procedures,' which resulted in a 'massive restatement process, an SEC investigation, and loss of substantial access to financial markets.'" *Id.* at 139 (summarizing the claims).

- On September 13, 2006, MMA announced that it would restate its financial statements for the second time in less than a year. In addition to acknowledging that its prior financial statements contained errors, MMA again warned investors that "the Company's internal control over financial reporting was not effective due to the material weaknesses disclosed within item 9A of the 2005 Annual Report."[119]

- On October 26, 2006, MMA announced that it had dismissed PwC as its independent auditor. *See* Form 8-K (Oct. 26, 2006). The announcement was also carried in the press.[120]

---

[115] MMA Press Release (Jan. 31, 2007) (Holland Ex. 25).

[116] *See* Form 8-K (Mar. 16, 2006) (Holland Ex. 12); *see also* Compl. ¶ 36.

[117] *See* Form 10-K (June 22, 2006) (Holland Ex. 13).

[118] *Id.* at 52-55; *see also* Compl. ¶ 39.

[119] Form 8-K (Sept. 13, 2006) (Holland Ex. 14); *see also* Compl. ¶ 41.

[120] *See, e.g.*, Laura Smitherman, *MuniMae Fires Auditor After Accounting Woes*, BALT. SUN (Oct. 27, 2006), at D2. The Court may consider information disclosed in press articles in determining whether plaintiffs were on

Given that all this information was known to investors by late January 2007, there can be no serious doubt that Plaintiffs were at least on inquiry notice of any potential claims under the Securities Act more than a year before they filed their claims in February 2008. *See, e.g., In re USEC*, 190 F. Supp. 2d at 821 (granting a motion to dismiss where "the pleadings and public documents demonstrate that plaintiffs were on inquiry notice more than a year before the complaint was filed").

### D. Plaintiffs' Section 11 Claim Relating to the Secondary Public Offering Is Barred by the Three-Year Statute of Repose.

In addition to being barred by the one-year statute of limitations, Plaintiffs' Section 11 claim against the Defendants and the Director Defendants relating to the SPO Statement (Count VI) is also time barred by Section 13's three-year statute of repose. Section 13 provides that "*[i]n no event*" shall an action "be brought to enforce a liability created under section 11 . . . more than three years after the security was *bona fide* offered to the public." 15 U.S.C. § 77m (2008) (emphasis added). As Defendants explained in their opening brief, courts have generally held that a security is *bona fide* offered to the public for purposes of Section 11 on the date that the registration statement for the securities is deemed effective.[121] Here, the SEC declared the SPO Statement effective on January 14, 2005.[122] Accordingly, the repose period for claims relating to the SPO Statement expired three years later, on January 14, 2008, more than two weeks before Plaintiffs filed their claims in this case.

Plaintiffs make two arguments in response, neither of which has any merit. *First*, Plaintiffs argue that the *bona fide* offering date was not January 14, 2005, the date that the SEC declared the SPO

---

inquiry notice. *See, e.g., Shah v. Meeker*, 435 F.3d 244, 249 (2d Cir. 2006); *In re Salomon Analyst Winstar Litig.*, 2006 WL 510526, at *4 (S.D.N.Y. Feb. 28, 2006). *See also* Compl. ¶ 42.

[121] *See, e.g., P. Stolz*, 355 F.3d at 99 ("It certainly is true that, in the case of registered securities, the date of registration has been treated as the date that starts the running of the repose period (most relevantly in the context of § 11 claims)."); *Finkel v. Stratton Corp.*, 962 F.2d 169, 173 (2d Cir. 1992) (same); *In re Adelphia Comme'n Corp. Sec. & Deriv. Litig.*, 2005 WL 1679540, at *6 (S.D.N.Y. July 18, 2005) ("It is well-settled in this Circuit that the limitations period governing § 11 claims challenging an offer of registered securities accrues from the effective date of the registration statement").

[122] *See* SEC Order (Jan. 14, 2005) (Holland Ex. 9).

Statement effective, because the sale of shares in MMA's secondary public offering actually occurred on February 3, 2005.[123] But Plaintiffs fail to cite a single case holding that the *bona fide* offering date for the purpose of the repose period is any date other than the effective date of the registration statement, which is often an earlier date than the sale itself, and simply ignore the cases Defendants cite.[124]

*Second,* Plaintiffs claim that the effective date of the SPO Statement was actually either February 1 or February 3, 2005, the dates that MMA filed a prospectus supplement and a final prospectus.[125] To support their argument, Plaintiffs cite *current* SEC rules providing that the filing date of a post-effective prospectus supplement shall be deemed a new effective date and thus a new *bona fide* offering date for purposes of Section 13.[126] But the SEC rules upon which Plaintiffs rely *did not exist at the time the SPO Statement was declared effective or when the securities were sold and were not adopted by the SEC until nearly a year later.* As Defendants explained in their opening brief,[127] MMA's February 1, 2005 prospectus supplement and February 2, 2005 final prospectus are not "post-effective amendments" and thus, under the SEC rules in effect at that time, did not change the January 14, 2005 effective date of the SPO statement for purposes of Section 11 liability and the Section 13 repose period.[128] Plaintiffs rely on SEC Rule 430B and Item 512(a)(5)(i)(B) of Reg. S-K, which were only

---

[123] *See* Sec. Act Br. at 35.

[124] Plaintiffs' reliance on the *P. Stolz* case lends them no support. As Plaintiffs concede, that case holds that "in the case of *registered securities* [such as those at issue here], the date of registration has been treated as the date that starts the running of the repose period (most relevantly in the context of § 11 claims)." 355 F.3d at 99 (emphasis added).

[125] *See* Sec. Act Br. at 36-37.

[126] *See* Sec. Act Br. at 38 (citing 17 C.F.R. § 229.512(a)(5)(i)(B) (2009) and 17 C.F.R. § 230.430B(f)(1) (2009)).

[127] Mem. at 58 n.111.

[128] *See, e.g.,* Regulation of Securities Offerings, Securities Act Release No. 7606A, 63 Fed. Reg. 67,174, 67,199 (Dec. 4, 1998) (distinguishing between "prospectus supplements" and "post-effective amendments"); Elimination of Certain Pricing Amendments and Revision of Prospectus Filing Procedures, Securities Act Release No. 6672, 51 Fed. Reg. 39,868, 39,872 (Nov. 3, 1986) ("Section 11 ordinarily does not apply to statements omitted from an effective registration statement and subsequently disclosed in a prospectus or *prospectus supplement, rather than a post-effective amendment.*") (emphasis added).

adopted by the SEC as of December 1, 2005 as part of the Securities Offering Reform effort, and which changed the law for issuers to now deem the filing of a prospectus supplement to be a new effective date for the registration statement.[129]   The SPO Statement, however, was filed nine months before the adoption of Rule 430B and Item 512(a)(5)(i)(B).   Neither rule was the law at the time the SPO Statement was filed, and neither has any retroactive application to registration statements filed before its adoption.[130]   Accordingly, neither is relevant here.   Plaintiffs are simply wrong on the law.

## III.   PLAINTIFFS' "CONTROL PERSON" CLAIMS SHOULD BE DISMISSED.

Plaintiffs do not dispute that their various "control person" claims under the Exchange Act and the Securities Act cannot stand in the absence of a primary violation.   For the reasons set forth above and in Defendants' opening brief, however, Plaintiffs' underlying claims fail, and their "control person" claims must as well.   *See, e.g., Cozzarelli*, 549 F.3d at 630.

### CONCLUSION

For all the foregoing reasons, the Complaint should be dismissed with prejudice.

---

[129]   *See* Securities Offering Reform, Securities Act Release No. 33-8591, 70 Fed. Reg. 44,722, 44,733 (effective Dec. 1, 2005) ("Rule 430B also establishes a new effective date for a shelf registration statement for Section 11 liability purposes only for the issuer and for a person that is at that time an underwriter. That new effective date will be the date a prospectus supplement filed in connection with the takedown or takedowns is deemed part of the relevant registration statement."); *id.* at 44799-800 (adding Item 512(a)(5)(i)(B) to Reg. S-K).

[130]   *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (holding that "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result" and that "[b]y the same principle, a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms").

Dated: June 19, 2009

GOODWIN PROCTER LLP

/s/ Mark Holland
Mark Holland (admitted *pro hac vice*)
620 Eighth Avenue
New York, New York 10018
Ph: (212) 813-8800
Fax: (212) 355-3333

Anthony M. Candido (admitted *pro hac vice*)
Margaret Minifie Snyder (MS 17576)
Kevin M. Fumai (admitted *pro hac vice*)
Ilya Shulman
CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, New York 10019
Ph: (212) 878-8000
Fax: (212) 878-8375

and

Ward B. Coe, III (WC 00282)
GALLAGHER EVELIUS & JONES LLP
218 North Charles Street, Suite 400
Baltimore, Maryland 21201
Ph: (410) 727-7702
Fax: (410) 468-2786

*Attorneys for Defendants*
*Municipal Mortgage & Equity, LLC,*
*Mark K. Joseph, William S. Harrison,*
*Charles M. Pinckney, and David Kay*

SIMPSON THACHER & BARTLETT LLP

/s/ James G. Gamble
James G. Gamble (admitted *pro hac vice*)
Jason S. Stone (admitted *pro hac vice*)
425 Lexington Avenue
New York, New York 10017
Ph: (212) 455-2000
Fax: (212) 455-2502

and

Jefferson V. Wright (JW 00990)
William M. Krulak, Jr. (WK 26452)
MILES & STOCKBRIDGE P.C.
10 Light Street
Baltimore, Maryland 21202
Ph: (410) 727-6464
Fax: (410) 385-3700

*Attorneys for Defendants*
*Charles C. Baum, Richard O. Berndt,*
*Eddie C. Brown, Robert S. Hillman,*
*Douglas A. McGregor, Arthur S. Mehlman, and*
*Fred N. Pratt, Jr.*

SAUL EWING LLP

/s/ Charles O. Monk, II
Charles O. Monk, II (CM 00913)
Charles N. Curlett, Jr. (CC 28246)
Lockwood Place, 8th Floor
500 East Pratt Street
Baltimore, Maryland 21202
Ph: (410) 332-8668
Fax: (410) 332-8870

*Attorneys for Defendant*
*Michael L. Falcone*