IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

IN RE:                              *
MUNICIPAL MORTGAGE & EQUITY,
LLC, SECURITIES AND DERIVATIVE      *
LITIGATION
                                    *     MJG-08-1961-MDL

                                    *

*        *        *        *        *        *        *        *        *

MEMORANDUM AND ORDER RE: MOTIONS TO DISMISS

The Court has before it Defendants Merrill Lynch, Pierce,

Fenner & Smith Inc.'s and RBC Capital Markets Corp.'s Motion to

Dismiss [Document 70], Municipal Mortgage & Equity, LLC and the

Individual Defendants' Motion to Dismiss [Document 72], and

Defendant Melanie Lundquist's Motion to Dismiss [Document 76]

and the materials submitted related thereto.  The Court has held

a hearing and had the benefit of the arguments of counsel.


I.    SUMMARY INTRODUCTION

In the early 2000's, Municipal Mortgage & Equity, LLC

("MuniMae") was one of the country's largest "syndicators" of

low income housing tax credits ("LIHTCs").  As discussed more

fully herein, MuniMae syndicated hundreds of LIHTC funds,

retained a small (typically 1% or less) ownership interest, and

received syndication and asset management fees for its services.

Effective 2004, there was a drastic change to the

accounting rules pertinent to MuniMae's financial statements,
requiring consolidation on its financial statements of
substantially all of its LIHTC funds.  In 2004, MuniMae (and its
outside accountants) took the erroneous position that such
consolidation was not required.  However, by 2007, MuniMae
announced that its position had been wrong and that its
financial statements had to be restated.  The cost of preparing
the restatements was so enormous that MuniMae's compliance
efforts had serious effects on its financial condition.

On January 28, 2008, MuniMae announced a cut to its long-
standing dividend rate by 37% and stated that it would be
delisted from the New York Stock Exchange ("NYSE").  The next
day, MuniMae announced that it faced difficulties in its efforts
to meet its restatement obligation.  The price of MuniMae shares
fell in response to these announcements.

The instant case is brought on behalf of a class consisting
of all investors who purchased MuniMae common stock between May
3, 2004 and January 29, 2008 (the "Class Period").

Plaintiffs[1] present claims in eight counts:

| Count | Statute and Rule | Defendants |
|---|---|---|
| One | Exchange Act § 10(b) [15 U.S.C. § 78j(b)] & Rule 10b-5 | MuniMae & Individual Defendants[2] |
| Two | Exchange Act § 20(a) [15 U.S.C. § 78t(a)] | Individual Defendants |
| Three | Securities Act § 11 [15 U.S.C. § 77k] | MuniMae, Individual Defendants & Director Defendants[3] |
| Four | Securities Act § 12(a)(2) [15 U.S.C. § 77l(a)(2)] | MuniMae |
| Five | Securities Act § 15 [15 U.S.C. § 77o] | Individual Defendants & Director Defendants |
| Six | Securities Act § 11 [15 U.S.C. § 77k] | MuniMae, Individual Defendants & Director Defendants |
| Seven | Securities Act § 12(a)(2) [15 U.S.C. § 77l(a)(2)] | MuniMae & Underwriter Defendants[4] |
| Eight | Securities Act § 15 [15 U.S.C. § 77o] | Individual Defendants & Director Defendants |

---

[1]   Some claims are presented by all Plaintiffs and some by fewer than all.  For simplicity, except as otherwise indicated, the Court will refer to Plaintiffs collectively when referring to a claim or contention made by any Plaintiff.

[2]   Chief Executive Officer ("CEO") Michael L. Falcone ("Falcone"), Chairman and former CEO Mark K. Joseph ("Joseph"), former Executive Vice President and Chief Financial Officer ("CFO") William S. Harrison ("Harrison"), former CFO Melanie M. Lundquist ("Lundquist"), former Chief Operating Officer and interim-CFO Charles M. Pinckney, and CFO David Kay (collectively, the "Individual Defendants").

[3]   Charles C. Baum, Richard O. Berndt, Robert S. Hillman, Douglas A. McGregor, Eddie C. Brown, Fred N. Pratt, Jr., and Arthur S. Mehlman (collectively the "Director Defendants").

[4]   Merrill Lynch, Pierce, Fenner & Smith Inc. and RBC Capital Markets Corp. (collectively, the "Underwriter Defendants").

By the instant motions, Defendants[5] seek dismissal of all claims.

II.  <u>PLEADING STANDARDS</u>

    A.  <u>In General</u>

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint. Pursuant to Federal Rule of Civil Procedure 8(a)(2), a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (citations omitted).

When evaluating a 12(b)(6) motion to dismiss, a plaintiff's well-pleaded allegations are accepted as true and the complaint is viewed in the light most favorable to the plaintiff. However, conclusory statements or a "formulaic recitation of the elements of a cause of action" will not suffice. <u>Id.</u>  A complaint must allege sufficient facts to "cross 'the line between possibility and plausibility of entitlement to relief.'" <u>Francis v. Giacomelli</u>, 588 F.3d 186, 193 (4th Cir. 2009)

---

[5]  Some defenses are presented by all Defendants and some by fewer than all.  For simplicity, except as otherwise indicated, the Court will refer to Defendants collectively when referring to a defense or contention made by any Defendant.

(quoting Twombly, 550 U.S. at 557).

Inquiry into whether a complaint states a plausible claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. Thus, if the well-pleaded facts contained within a complaint "do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662 (2009)) (internal quotation marks omitted).

B.    Heightened Pleading for Fraud

Where a claim alleges fraud or mistake, a party must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy Rule 9(b)'s heightened pleading standard, a plaintiff must allege facts establishing the "who, what, when, where, and how" of the claimed fraud. U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 379 (4th Cir. 2008) (citations omitted). In evaluating whether a cause of action must be pled with particularity, a court examines whether the claim requires an essential showing of fraud. Baltimore Cnty. v. Cigna Healthcare, 238 F. App'x 914, 921 (4th Cir. 2007).

"Fraud is a generous tort, encompassing affirmative

misrepresentations and omissions alike, its boundaries limited only by the imaginations of crafty and unprincipled minds." Wamsley v. LifeNet Transplant Servs., 2011 U.S. Dist. LEXIS 130760, 9-12 (S.D. W. Va. Nov. 10, 2011) (citing Black's Law Dictionary 731 (9th ed. 2009), defining fraud as a "knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment").  Rule 9(b) applies to allegations under the Securities Act where those allegations "sound in fraud," even though claims under Sections 11 and 12(a)(2) do not have fraud as an element.  Cozzarelli v. Inspire Pharms., Inc., 549 F.3d 618, 629 (4th Cir. 2008).

C.   Securities Fraud Actions

A special pleading standard applies to certain elements of a securities fraud claim brought under Section 10(b) of the Exchange Act.  To succeed in a Section 10(b) private suit, a plaintiff must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation (that is, the economic loss must be proximately caused by the misrepresentation or omission)."  Matrix Capital Mgmt. Fund, L.P. v. BearingPoint, Inc., 576 F.3d 172, 181 (4th Cir. 2009).

Prior to the enactment of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 109 Stat. 737, the sufficiency of a complaint for securities fraud under Section 10(b) of the Exchange Act was governed by the heightened pleading standard set forth in Federal Rule of Civil Procedure 9(b).  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007). In 1995, Congress enacted the PSLRA, clarifying and strengthening the particularity requirements of Rule 9(b) as applied in the context of federal securities class action lawsuits.  Under the PSLRA, to survive a motion to dismiss, a complaint for violation of the federal securities laws must meet the heightened pleading requirements set forth under 15 U.S.C. § 78u-4(b).

First, any private securities complaint alleging that the defendant made a false or misleading statement must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1)(B).

Second, with respect to each act or omission, the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  § 78u-4(b)(2).

Thus, the PLSRA's heightened pleading standard is applicable only to the scienter and misrepresentation elements

of a § 10(b) claim.[6]  <u>Teachers' Ret. Sys. v. Hunter</u>, 477 F.3d

162, 172 (4th Cir. 2007).  Loss causation must only be pled with

"sufficient specificity," consistent with Rule 9(b).  <u>Katyle v.

Penn National Gaming, Inc.</u>, 637 F.3d 462, 471 (4th Cir. 2011).

     As with any motion to dismiss for failure to state a claim

on which relief can be granted, when faced with a Rule 12(b)(6)

motion to dismiss a claim brought under Section 10(b) of the

Exchange Act, district courts must consider the complaint in its

entirety.  The district court must accept all factual

allegations in the complaint as true, and consider only such

sources outside the complaint that are, in effect, deemed to be

part of the complaint, for example, documents incorporated into

the complaint by reference and matters of which a court may take

judicial notice.[7]  <u>Tellabs</u>, 551 U.S. at 322.

---

[6]     "Of course, the other elements of a securities fraud claim
would be analyzed under the traditional pleading scheme of Rules
8 and 9, since Congress only addressed misrepresentations and
scienter in § 78u-4(b)."  <u>Teachers' Ret. Sys.</u>, 477 F.3d at 172.

[7]     To be subject to judicial notice, a fact must not be
subject to reasonable dispute in that it is capable of
"accurate[] and read[y] determin[ation] from sources whose
accuracy cannot reasonably be questioned."  Fed. R. Evid. 201.
Judicial notice is appropriate of the content of S.E.C. filings,
to the extent that this establishes that the statements therein
were made, and the fact that these documents were filed with the
agency.  <u>See</u> <u>Dreiling v. Am. Exp. Co.</u>, 458 F.3d 942, 946 n.2
(9th Cir. 2006) (S.E.C. filings subject to judicial notice); <u>In
re Acterna Corp. Sec. Litig.</u>, 378 F. Supp. 2d 561, 571 (D. Md.
2005) ("'In securities fraud actions, courts will also examine
the other information that was publicly available to reasonable
investors at the time the defendant made statements plaintiffs
alleged were fraudulent, including documents or articles cited

If a complaint does not satisfy the pleading requirements of the PSLRA, upon motion of the defendant, the court must dismiss the complaint.  15 U.S.C. § 78(u)-4(b)(3)(A).


III.  <u>FACTUAL ALLEGATIONS</u>

　　A.　　<u>MuniMae's LIHTC Syndications</u>

MuniMae, a Delaware corporation based in Baltimore, Maryland, became, by 2003, one of the country's largest "syndicators" of low-income housing tax credits ("LIHTCs").

Federal income tax law includes LIHTCs to provide an incentive for developers to construct low-income rental housing. Frequently, low-income housing developers find it advantageous to sell these tax credits to a syndicator.  The syndicator will form an investment fund (an "LIHTC Fund") to invest in the developer's low-income housing projects.  The syndicator will assemble a group of investors to invest in the LIHTC Fund and obtain the benefit of the tax credits.

As a syndicator, MuniMae would organize investors into "upper-tier partnerships" that held investments in multiple "lower-tier partnerships" developing affordable housing projects.  MuniMae acted as a general partner of the LIHTC Funds

---

in the complaint, S.E.C. filings, press releases, stock price tables, and other material on which plaintiff's allegations necessarily rely.'").  The Court does not take judicial notice of the truth of the underlying facts in such public documents.

with an ownership interest ranging from .1% to 1.0%.  Compl. ¶
20.  Typically, MuniMae's ownership share was larger than that
of any single investor.  MuniMae developed approximately three
hundred of these LIHTC Funds, and received syndication and asset
management fees for its services.


    B.    The Consolidation Requirement

        1.    What Was Required To Be Consolidated?

    Prior to 2003, MuniMae's financial reporting complied with
Financial Accounting Standards Board ("FASB") Accounting
Research Bulletin No. 51.  This required an enterprise's
financial statements to consolidate financial data of
subsidiaries in which the enterprise had a majority voting
interest.  However, by 2003, after the Enron accounting scandal,
the FASB decided that this approach was not sufficient to
identify financial risks from "off-balance sheet" entities.
Compl. ¶ 27.  The FASB, therefore, drastically changed the
reporting rules for consolidated financial statements.  In early
2003, it adopted GAAP Financial Interpretation No. ("FIN") 46
and, in December of that year, a revision, FIN 46R.

    Effective with the first quarter of 2004, FIN 46R defined a
category of entities called "Variable Interest Entities"
("VIEs") and required consolidation of VIE financial statements
onto the financial statement of the VIE's "primary beneficiary."

In 2004, MuniMae took the erroneous position that FIN 46R required consolidation on its financial statements for only some, not essentially all, of its LIHTC Funds.  MuniMae announced in May 2004 that it had not consolidated LIHTC Funds with assets of $970.3 million and liabilities of $90.8 million. Compl. ¶ 128.

MuniMae's interpretation of FIN 49R was reviewed by MuniMae's outside auditor, PricewaterhouseCoopers ("PwC"), which certified that MuniMae's financial statements for the year ended December 31, 2004 were prepared in accordance with GAAP.  See Mar. 16, 2005 Form 10-K at 63-63, Holland Ex. 10.  Thereafter, until a January 2007 announcement that its interpretation had been erroneous, MuniMae repeatedly represented that it was in compliance with FIN 46R.

2.   Cost of Consolidation

The cost of compliance with the consolidation requirement became enormous and had serious effects on MuniMae's financial condition.

During the Class Period, MuniMae utilized Cash Available for Distribution ("CAD"), a non-GAAP measure of current earnings, as the relevant indicator of the Company's ability to

pay dividends.[8]  According to Defendants, the calculation of CAD
was not materially affected by whether or not the LIHTC Funds
were consolidated pursuant to FIN 46R.  See MuniMae Defs.' Mot.
8.  However, the determination of CAD took into account costs
such as those necessary to restate financial statements.
Therefore, the costs of performing the financial restatements
that ultimately took place were expense items that reduced CAD,
and thereby substantially impacted MuniMae's payment of
dividends.


        C.    The Restatements

              1.    First Restatement

     On March 10, 2006, MuniMae announced that it had to restate
its financial statements covering fiscal year 2002 through the
third quarter of 2005 due to certain accounting errors and its
previously filed financial statements could not be relied upon
(the "First Restatement").  This First Restatement was necessary
due primarily to the (1) recognition of syndication fees; (2)
application of equity method accounting; (3) recognition of

---

[8]     According to MuniMae's Form 10-K filed with the S.E.C. on
March 12, 2004, CAD differs from net income in four ways,
including different treatment of several types of fees,
different treatment of certain non-cash gains and losses,
different treatment of investments in partnerships, and
different treatment of tax credit equity funds.  See Compl. ¶
57.

interest income; and (4) amortization of mortgage servicing rights.   See Compl. ¶ 194.   The press release stated that the First Restatement "does not impact [CAD] in any period."   Id. The Company completed the First Restatement and filed restated financials on June 22, 2006.   According to Defendants, "[t]he First Restatement did not concern the issue of whether entities should be consolidated under FIN 46R."   Mot. Dismiss [Doc. 72] 8.

### 2.   Second Restatement

On September 13, 2006, MuniMae announced that it had to, again, restate its financial statements covering fiscal years 2003 through 2005.

The Second Restatement was necessary to correct: (1) accounting for equity commitments related to affordable housing projects; (2) cash flow classification of cash received from investors in guaranteed tax credit equity funds; and (3) accounting for syndication fees.[9]   Compl. ¶ 220.   MuniMae announced that "'[t]he restatement will not impact cash available for distribution . . . in any period, or the Company's ability to pay future distributions to common shareholders.'" Compl. ¶ 221.

---

[9]    Defendants state that the Second Restatement's syndication fee issue was different from the syndication fee issue addressed in the First Restatement.   Mot. Dismiss [Doc. 72] 9 n.28.

On October 26, 2006, MuniMae announced that it had
dismissed PwC as its independent registered public accounting
firm and hired KPMG to replace it.  Oct. 26, 2006 Form 8-K,
Holland Ex. 15.  As part of this disclosure, MuniMae stated that
"[d]uring the years ended December 31, 2005 and December 31,
2004 and through October 20, 2006, there were no disagreements
with PwC on any matter of accounting principles or practices,
financial statement disclosure or audit scope or procedure,
which disagreements if not resolved to the satisfaction of PwC
would have caused them to make reference thereto in their
reports on [MuniMae's] financial statements."  Id.  MuniMae
attached to its Form 8-K a letter from PwC that acknowledged and
agreed with this assertion.  Oct. 26, 2006 Form 8-K Ex. 16,
Holland Ex. 15.

On January 31, 2007, MuniMae announced that, as part of the
Second Restatement, it was required to consolidate
"substantially all" of its LIHTC Funds.  Jan. 31, 2007 MuniMae
Press Release, Holland Ex. 25.  In May and July of 2007, MuniMae
reiterated its need to consolidate the LIHTC Funds, stating that
"it did not maintain effective policies and procedures over the
identification of entities requiring consolidation," and that
these control deficiencies resulted in financial misstatements.
May 4, 2007 Form 12b-25, Holland Ex. 16; July 11, 2007 Form 8-K,
Holland Ex. 17.

In August 2007, MuniMae announced that it had hired
Navigant Consulting Company to assist with the restatement
process, noting that 20 company employees and 72 consultants
were working on the effort.  Compl. ¶ 231.  MuniMae stated that
"the obvious downside to these efforts is expense . . . . we are
not done with our assessment of the work remaining" and "we
can't completely assess the magnitude of unbudgeted fees for our
outside auditors that will result from our restatement efforts."
August 7, 2007 Form 8-K Ex. 99.1, Holland Ex. 18.

In November 2007, in conjunction with a dividend
announcement, MuniMae announced that it had over 100 full-time
consultants and employees working on the restatement, and that
its "budget for the year did not contemplate external resources
of nearly this magnitude and the costs will be very significant
for this year and well into next year."  Compl. ¶ 235; Nov. 8,
2007 Form 8-K Ex. 99.2, Holland Ex. 19.  However, it also noted
that "management plans to ask the Board to maintain the current
dividend policy."  Compl. ¶ 234; Nov. 8, 2007 Form 8-K Ex. 99.2,
Holland Ex. 19.

The Second Restatement was not concluded until MuniMae
issued restated financial statements on February 13, 2009.


D.    Dividend Distributions

MuniMae's stock was attractive to investors because of its

regular dividend distributions.  See Hr'g Tr. 10 June 23, 2010.

Despite the costs incurred in its efforts to comply with its

consolidation requirements under FIN 46R, MuniMae continued to

provide consistent increases in its quarterly dividend

distribution throughout the Class Period.  According to

Plaintiffs, this gave a false impression of MuniMae's financial

condition.

On November 2, 2007, MuniMae announced its 43rd consecutive

increase in its quarterly distribution.  However, at this time,

MuniMae stated:

> Due to the costs incurred by the Company in
> connection with the Company's previously
> announced restatement of its financial
> statements, it is possible that the dividend
> payout ratio for the 2007 fiscal year may
> exceed 100% of the Company's net cash
> generated from operations for the fiscal
> year 2007.  The exact payout ratio for 2007
> will not be known until after the completion
> of the fiscal year.

Compl. ¶ 233; Nov. 2, 2007 MuniMae Press Release, Holland Ex.

27.

E.   The January 2008 Announcements

On January 28, 2008, MuniMae announced that it was cutting

the dividend by 37%.  MuniMae attributed the reduction in the

dividend distribution to (1) the costs associated with the

Company's ongoing restatement of its financial statements; (2)

the decision to conserve capital given the then-current volatility in the credit and capital markets; and (3) the desire to dedicate additional capital to its high-growth Renewable Energy Finance business.  Compl. ¶ 237.

On January 28, 2008 the Company also announced that it would be delisted from the NYSE as a result of its inability to complete its restatement by the NYSE-imposed March 3, 2008 deadline.  Id. at ¶ 238.  The price of MuniMae shares dropped approximately 47%, from $17.20 per share on January 28, 2008 to $9.19 per share on January 29, 2008, on unusually heavy trading volume of more than 3.7 million shares.  Compl. ¶¶ 43, 239.

On January 29, 2008, MuniMae announced that (1) the restatement involved analyzing over 200 variable interest entities, which would require analysis of more than 2,000 partnerships and 6,000 separate financial statements; (2) the Company had to create and implement a process to analyze these variable interest entities; (3) the restatement reached back 3 years and required analyzing 10 financial periods; and (4) due to MuniMae's change in auditors, PwC's work was not being relied upon.  See Opp'n [Doc. 84] 14.  The price of MuniMae shares fell further, to $7.13 per share.  Compl. ¶¶ 44, 241.

F.    The Secondary Public Offering

In early 2005, during the Class Period, MuniMae made

17

allegedly actionable statements relating to a Secondary Public Offering ("SPO").  The parties dispute the effective date of the SPO.

The SPO registration statement was filed on January 3, 2005, and was initially declared effective on January 14, 2005. On February 1, 2005, the Defendants filed a "prospectus supplement" that stated that the SPO Prospectus would be effective the following day, February 2, 2005, with a closing date of February 8, 2005.  On February 2, 2005, MuniMae and the Underwriter Defendants commenced the secondary public offering of 2,575,000 shares of MuniMae common stock priced at $26.51 per share.  A finalized version of the supplement was filed, pursuant to Rule 424(b)(5), on February 3, 2005.  Opp'n [Doc. 86] 37.

G.   The Dividend Reinvestment Plan

MuniMae made allegedly actionable statements that were incorporated by reference in its MuniMae's Form S-3 Dividend Reinvestment Plan ("DRP").  The purpose of the Dividend Reinvestment Plan was to provide investors with a method to reinvest their cash dividends by purchasing additional "Growth Shares" of the company.

Filed on September 4, 1997, the DRP registration statement incorporated by reference "[a]ll documents filed by the Company

pursuant to Section 13(a), 13(c), 14 or 15(d) of the Exchange
Act after the date of th[e] Prospectus and prior to the
termination of this offering."  Compl. ¶ 324.  Thus, actionable
statements made during the Class Period would be incorporated by
reference in the Form S-3 Registration Statement.[10]


IV.  <u>DISCUSSION</u>

Plaintiffs'[11] Consolidated Amended Class Action Complaint
(the "Complaint") [Document 45] seeks remedies under Sections
10(b) and 20(a) of the Securities Exchange Act of 1934 (the
"Exchange Act"),[12] S.E.C. Rule 10b-5,[13] and the Securities Act of
1933 (the "Securities Act").[14]

The Exchange Act and S.E.C. Rule 10b-5 claims are brought
on behalf of all persons who acquired MuniMae common stock
between May 3, 2004 and January 29, 2008 (the "Class Period"),
against MuniMae and six of MuniMae's senior officers and
directors: Chief Executive Officer ("CEO") Michael L. Falcone
("Falcone"), Chairman and former CEO Mark K. Joseph ("Joseph"),

---

[10]   It may be appropriate to view the Class Period statements
as, in effect, incorporating the 1997 registration statement.
[11]   Robert Yates, Alan S. Barry, David Young, Carlo Hornsby, Ed
Friedlander, and William D. Felix have been selected as Lead
Plaintiffs [<u>see</u> Doc. 9].  Additional named plaintiffs include
David A. Kresmer, Charles W. Dammeyer, and Paul B. Engel.
[12]   15 U.S.C. §§ 78j(b) & 78t(a).
[13]   17 C.F.R. § 240.10b-5.  S.E.C. Rule 10b-5 implements
Section 10(b) of the Exchange Act.
[14]   15 U.S.C. §§ 77k, 77l, & 77o.

former Executive Vice President and Chief Financial Officer
("CFO") William S. Harrison ("Harrison"), former CFO Melanie M.
Lundquist ("Lundquist"), former Chief Operating Officer and
interim-CFO Charles M. Pinckney, and CFO David Kay
(collectively, the "Individual Defendants").

The Securities Act claims are brought on behalf of all
persons who purchased MuniMae common stock pursuant to the
registration statement and prospectus filed with the S.E.C. in
connection with MuniMae's February 2, 2005 Secondary Public
Offering ("SPO") and all persons that purchased MuniMae Growth
Shares pursuant to the registration statement and prospectus
dated September 4, 1997 filed with the S.E.C. in connection with
MuniMae's Dividend Reinvestment and Growth Share Purchase Plan
(the "DRP").  The Securities Act claims are brought against "the
Securities Act Defendants": the lead underwriters of the
February 2, 2005 Secondary Public Offering of 2,575,000 common
shares: Merrill Lynch, Pierce, Fenner & Smith Inc. and RBC
Capital Markets Corp. (collectively, the "Underwriter
Defendants"); members of the MuniMae Board of Directors: Charles
C. Baum, Richard O. Berndt, Robert S. Hillman, Douglas A.
McGregor, Eddie C. Brown, Fred N. Pratt, Jr., and Arthur S.
Mehlman (collectively the "Director Defendants"); and three of
the Individual Defendants: Falcone, Harrison, and Joseph.
MuniMae, the Individual Defendants, and the Director Defendants

will collectively be referred to as the "MuniMae Defendants."

A.   Exchange Act Claims (Counts One and Two)

In Count One, Plaintiffs allege that MuniMae and the Individual Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and S.E.C. Rule 10b-5 promulgated thereunder.  Plaintiffs allege that during the Class Period, these Defendants knowingly or recklessly engaged in a fraudulent scheme and made deceptive statements and omissions of material fact, the purpose and effect of which was to induce the Plaintiffs to purchase MuniMae shares at artificially inflated prices.

In Count Two, Plaintiffs allege that the Individual Defendants violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), because they were controlling persons who, by virtue of their positions, influenced and controlled the decision-making of MuniMae, including the decisions to disseminate the allegedly false and misleading statements.

1.   The Statute and Rule

Section 10(b) of the Securities and Exchange Act of 1934 makes it unlawful "[t]o use or employ, in connection with the purchase and sale of any security registered on a national securities exchange . . . any manipulative or deceptive device

21

or contrivance in contravention of such rules and regulations as the [S.E.C.] may prescribe."  15 U.S.C. § 78j(b).

The Supreme Court has implied a private cause of action from the text and purpose of Section 10(b).  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 318 (2007).  The Securities and Exchange Commission promulgated its Rule 10b-5 to implement Section 10(b), which makes it unlawful:

> (a)  To employ any device, scheme, or artifice to defraud,
>
> (b)  To make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c)  To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.


>    2.   Elements of a Rule 10-5 Claim

There are six basic elements of a Rule 10b-5 claim:

> (1)  A material misrepresentation or omission by the defendant,
>
> (2)  Scienter,
>
> (3)  A connection between the misrepresentation or omission and the purchase or sale of a security,
>
> (4)  Reliance upon the misrepresentation or omission,

(5)  Economic loss, and

(6)  Loss causation.

Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552
U.S. 148, 157 (2008).

These elements shall be addressed in turn.


a.  Material Misrepresentation or Omission

Plaintiffs allege that many statements made during the
class period constitute material misrepresentations or
omissions.  These allegations include assertions that:

(1)  Defendants falsely claimed that MuniMae had complied
with FIN 46R in the Class Period roughly spanning 2004
to 2006.[15]

(2)  Defendants concealed the fact that MuniMae had no
processes in place to consolidate the LIHTC Funds onto
its financial statements.

(3)  Defendants falsely claimed that the financial
restatements would not affect CAD or MuniMae's
dividend.[16]

---

[15]  See Compl. ¶¶ 127-128 (quoting First Quarter 2004 10-Q)
("Upon adoption of FIN 46 in March 2004, the Company determined
that it is the primary beneficiary in certain of the funds it
originates where there are multiple limited partners.  As a
result, the Company consolidated these equity investments at
March 31, 2004. . . . The Company also has a general partner
interest in certain other low-income housing tax credit equity
funds where it has concluded that it is not the primary
beneficiary.  Accordingly, [certain] funds . . . have not been
consolidated."); see also, e.g. Compl. ¶¶ 138-139, 143, 146.
[16]  See Compl. ¶ 194 (quoting March 10, 2006 [First
Restatement] Press Release) ("MuniMae . . . announced today that
it will restate net earnings . . . . This restatement does not
impact cash available for distribution (CAD) in any period."),

(4)   MuniMae concealed its disagreement with PwC about whether to consolidate the LIHTC Funds onto MuniMae's financial statements.[17]

(5)   Defendants concealed the scope and the significant costs of the restatement.[18]

Defendants do not admit that there were any material misrepresentations or omissions,[19] but do not contend that Plaintiffs have failed to allege that there were some.

---

see also Compl. ¶ 221 (quoting Sept. 13, 2006 Form 8-K [Second Restatement Announcement]) ("The restatement will not impact cash available for distribution . . . in any period, or the Company's ability to pay future distributions to common shareholders.").

[17]   See Compl. ¶ 223 (alleging that a confidential witness revealed that "MuniMae's senior management had significant disagreements with PwC regarding the application of FIN 46" and "internal discussions about whether to restate had been going on for months prior to the March 2006 [First Restatement] announcement").

[18]   Plaintiffs allege that, from the start of the Class Period, MuniMae omitted information that left investors with no way of knowing that MuniMae faced the monumental task of consolidating 230 LIHTC Funds and significantly understated the liabilities of the LIHTC Funds.  See Opp'n [Doc. 84] 24-25 n.11.  Moreover, even in November 2007, despite disclosing that the cost of the restatement would be "very significant," MuniMae mislead investors by announcing another dividend increase and by stating that it planned to ask its Board to maintain the current dividend policy.  See Compl. ¶ 233-235.  Plaintiffs argue that these omissions contravened the requirements of S.E.C. Item 303(a), which requires an issuer's financial statements to "describe any known trends or uncertainties that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. 229.303(a)(3)(ii); see Opp'n [Doc. 84] 36-37 & n.15.

[19]   See Hr'g Tr. 29 June 23, 2010.

b.   Scienter

Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." § 78u-4(b)(2).  Scienter, in this context, is defined as "'a mental state embracing intent to deceive, manipulate, or defraud.'"  Tellabs, 551 U.S. at 319 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193-94 & n.12 (1976)).

Scienter can be established by alleging sufficient facts to show either that the statement or omission was made intentionally or with "severe recklessness" regarding the danger of deceiving the plaintiff.  Teachers' Ret. Sys. v. Hunter, 477 F.3d 162, 183-84 (4th Cir. 2007).  The Fourth Circuit has defined, for purposes of Section 10(b), a reckless act as one "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  Matrix Capital Mgmt. Fund, L.P. v. BearingPoint, Inc., 576 F.3d 172, 181 (4th Cir. 2009).[20]

---

[20]   See also In re Gildan Activewear, Inc. Sec. Litig., 636 F. Supp. 2d 261, 272 (S.D.N.Y. 2009) ("To state a claim based on recklessness, plaintiffs may either 'specifically allege defendants' knowledge of facts or access to information contradicting defendants' public statements, or allege that defendants failed to check information they had a duty to

25

In 2007, the Supreme Court in Tellabs noted that, in determining the adequacy of an allegation of scienter, the proper inquiry is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.  551 U.S. at 322-23.  In determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences.  Id. at 323.  It is not enough for a plaintiff to plead facts from which a reasonable person merely could infer that the defendant acted with the required intent; rather, plaintiffs must plead facts giving rise to a "strong," "powerful," or "cogent" inference.  Id.  "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324.  "'In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?'" Matrix, 576 F.3d at 182 (quoting Tellabs, 551 U.S. at 326).

To the extent a plaintiff alleges fraud against a corporate

monitor'").

defendant, the plaintiff must allege facts that support a strong inference of scienter with respect to at least one authorized agent of the corporation.   <u>Matrix</u>, 576 F.3d at 182. Additionally, to the extent a plaintiff alleges fraud claims against individual defendants, the plaintiff must allege facts supporting a strong inference of scienter as to each defendant. <u>Id.</u>

Plaintiffs contend that their allegations, viewed holistically, give rise to a cogent and compelling inference that MuniMae and the Individual Defendants misled the market intentionally or with severe recklessness.  Plaintiffs allege the following indicia of scienter:[21]

> (1)  The Individual Defendants were the most senior executive and financial officers of MuniMae and thus had direct responsibility for and knowledge of public disclosures and financial statements;
>
> (2)  Compliance with FIN 46R involved MuniMae's core business of syndicating LIHTC Funds in which it was the industry leader;
>
> (3)  Successive Chief Financial Officers resigned during the Class Period;
>
> (4)  Based on the magnitude of the restatements, which took two and a half years to complete, and the magnitude of the value of the discrepancy (the financial statements understated liabilities by $1.9 billion), the underlying accounting problems must have been known to the Defendants;

---

[21]    <u>See</u> Opp'n [Doc. 84] 41; Compl. ¶ 247.

(5)  PwC insisted on the consolidation of the
     LIHTC Funds prior to the First Restatement
     in March 2006;

(6)  Defendants disagreed with PwC regarding the
     consolidation of the LIHTC Funds and
     ultimately fired them;

(7)  The Individual Defendants knew about
     MuniMae's noncompliance with FIN 46R as
     early as the First Restatement and
     understood the massive scale and exorbitant
     costs associated with the restatement
     project – that is, that the restatement
     project required review of over 300 LIHTC
     Funds and consolidation of 230 LIHTC Funds,
     which involved reviewing more than 2,000
     partnerships, preparing over 6,000 financial
     statements for 10 reporting periods, and
     redoing all of PwC's work which could not be
     relied upon.

(8)  MuniMae did not have the automated systems
     in place to accomplish the consolidations,
     thereby necessitating significant, manual
     labor;

(9)  Defendants were motivated to keep the LIHTC
     Funds off its books in order to keep the
     LIHTC Funds' operating losses and
     liabilities from interfering with MuniMae's
     ability to maintain the leverage and debt
     ratios needed to the obtain the bank
     financing to fund its core investment
     activities; and

(10) Defendants were motivated to artificially
     inflate the price of MuniMae stock so that
     they could profit from the inflated value
     through insider sales, the SPO, private
     placements, and corporate acquisitions.

### 1.   <u>Confidential Witnesses</u>

Many of Plaintiffs' scienter allegations are based on information obtained from three confidential witnesses (referred to as "CW1", "CW2", and "CW3").

CW1 was the Administrative Assistant to MuniMae's head of Internal Audit, Angela Barone, from June 2004 through June 2007 and continued to work at the Company in the Asset Management Department until April 2008.  The Complaint states that

> During CW1's tenure in Internal Audit, the Internal Audit Department conducted weekly meetings attended by the head of Internal Audit, the Audit Manager (Kim Huffman), a representative from IT (Michelle Smith and later Lisa Shank), and CW1.  The purpose of the meetings was to give status reports on ongoing audit work.  The meetings usually lasted approximately one hour.  Half of the time, or about 30 minutes, was usually spent discussing FIN 46R and SAS 70.  Frustration about the progress of work pursuant to FIN 46R was an ongoing complaint expressed at the weekly meetings. . . .   The head of Internal Audit . . . met with Defendant Falcone at least twice per month and regularly communicated the audit issues and frustration with FIN 46R compliance to Defendant Falcone.  CW1 knew of Barone's reports to Defendant Falcone because Barone reported at the weekly Internal Audit meetings Defendant Falcone's reaction to Barone's frustrations.  Barone also spoke to Defendant Lundquist every day and kept her "in the loop" to the same extent as Defendant Falcone.

Compl. ¶ 80.  Thus, the Complaint specifies that CW1 personally attended meetings in his or her capacity as Administrative

Assistant where frustrations related to FIN 46R were discussed. The Complaint reflects that some of CW1's knowledge was gained by virtue of hearsay, and the allegations are very vague as to when any Defendant realized that the LIHTC Funds all needed to be consolidated onto MuniMae's financial statements.

CW1 also states that Defendant Falcone sent a memo to all MuniMae employees in the fall of 2006, presumably which CW1 received directly, regarding the restatement.  The memo explained that the Company was restating its financials, that the auditing staff would be focusing all of their efforts on the restatement and would be required to work overtime, and that questions should be directed to Defendant Falcone or the comptroller.  CW1 is vague as to the exact date of this memo, but "fall of 2006" is consistent with the announcement of the Second Restatement, which occurred on September 13, 2006.  See Compl. ¶ 81.

CW2 was an in-house certified public accountant who worked in MuniMae's Baltimore headquarters from late 2005 through April 2007 and reported directly to Defendant Lundquist and Chief Accounting Officer Greg Thor ("CAO Thor").  The Complaint alleges, that according to CW2:

> In late 2005 and early 2006, CW2, Defendant
> Lundquist and CAO Thor began to quantify
> various accounting problems and determined
> that the Company needed to restate its
> financials. . . . [CAO] Thor's primary role

30

was reviewing the LIHTCEFs to determine if
they should have been consolidated under FIN
46R. . . . [F]or each fund, they would
review the contract and other documentation
about the entity and then map out the deal
to determine whether MuniMae was the primary
beneficiary. . . . [A]t the time of the
first restatement (by mid-2006), they[22] had
concluded that the primary beneficiary
determinations for the tax credit equity
funds had been done incorrectly and that
most of the funds should have been
consolidated.

Compl. ¶ 82.

Moreover, CW2 states that the Company's outside auditors,

PwC, and later, KPMG, communicated with MuniMae through the

Company's CFO, Harrison and later Lundquist.  CW2 states that

PwC was present at all Board of Directors meetings and discussed

"riskier" accounting issues like FIN 46.[23]  Compl. ¶ 83.

According to the Complaint, CW2 was involved in the First

Restatement from the beginning and worked alongside various

outside consultants.  CW2 states that accountants from Deloitte

were brought in to help with the project, and that Deloitte

served as a project manager and facilitated communication

between the team working on the restatement, which included

Lundquist and Falcone, who, according to CW2, "were very

involved in the restatement process in late 2005 and 2006."

---

[22]    Presumably, by "they," CW2 is referring to CW2, Defendant
Lundquist and CAO Thor.
[23]    It is not clear what CW2's basis for these allegations is,
other than CW2's role as a certified public accountant at
MuniMae headquarters who reported to Lundquist and CAO Thor.

Compl. ¶ 84.

> Throughout CW2's tenure at MuniMae,
> Defendant Lundquist met with Defendant
> Falcone to provide him with updates
> regarding the restatement at least on a
> weekly basis and sometimes on a daily basis.
> During these meetings, Lundquist would
> repeatedly bring up FIN 46.[24]  Also, there
> were bi-weekly meetings attended by
> Defendants Lundquist and Falcone, as well as
> Thor and CW2, during which status updates on
> the restatement, including PowerPoint
> presentations, were given.  These updates
> included information as to how many tax
> credit equity funds needed to be
> consolidated and the financial impact of
> consolidating these entities. . . . Through
> these meetings and presentations, Defendants
> Falcone and Lundquist had actual knowledge
> of the Company's failure to comply with FIN
> 46R at the time of MuniMae's first
> restatement, but they concealed this
> information from investors.  Through their
> direct and personal involvement in the
> restatements, Defendants Falcone and
> Lundquist also had first-hand knowledge
> about the scope and massive scale of the
> restatement project and the efforts
> undertaken to consolidate over 230 VIEs as
> required by FIN 46R, but concealed from
> investors the fact that the costs of this
> project would have a devastating effect on
> MuniMae's CAD and would threaten its ability
> to continue increasing quarterly
> distributions to shareholders.

Compl. ¶ 84-85.  CW2 also states that CAD was "a big focus of

the company" and "all Falcone cared about."  Compl. ¶ 84.

Finally, CW3 was hired as a staff accountant by MuniMae in

---

[24]   Again, it is not clear what CW2's basis for this allegation
is.  CW2 does not appear to allege that he or she attended the
weekly meeting of Lundquist and Falcone.

2000 and was eventually promoted to a position in the Internal Auditing Department as project manager for Sarbanes-Oxley Act compliance.  As an Internal Auditing manager, CW3 reported to the head of Internal Audit, Angela Barone, and regularly attended meetings concerning MuniMae's accounting policies with Defendants Falcone, Harrison and Joseph and later, Defendant Lundquist.  CW3 left MuniMae in approximately March 2006, "just as it was announcing its first restatement."  Compl. ¶ 88.

According to CW3, Defendants Falcone, Harrison, and Lundquist disagreed with PwC about the consolidation of tax credit equity funds pursuant to FIN 46R, and discussions about whether to restate went on for months prior to the First Restatement announcement in March 2006.  CW3 attributed the need for the First Restatement to the "'debate around FIN 46's documentation process,'" which had "'come to a head'" between PwC and MuniMae's senior executives.  Compl. ¶ 88.  CW3 stated that the FIN 46 issues pertained to the consolidation of various tax credit equity funds and whether they should be considered VIEs.  According to CW3, the PwC partner leading the MuniMae engagement insisted that the value of the LIHTC Funds be disclosed on MuniMae's financial statements, and MuniMae argued with PwC about how to classify the LIHTC Funds and how to determine the percentage of ownership MuniMae held in each one. These arguments occurred in monthly meetings attended by CW3,

33

Falcone, Harrison and later Lundquist, and Angela Barone.
According to CW3, Defendant Joseph had been "'fairly hands on'"
with respect to these accounting issues.  Compl. ¶ 88.

CW3 also described MuniMae's accounting as "'always'" being
in a state of "'some confusion and chaos'" because of the
Company's rapid expansion, acquisition of multiple partnerships,
and inadequate accounting staff to appropriately handle each
transaction.  Compl. ¶ 90.

## 2.   Insider Trading

Plaintiffs allege that the Defendants were motivated to
commit fraud so they could improperly profit from insider stock
sales.  During the Class Period, three of the six Individual
Defendants sold some of their MuniMae stocks.[25]

Plaintiffs allege that the sales by Defendants Joseph,
Falcone and Harrison were suspicious due to the large percentage
of holdings sold and the gross proceeds yielded as a result of
those sales:

- Harrison sold 77.91% of his Class Period holdings,
  realizing gross proceeds of $1,131,434.

- Joseph sold 36.53% of his Class Period holdings,
  realizing gross proceeds of approximately $4,680,771.

---

[25]   Plaintiffs argue that the fact that some Defendants did not
sell during the Class Period does not undermine an inference of
the other Defendants' fraudulent intent.

- Falcone sold 28.65% of his Class Period holdings, realizing gross proceeds of approximately $1,229,526.[26]

Plaintiffs also contend that the timing of some of the trades is suspicious.  As described above, Plaintiffs rely on the confidential witnesses to allege that Falcone and Lundquist had actual knowledge that MuniMae had failed to comply with FIN 46R by mid-2006, by which time Falcone and Harrison attended monthly meetings to discuss disclosing the value of the LIHTC Funds on MuniMae's financial statements, and Joseph was "'fairly hands on' with respect to these accounting issues."  Compl. ¶¶ 85, 88.

Defendant Joseph's single largest stock sale of the Class Period occurred just weeks before the First Restatement announcement (Feb. 21, 2006), and eight of Defendant Joseph's ten highest-yielding trades[27] during the Class Period occurred between January and May 2006 (around the time that CW2 and CW3 state that Defendants were aware of MuniMae's violations of FIN 46R).  Defendant Falcone's largest-yielding trade during the Class Period occurred just weeks after the announcement of the First Restatement (on April 3, 2006).  However, all of Harrison's sales took place in early December 2004.

---

[26]    See Compl. ¶ 248.
[27]    Joseph made 36 trades during the Class Period.  See Compl. ¶ 248.

3.   Other Indicia

Plaintiffs include in their alleged indicia of scienter, the Individual Defendants' involvement in the core business of MuniMae, the magnitude of the FIN 46R discrepancy, and the allegations that Defendants were motivated to avoid consolidation of the LIHTC Funds for other financial reasons. Plaintiffs' theory is that MuniMae feared the uncertain effects of consolidation of the LIHTC Funds onto MuniMae's financial statements and believed consolidation would hurt MuniMae because it would lead to a less favorable debt to equity ratio,[28] would hinder MuniMae's ability to maintain bank financing on affordable terms, and would impact MuniMae's treatment of syndication and management fees.  Once the need to consolidate the LIHTC Funds was disclosed, MuniMae and its officers were motivated to conceal the costs of the restatement to maintain the inflated share price.

Plaintiffs further assert that:

- The alleged scheme facilitated MuniMae's ability to engage in acquisitions during the Class Period.[29]

---

[28]   Whereas, in March 2004 MuniMae had disclosed that the unconsolidated LIHTC Funds had $970.3 million in assets and $90.8 million in liabilities, after the restatements, MuniMae reported $1.9 billion in liabilities and $4.6 billion in assets. See Compl. ¶ 254; Reply [Doc. 97] 21.

[29]   Plaintiffs allege that MuniMae funded the acquisition of Glaser Financial Group, Inc., in June 2005, and of Renewable Ventures, LLC, in May 2006, with artificially inflated shares of its stock.  See Compl. ¶ 253.

- MuniMae and the Individual Defendants feared that the outcome of the Second Restatement could cause MuniMae to default on its net worth covenants, precipitating bankruptcy.  See Compl. ¶¶ 254-56.

- MuniMae was motivated to keep the LIHTC Funds off its financial statements so that it could more easily seek additional financing through the February 2005 Secondary Public Offering[30] and raise additional capital through private offerings by MuniMae subsidiaries and by closing certain credit equity funds.[31]

- The magnitude of the costs of the restatement was so great - approximately $54M in 2007 - that MuniMae and its officers had to have known prior to the January 2008 disclosures that the costs were becoming so great that they would impact the dividend.


### 4.   Competing Inferences

Defendants urge the Court to conclude that it is more likely that there were innocent rather than improper reasons for their behavior.  They assert that MuniMae and its officers struggled with a difficult accounting rule that had a dramatic impact on MuniMae's financial statements, and while doing so, made repeated disclosures in an attempt to keep its shareholders apprised of the developments and costs as they occurred.

Defendants argue that the Complaint fails to plead a compelling and cogent inference of scienter because MuniMae disclosed all relevant information to its accountants, auditors,

---

[30]   Plaintiffs contend that the SPO's $26.51 share price was artificially inflated by the alleged fraud.  See Compl. ¶ 251.

[31]   Plaintiffs specify eight such events: three in 2004, four in 2005, and one in 2006.  See Compl. ¶ 252.

and investors; FIN 46R was a new and challenging accounting standard; MuniMae undertook its restatements on its own initiative; the costs of the restatement started to mount substantially in late 2007 when outside consultants were brought in; and MuniMae did made disclosures about the restatement and its costs throughout the class period, even if they were arguably inadequate.

Defendants contend that no confidential witness states that the senior executives knew about the costs of the restatement long before the costs were disclosed, and Plaintiffs' allegations with respect to the costs boil down to an argument that because the cost was so high, MuniMae and its executives should have known of the scale.  Defendants also point out that PwC, a prestigious accounting firm,also struggled with the application of FIN 46R in this case.

Defendants argue that the audited financial statements from PwC for 2004 and 2005 that said they were in compliance with GAAP, including FIN 46R, contradicts Plaintiffs' contention that the relevant Defendants knew early in the class period that MuniMae had failed to comply with FIN 46R.[32]  In October 2006,

---

[32]   MuniMae's first quarter 2004 financials were not audited, but MuniMae's financials for the year ended December 2004 were audited by PwC and used the same application of FIN 46R.  PwC certified without qualification that MuniMae's financials for the year ended December 2004 were prepared in accordance with GAAP.  Mot. Dismiss [Doc. 72] 7.

MuniMae announced, and PwC agreed, that "[d]uring the years ended December 31, 2005 and December 31, 2004 and through October 20, 2006, there were no disagreements with PwC on any matter of accounting principles or practices, financial statement disclosure or audit scope or procedure, which disagreements if not resolved to the satisfaction of PwC would have caused them to make reference thereto in their reports on [MuniMae's] financial statements."  Oct. 26, 2006 Form 8-K & Ex. 16, Holland Exs. 10 & 15.

With respect to insider trading, Defendants argue that insider sales in this case were not unusual or suspicious because the sales took place early in the class period, well before the January 2008 disclosures, a declining number of insiders were selling shares, the percentage of holdings sold were not too great, and that Joseph and Falcone traded pursuant to non-discretionary S.E.C. Rule 10b5-1 plans, thus, the trades were made automatically, and not at the defendants' specific direction.[33]

---

[33]   A 10b5-1 plan refers to a periodic divestment plan that purports to meet S.E.C. requirements for an affirmative defense to insider trading.  The plan must be entered into prior to the insider becoming aware of any material, non-public information that would otherwise prohibit trades.  See 17 C.F.R. § 240.10b5-1; Lefkoe v. Jos. A. Bank Clothiers, 2008 WL 7275126 at n.7 (D. Md. May 1, 2008).  The Complaint acknowledges that Joseph and Falcone's trades were made automatically pursuant to a Rule 10b5-1 Plan, however, it alleges that "at the time the Rule

5.   Holistic Scienter Analysis

To evaluate whether Plaintiffs' factual allegations give rise to a strong inference of scienter, the Court must first discuss whether they permit an inference of scienter.  Matrix Capital Mgmt. Fund, L.P. v. BearingPoint, Inc., 576 F.3d 172, 183 (4th Cir. 2009).  "While we ultimately evaluate plaintiffs' allegations of scienter holistically, we only afford their allegations the inferential weight warranted by context and common sense."  Id.  Then, the Court discusses "whether 'a reasonable person would deem [any] inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'"  Id. (quoting Tellabs, 551 U.S. at 324).  The Court will discuss Plaintiffs' allegations in turn.

a.   Confidential Witnesses

"When the complaint chooses to rely on facts provided by confidential sources, it must describe the sources with sufficient particularity to support the probability that a person in the position occupied by the source would possess the

---

10b5-1 plans were instituted, the Individual Defendants knew that MuniMae was engaging in improper accounting in order to inflate its revenue and issuing false and misleading financial statements."  Compl. ¶ 250.

information alleged or in the alternative provide other evidence to support their allegations." Teachers' Ret. Sys., 477 F.3d at 174 (internal quotation marks and citations omitted); see also Lefkoe v. Jos. A. Bank Clothiers, 2008 WL 7275126, at *7 (D. Md. 2008) (Nickerson, J.) (relying on confidential source allegations where the complaint provided "job descriptions that suggest that the sources would have personal knowledge of the facts alleged and, in many cases, provides multiple sources to corroborate facts"). Hearsay allegations and bald assertions made by confidential witnesses will not defeat a Rule 12(b)(6) motion. In re Pall Corp., 2009 U.S. Dist. LEXIS 88240, 17-18 (E.D.N.Y. Sept. 21, 2009). Confidential witness allegations must be examined to consider the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, the coherence and plausibility of the allegations, and similar indicia. See id. (citations omitted).

The main thrust of the Confidential Witness allegations is that:

- Frustrations related to the application of FIN 46R were discussed in weekly Internal Audit Department meetings as early as 2004;

- In fall 2006 the internal audit staff were told that they would be focusing their efforts on the Second Restatement,

- By mid-2006, Lundquist and others had concluded that most of the LIHTC Funds should have been consolidated;

- Falcone and Lundquist were aware of scope and scale of the restatement project but concealed its cost,

- MuniMae "argued" with PwC about how to classify the LIHTC Funds and determine ownership, and

- The PwC partner leading the MuniMae engagement "insisted" that the LIHTC Funds be consolidated on MuniMae's financial statements prior to March 2006.

See Compl. ¶¶ 80-88.

There is no doubt that these allegations are somewhat supportive of an inference that MuniMae and some of the Individual Defendants acted with fraudulent intent.  They would, if accurate, establish that in mid-2006 Defendant Lundquist and other accounting staff had concluded that the LIHTC Funds needed to be consolidated, a determination that was not announced until January 2007, after MuniMae had issued restated financial statements in June and July of 2006 with no such disclosure, and well after the announcement of the Second Restatement in September 2006.  However, these confidential witness allegations are not inconsistent with the competing inference that Falcone, Lundquist, Joseph, and PwC struggled with the proper interpretation and application of FIN 46R to its business from the time of the standard's inception in 2004 until January 2007, when MuniMae announced that substantially all of the LIHTC Funds would have to be consolidated.

b.   Insider Trading

The significance that may be attributed to an allegation of
motive depends on an analysis of a complaint in its entirety.
Tellabs, 551 U.S. at 324.  Allegations of personal financial
gain "may weigh heavily in favor of a scienter inference."  Id.
"[I]nsider trading can imply scienter only if the timing and
amount of a defendant's trading were 'unusual or suspicious.'"
Teachers' Ret. Sys., 477 F.3d at 184.  Whether an insider's sale
of stock is "unusual in scope" depends on factors such as "the
amount of profit made, the amount of stock traded, the portion
of stockholdings sold, or the number of insiders involved."  In
re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 277 (3d
Cir. 2006).

The Court does not find the insider trading that took place
in the instant case to be unusual or suspicious.  The fact that
only six insiders, and only three of the six Individual
Defendants, sold shares during the Class Period is supportive of
the defense position.  See Acito v. IMCERA Group, 47 F.3d 47, 54
(2d Cir. 1995); In re First Union Corp. Sec. Litig., 128 F.
Supp. 2d 871, 898 (W.D.N.C. 2001).  Moreover, while the overall
value of the shares sold during the Class Period was up from
before the Class Period, fewer insiders made sales.  See Compl.
¶¶ 248-49 (charts comparing pre-Class Period insider trading to
Class Period insider trading show that twelve insiders sold

43

approximately $7 million in shares in the period leading up to the Class Period, whereas six insiders sold approximately $12 million in shares during the Class Period).

The Court does not find the timing of the sales to be suspicious.  While Harrison sold nearly 78% of his holdings, he did so in early December 2004.  This was well before the financial restatements and well before mid-2006, when, according to CW2, certain officers had knowledge that all of the LIHTC Funds would have to be consolidated.  Joseph made 36 trades during the Class Period to sell 36.53% of his holdings at regular intervals every month[34] starting in April 2005 through

---

[34]    Both Joseph and Falcone were trading pursuant to non-discretionary Rule 10b5-1 plans. Joseph established his Rule 10b5-1 plan in March 2005, <u>see</u> Apr. 28, 2005 Form 4, Holland Ex. 11, and Falcone established his plan in September 2003, <u>see</u> Oct. 4, 2004 Form 4, Holland Ex. 7.  As argued by Defendants, S.E.C. Rule 10b5-1(c)(1) specifically makes the fact that shares are sold pursuant to a Rule 10b5-1 plan an affirmative defense to a charge of insider trading.  Moreover, Defendants allege that Joseph and Falcone's S.E.C. Form 4s reflect that they were accumulating shares of MuniMae and selling portions to pay the tax bills related to the transactions.  <u>See</u> Hr'g Tr. at 64.  However, Plaintiffs contend that that "at the time the Rule 10b5-1 plans were instituted, the Individual Defendants knew that MuniMae was engaging in improper accounting in order to inflate its revenue and issuing false and misleading financial statements," Compl. ¶ 250, and that it is premature to consider the fact that these trades were made pursuant to such a plan, because "Defendants must prove that the plan was entered into in good faith and before the insider became aware of material nonpublic information."  Opp'n [Doc. 84] 56 n.28 (citing 17 C.F.R. § 240.10b5-1(c)(1)(i)(B)(1)-(3)).  While other courts have considered the fact that insider trades were made pursuant to a non-discretionary 10b5-1 plan as part of the scienter inquiry on a motion to dismiss, <u>see, e.g.</u> <u>Elam v. Neidorff</u>, 544

June 2006.  While Plaintiffs note that Joseph's highest sale

took place in February 2006, shortly before the First

Restatement announcement, and that eight of his ten largest

sales were between January and May, 2006, Joseph had repeatedly

sold the same number of shares in 2005 when the share price was

lower (thus the sale proceeds were smaller).  Falcone, who sold

28.65% of his holdings, did so mostly in 2004 (7 sales) and 2005

(7 sales), with only 2 sales taking place in 2006, and those

sales were not out of line with his prior sales.  See First

Union Corp. Sec. Litig., 128 F. Supp. 2d at 899-90 (finding that

insiders sales were "of little probative value" when the bulk of

the sales occurred prior to the time that most of the problems

---

F.3d 921, 928 (8th Cir. Mo. 2008), where a defendant entered
into the plan during the Class Period, as Joseph did here, the
fact that the trades were made pursuant to the plan are still
potentially suspect.  See Cent. Laborers' Pension Fund v.
Integrated Elec. Servs., 497 F.3d 546, 554 (5th Cir. Tex. 2007).
But see In re IAC/InterActiveCorp Sec. Litig., 478 F. Supp. 2d
574, 604 (S.D.N.Y. 2007) (finding that defendant's sales
pursuant to a 10b5-1 plan did not raise a strong inference of
scienter despite allegation that plan was entered into after
defendant had material, non-public information).
    The Court finds that it is not necessary, and perhaps not
appropriate, to consider the fact that Joseph and Falcone's
Class Period trades were made pursuant to Rule 10b5-1 plans at
this stage.  See Lefkoe v. Jos. A. Bank Clothiers, 2008 WL
7275126, at *5 (D. Md. May 1, 2008) (J. Nickerson) (noting that
the existence of the 10b5-1 plan is properly before the Court on
a motion to dismiss by virtue of the S.E.C. filing, however the
plan itself is not).  Even without considering the substance of
the nondiscretionary trading plans, the sum of Plaintiff's
allegations do not create a cogent and compelling inference of
scienter.

arose at the company, and many months before the allegedly
corrective disclosure).  Thus, any inference of fraudulent
intent based on the timing and volume of Harrison and Falcone's
insider trading is very slight.

Plaintiffs raise some inference of fraudulent intent with
respect to Joseph, who allegedly was "'fairly hands on'" with
the accounting issues, and thus was aware of the discussions
about FIN 46R that had been going on "for months" prior to the
March 2006 announcement of the First Restatement.  See Compl. ¶
88.  However, these sales began at regular intervals fairly
early in 2005, and Joseph sold only 36.53% of his holdings, thus
the inference of fraud created is hardly significant.


c.   Magnitude of Discrepancy

Plaintiffs urge this Court to find that because the
discrepancies revealed by the restatements were so astronomical,
the Defendants must have known of the accounting problem.  See
In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F.
Supp. 2d 474, 488-89 (S.D.N.Y. 2004) ("When a company is forced
to restate its previously issued financial statements, the mere
fact that the company had to make a large correction is some
evidence of scienter."); In re MicroStrategy Inc. Sec. Litig.,
115 F. Supp. 2d 620, 636 (E.D. Va. 2000) ("significant
overstatements of revenue tend to support the conclusion that

46

defendants acted with scienter") (citations and internal
quotation marks omitted).  However, the nature of the
discrepancy in this case does not lead to the inference that the
Defendants acted with scienter.  Here, MuniMae held a less than
one percent interest in the 230 LIHTC Funds that were not
initially consolidated, and as a result of the determination
that it was the "primary beneficiary" according to FIN 46R it
was required to consolidate all of the LIHTC Funds' assets and
liabilities onto its financial statements.  Thus, the error had
a vast effect on MuniMae's cost of compliance.  However, in a
realistic sense, because MuniMae's ownership interest in each
LIHTC Fund was minor (1% or less), the practical impact of the
consolidation on MuniMae's viability (as distinct from the cost
to prepare the restated financials) was not significant.  In
short, MuniMae was no Enron.

A perhaps useful analogy may be provided in a hypothetical
pollution context in which a manufacturer certified that its
facility emitted no pollutants but had not utilized state of the
art measuring devices.  When forced, at great expense, to use
the modern measuring devices, the company admitted that there
was more than zero emission of pollutants but the amount was
below the environmentally permitted level.

d.   Core Operations

The LIHTC Funds were part of MuniMae's core business.

However, the alleged misstatements and omissions concerned the

application of a challenging new accounting rule to the funds.

Thus, it does not necessarily follow that the officers knew that

their statements were false when made.  "Although in some

circumstances it may be reasonable to assume that officers of a

company know of facts critical to the company's core operations,

that is not the case here."  In re Constellation Energy Group,

Inc., 738 F. Supp. 2d 614, 635 (D. Md. 2010) (declining to apply

the core operations inference where plaintiffs alleged that

company executives should have known that downgrade collateral

obligations were miscalculated despite the importance of

liquidity to company's core business); cf. In re Campbell Soup

Co. Sec. Litig., 145 F. Supp. 2d 574, 599 (D.N.J. 2001) (finding

that it was fair to infer that Campbell Soup Co. executives had

pertinent knowledge about quarter-end soup discounting practices

and related accounting effects).[35]


e.   Other Motivation

Plaintiffs' allegations that the alleged fraud enabled

---

[35]    The Court also notes that the "core operations inference,"
see In re: Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324
F. Supp. 474, 489-90, has been questioned in light of the PSLRA,
see Bd. of Trs. of Ft. Lauderdale Gen. Emples. Ret. Sys. v. Oao,
2011 U.S. Dist. LEXIS 88143, 42-43 (S.D.N.Y. Aug. 9, 2011).

MuniMae to benefit from a more favorable debt to equity ratio and an artificially inflated stock price are not persuasive allegations of scienter.

The SPO took place in early 2005, near the beginning of the Class Period, at a time when FIN 46R was being discussed.  No Confidential Witness alleges that any Defendant knew that FIN 46R had been applied incorrectly at this time.  Similarly, one of the two acquisitions relied upon by Plaintiffs took place early on, in June 2005, although the other took place in May 2006.

Plaintiffs' allegations related to obtaining favorable financing and avoiding default on debt covenants are non-specific.  "Courts have repeatedly rejected these types of generalized motives – which are shared by all companies – as insufficient to plead scienter under the PSLRA."  Ottmann v. Hanger Orthopedic Group, Inc., 353 F.3d 338, 352 (4th Cir. 2003) (emphasis in original); see also Cozzarelli v. Inspire Pharm. Inc., 549 F.3d 618, 627 (4th Cir. 2008) (post-Tellabs) ("Indeed, the motivations to raise capital or increase one's own compensation are common to every company and thus add little to an inference of fraud.").  While the Court considers these allegations alongside the others in the holistic scienter analysis required by Tellabs, 551 U.S. at 326, these allegations are not inherently suspicious, as the same can be said of most

49

any other company.

f.   Class Period Disclosures

During the Class period, MuniMae made repeated disclosures about the cost and difficulty of the restatement project.  This, the Court finds, tends to negate an inference that MuniMae was intentionally or recklessly misleading investors.  "A disclosure that meaningfully alerts investors to the risk that financial information is not accurate may suggest that the individuals responsible for the disclosure did not knowingly (or perhaps not even recklessly) misstate the underlying financial information." Matrix, 576 F.3d at 187-89 (finding that, under the circumstances, a class period disclosure made about internal control deficiencies lent some weight to the "inference that defendants were not acting with scienter but rather were endeavoring in good faith to inform investors of their internal control and financial reporting problems.").

As in Matrix, the fact that MuniMae repeatedly alerted financial investors that it needed to restate its financials, that its internal accounting controls were deficient, that it had hired outside consultants, and that the costs of the restatements were very significant and beyond what had been contemplated, tends to negate the inference of scienter.  See id.

6. <u>Scienter Conclusion</u>

a. <u>All Defendants</u>

On balance, the Court finds that Plaintiffs have not created a cogent or compelling inference that MuniMae or any of the Individual Defendants acted knowingly or recklessly,[36] in a way that "embrac[ed] intent to deceive, manipulate, or defraud." <u>Tellabs</u>, 551 U.S. at 319.

The Court finds the inference that Defendants nefariously avoided consolidating the LIHTC Funds onto MuniMae's financial statements for fear of the unknown, and then nefariously avoided revealing the true cost of the restatement, to be at the low end of plausibility. The competing inference offered by Defendants – that they struggled with a new and difficult accounting rule that ultimately required a restatement that was more expensive and had a greater impact on their bottom line than they had anticipated – is more compelling.

"[W]hen the facts as a whole more plausibly suggest that the defendant acted innocently – or even negligently – rather than with intent or severe recklessness, the action must be dismissed." <u>Cozzarelli v. Inspire Pharms., Inc.</u>, 549 F.3d 618,

---

[36] A reckless act is one "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." <u>Matrix</u>, 576 F.3d at 181.

624 (4th Cir. 2008).  Thus, the Court finds that Plaintiffs have not satisfied the scienter pleading requirements of the PSLRA.


b.   Lundquist

Lundquist is uniquely situated among the Individual Defendants, because she was an officer of MuniMae for only a portion of the Class Period.  She became CFO in December 2005, well after MuniMae had made its erroneous decision regarding FIN 46R.  Lundquist was CFO in March 2006, at the time of the First Restatement, when MuniMae withdrew its financial statements.  In June and July 2006, Lundquist issued the restated financial statements and certified forms 10-K and 10-Q.  Shortly thereafter, in September 2006, Lundquist again withdrew MuniMae's financial statements and announced the Second Restatement.  Lundquist left MuniMae in July 2007, six months before the January 2008 dividend announcement and subsequent stock price drop.

Plaintiffs allege that Lundquist is liable under S.E.C. Rule 10b-5 because Lundquist knew she had to consolidate all the LIHTC Funds (according to CW2 and CW3) and left the company without disclosing that fact.  Plaintiffs' theory is that Lundquist hoped that she could get away with the misstatements in the June and July 2006 certified 10-K and 10-Q.  According to Plaintiffs, Lundquist was aware of the huge cost of the Second

Restatement, despite the fact that she left MuniMae well before Navigant was hired, based on her involvement with the First Restatement.  See Opp'n [Doc. 84] 46.

Lundquist responds that Plaintiffs fail to plead a compelling inference that she knowingly or recklessly made material omissions or misstatements.  Lundquist points out that she had no investment in MuniMae's earlier accounting decisions with respect to FIN 46R and was willing to disclose in March 2006 that the accounting was faulty.  She states that if, by mid-2006 she had known that essentially all of the LIHTC Funds needed to be consolidated, it would have been senseless to subject herself to sanctions under the Sarbanes-Oxley statute by issuing the June and July 2006 certified 10-K and 10-Q financial statements only to withdraw them again in September 2006. Moreover, Lundquist did not engage in any insider trading during the Class Period, was not yet working at MuniMae during the SPO in early 2005, and was present when only one of the two specified acquisitions took place.

Lundquist argues that the more compelling inference to draw from the allegations, including the allegation that she was told by March 2006 that all of the LIHTC Funds would have to be consolidated by CW2 and PwC (according to CW3), is that, at the time MuniMae issued the restated 10-Q and a 10-K in the summer of 2006, she (and PwC) had become comfortable with the

accounting, and did not then think that more restatements would be necessary.  The Court agrees.

In sum, the Court finds that, even if it had concluded that Plaintiffs had adequately alleged scienter on the part of MuniMae and the other Defendants, it would not so find as to Lundquist.

### c.   Sale of Security, Reliance and Economic Loss

Defendants do not seek dismissal based on the inadequacy of allegations of a connection between the misrepresentation or omission and the purchase or sale of a security, reliance, or the existence of alleged economic losses.

### d.   Loss Causation

Defendants contend that the Complaint does not adequately allege loss causation.

Loss causation is the proximate cause element of a securities fraud claim.  See In re Mut. Funds Inv. Litig., 566 F.3d 111, 119 (4th Cir. 2009), rev'd on other grounds, Janus Capital Group, Inc. v. First Derivative Traders, 131 S. Ct. 2296, 2305 (2011).  To survive a motion to dismiss, a securities fraud plaintiff must adequately allege that "defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss." Dura

Pharms., Inc. v. Broudo, 544 U.S. 336, 346 (2005).  Loss causation must be pled with "sufficient specificity," consistent with Rule 9(b).  Katyle v. Penn National Gaming, Inc., 637 F.3d 462, 471 (4th Cir. 2011).  Plaintiffs are only required to show that the defendant's conduct was a substantial cause of its injury; other contributing forces to the loss will not bar recovery under the loss causation requirement.  In re Mut. Funds, 566 F.3d at 128.

"The essence of loss causation is the notion that the alleged 'misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.'"  In re IMAX Sec. Litig., 587 F. Supp. 2d 471, 485 (S.D.N.Y. 2008) (quoting Lentell v. Merrill Lynch & Co., 396 F.3d 161, 173 (2d Cir. 2005)).  Thus, to plead causation, a complaint can allege that the market reacted negatively to a corrective disclosure regarding the falsity of the defendant's statements.  See id.  A complaint may also plead loss causation by alleging that a previously concealed risk materialized.  See Teachers' Ret. Sys., 477 F.3d at 187 n.3.

Plaintiffs argue that the announcements made on January 28 and 29 were corrective disclosures that revealed, for the first time, that MuniMae would be unable to timely complete its restatement and would be delisted from the NYSE, and that the restatement impacted CAD.  "The risk that this restatement would

be so costly as to impact CAD was concealed from investors throughout the Class Period.  When this risk materialized . . . MuniMae stock collapsed."  Opp'n [Doc. 84] 69.

Defendants contend that the stock price drop was based solely on the announcement of the cut to the dividend, because its disclosures throughout 2007, in particular, the November disclosure, provided warnings that the restatement was costly and that it could impact CAD and thus the dividend.  Defendants argue that in November 2007, MuniMae "expressly warned" that due to the significant restatement costs, "the Company's net cash from operations may not be sufficient to pay the level of dividends it had been paying to date."  Mot. Dismiss [Doc. 72] 23.  MuniMae's actual statement in November 2011 was not quite so clear, but it did announce, "it is possible that the dividend payout ratio for the 2007 fiscal year may exceed 100% of the Company's net cash generated from operations for the fiscal year 2007."  Compl. ¶ 233.

However, as Plaintiffs note, in November MuniMae concurrently announced that "management plans to ask the Board to maintain the current dividend policy."  Compl. ¶ 234.  Thus, Plaintiffs contend that investors were misled to believe that the restatement costs were not so significant as to bring an end to MuniMae's practice of increasing its quarterly dividend because the November disclosures were "far too vague and lacking

in specificity to warn investors that the restatement costs
would . . . ultimately require slashing their dividends," Opp'n
[Doc. 84] 77, and because investors had previously been assured
that the Second Restatement would "'not impact cash available
for distribution . . . in any period, or the Company's ability
to pay future distributions to common shareholders.'"  Compl. ¶
221 (quoting Sept. 13, 2006 Form 8-K).  MuniMae's stock price
remained relatively stable after these announcements, <u>see</u> Compl.
¶¶ 226, 233, suggesting that they were not curative, <u>see</u> <u>In re
Merck & Co., Inc. Secs., Deriv. & ERISA Litig.</u>, 543 F.3d 150,
167-68 (3d Cir. 2008).

The January 28 and 29 disclosures announced that MuniMae
was reducing its dividend by 37% "due to the cost of the
Company's ongoing restatement of its financial statements, the
decision by the Company to conserve capital to protect the long-
term prospects of the business given the current volatility in
the credit and capital markets, and the desire to dedicate
additional capital to the high-growth Renewable Energy Finance
business."  Compl. ¶ 234.  MuniMae also announced that the NYSE
would delist its stock because it would not complete its
restatement by the NYSE-imposed March deadline.  These two
announcements precipitated a total 57% drop in MuniMae's stock
price.

The Court finds that Plaintiffs have adequately pleaded

loss causation.  They describe their loss theory with
"sufficient specificity," as required by Katyle, 637 F.3d at
471.  Plaintiffs link the steep decline in MuniMae's stock price
with the disclosures made on January 28 and 29.

While Defendants raise valid arguments that they had at
least somewhat warned of the risk that the dividend could be
cut, and that projections relating to future economic
performance are immaterial as a matter of law, 15 U.S.C. § 78u-
5, the facts as presented by Plaintiffs show that these
"warnings," in context, did not cause significant stock price
declines.

Of course, Defendants may be able to present evidence that
other contributing facts led to investors' losses.  "Loss
causation becomes most critical at the proof stage."  McCabe v.
Ernst & Young, LLP, 494 F.3d 418, 427 n.4 (3rd Cir. 2007)
(internal quotation marks omitted); see also In re Mut. Funds,
566 F.3d at 128 ("it is during the damages inquiry, not the
earlier proximate cause inquiry, that the exact amount of
damages solely caused by the defendant's conduct must be
calculated") (emphasis in original) (internal quotation marks
omitted).  "So long as the plaintiff alleges facts to support a
theory that is not facially implausible, the court's skepticism
is best reserved for later stages of the proceedings when the
plaintiff's case can be rejected on evidentiary grounds."  In re

Gilead Sciences Secs. Litig., 536 F.3d 1049, 1057 (9th Cir. 2008).

In sum, Plaintiffs have pleaded the loss causation element of their 10b-5 claim.


### 3.   Control Person Liability (Count Two)

Plaintiffs allege that the Individual Defendants violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), because they were controlling persons who, by virtue of their positions, influenced and controlled the decision-making of MuniMae, including the decisions to disseminate the allegedly false and misleading statements.  Section 20(a) provides for derivative liability for those who control others found to be primarily liable under the Act.  15 U.S.C. § 78t(a).  A claim of control person liability must allege a predicate violation of Section 10(b).  In re Mut. Funds Inv. Litig., 566 F.3d at 129.

As discussed above, the Court holds that herein, Plaintiffs have failed to adequately plead a viable underlying 10b-5 violation.  Therefore, they have not pleaded a predicate offense on which to base control person liability.


### 4.   Resolution of Exchange Act Claims

As discussed above, Plaintiffs have failed to plead adequately the scienter element of their Securities Act claims.

Accordingly, Counts One and Two shall be dismissed.


      B.    <u>The Securities Act Claims (Counts Three through Eight)</u>

Plaintiffs bring claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 relating to the Dividend Reinvestment Plan ("DRP") and the Secondary Public Offering ("SPO").

In Count Three, Plaintiffs Felix and Engel allege that MuniMae, the Individual Defendants, and the Director Defendants violated Section 11 of the Securities Act, 15 U.S.C. § 77k, by making materially untrue or misleading statements and omissions in the September 4, 1997 DRP registration statement, which incorporated by reference MuniMae's allegedly false and misleading financial statements that were issued prior to the eleven dividend distributions that took place during the Class Period.  Because the financial statements were allegedly false and misleading, the DRP registration statement incorporating those documents was also false and misleading as of the date of the financial statements.

In Count Four, Plaintiffs Felix and Engel allege that MuniMae, as seller, offeror, and/or solicitor of purchasers of the Growth Shares offered pursuant to the Dividend Reinvestment Plan, violated Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), by making materially untrue or misleading

statements and omissions in the September 4, 1997 DRP registration statement.

In Count Five, Plaintiffs Felix and Engel allege that the Individual Defendants and the Director Defendants violated Section 15 of the Securities Act, 15 U.S.C. § 77o, by virtue of their ability to control MuniMae, which allegedly violated Section 11 of the Securities Act with respect to the DRP registration statement as described above.

In Count Six, Plaintiff Charles Dammeyer ("Dammeyer"), who is not a lead plaintiff, alleges that MuniMae, the Individual Defendants, the Director Defendants, and the Underwriter Defendants violated Section 11 of the Securities Act by incorporating materially untrue and misleading statements into MuniMae's early 2005 SPO registration statement and prospectus. Plaintiff Dammeyer alleges that he purchased shares of MuniMae common stock "pursuant and/or traceable to" MuniMae's February 2, 2005 SPO prospectus.

In Count Seven, Plaintiff Dammeyer alleges that MuniMae and the Underwriter Defendants violated Section 12(a)(2) of the Securities Act, because these defendants allegedly were sellers, offerors, and/or solicitors of purchasers of the shares offered pursuant to the early 2005 SPO registration statement and prospectus.

In Count Eight, Plaintiff Dammeyer alleges that the

Individual Defendants and the Director Defendants violated
Section 15 of the Securities Act, by virtue of their ability to
control MuniMae, which allegedly violated Section 11 of the
Securities Act with respect to the SPO registration statement
and prospectus as described above.

These Securities Act claims are summarized in the following
table:

| Count | Section | Basis | Defendants |
|-------|---------|-------|------------|
| Three | § 11 | DRP | MuniMae, Individual Defendants & Director Defendants |
| Four | § 12(a)(2) | DRP | MuniMae |
| Five | § 15 | DRP | Individual Defendants & Director Defendants |
| Six | § 11 | SPO | MuniMae, Individual Defendants & Director Defendants |
| Seven | § 12(a)(2) | SPO | MuniMae & Underwriter Defendants |
| Eight | § 15 | SPO | Individual Defendants & Director Defendants |

These claims are "predicated exclusively upon the strict
liability of Defendants . . . for making materially untrue
and/or materially misleading statements and omissions in the SPO
Registration Statement and Prospectus."  Compl. ¶ 358; see also
Compl. ¶ 321 (DRP claims also predicated on Defendants' strict
liability).

The basic purpose of the Securities Act of 1933 is to
provide greater protection to purchasers of registered
securities via a registered offering.  Herman & MacLean v.
Huddleston, 459 U.S. 375, 383 (1983).  The Securities Act

focuses primarily on the initial distribution of securities.

Section 11 of the Securities Act addresses liability for registration statements filed with the Securities Exchange Commission.  See 15 U.S.C. § 77k(a).  If someone purchases a security for which the registration statement contained a material misstatement or omission, this section allows him to sue "every person who signed the registration statement," every director in the issuer at the time of the statement's filing, and "every underwriter with respect to such a security."  See id.  There is no state of mind element to a § 11 claim, and liability is "virtually absolute, even for innocent misstatements."  Wagner v. First Horizon Pharm. Corp., 464 F.3d 1273, 1277 (11th Cir. 2006) (quoting Herman & MacLean, 459 U.S. at 382).

Section 12(a)(2) imposes liability on any person who offers or sells a security by means of a "prospectus or oral communication" that contains an untrue statement of material fact or omits to state a material fact necessary to make the statements not misleading.  15 U.S.C. § 77l(a)(2).

Section 15 provides for joint and several liability of every person who "controls" any person liable under Sections 11 or 12.  15 U.S.C. § 77o; see also Cohen v. USEC, Inc., 70 Fed. Appx. 679, 686-87, 2003 WL 21689097, at *6 (4th Cir. 2003).

All of the Securities Act claims are subject to the one-

63

year statute of limitations and three-year statute of repose set forth in Section 13.

The statute of limitations provides:

> No action shall be maintained to enforce any liability created under section 11 or section 12(a)(2) unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence.

15 U.S.C. § 77m.

The statute of repose provides that "[i]n no event shall any such action be brought to enforce a liability created under section 11 . . . more than three years after the security was bona fide offered to the public." Id.

By the instant motions, Defendants seek dismissal of all Securities Act claims, contending that:

(1)   Lundquist cannot be liable because she did not sign the relevant registration statements.[37]

(2)   To the extent that the Securities Act claims sound in fraud, Plaintiffs have failed to plead their allegations with particularity.[38]

(3)   The claims are barred by the one-year statute of limitations.[39]

---

[37]   This argument applies to Counts Three and Six.
[38]   This argument applies to the Section 11 and Section 12(a)(2) claims, thus, Counts Three, Four, Six, and Seven.
[39]   The statute of limitations in Section 13 explicitly applies to the Section 11 and Section 12(a)(2) claims, thus, Counts Three, Four, Six, and Seven. Because Section 15 creates derivative liability for violations of Sections 11 and 12, the statute of limitations applies to it as well. See Dodds v. Cigna Sec., Inc., 12 F.3d 346, 349 n.1. Thus, this argument

64

(4)   The Section 11 claim with respect to the SPO is barred
      by the three-year statute of repose.[40]

(5)   The only Plaintiff asserting Sections 11 and 12(a)(2)
      claims with respect to the SPO lacks standing.[41]

(6)   The Underwriter Defendants cannot be liable on the SPO
      Section 12(a)(2) claim because plaintiffs failed to
      plead the immediate seller element.[42]

(7)   The Section 15 claims should be dismissed because
      Plaintiffs fail to establish a primary violation under
      Sections 11 or 12(a)(2).[43]

The Court will address these arguments in turn.


   1.   Defendant Lundquist

Defendant Lundquist contends that she cannot be liable

because she did not sign the relevant registration statements.

Lundquist was CFO from December 15, 2005 until July 10, 2007.


      a.   SPO-Based Claims

The SPO took place in February 2005, approximately ten

months before Lundquist joined MuniMae.  As Plaintiffs conceded

at the hearing, Lundquist is not liable under Section 11 because

she did not sign the SPO Registration Statement.  See Hr'g Tr.

---

applies to all of the Securities Act claims.
[40]   This argument applies to Count Six, the Section 11 claim
related to the SPO.
[41]   This argument applies to the Section 11 and Section
12(a)(2) claims related to the SPO, thus, Counts Six and Seven.
[42]   This argument applies to Count Seven, the Section 12(a)(2)
claim related to the SPO.
[43]   Counts Five and Eight.

155 June 23, 2010.  Accordingly, the claims against Lundquist in

Count Six shall be dismissed.


        b.   <u>DRP-Based Claims</u>

The DRP registration statement was initially filed with the

S.E.C. on September 4, 1997.  Compl. ¶ 321.  However, the DRP

registration statement stated:

> All documents filed by the Company pursuant
> to Section 13(a), 13(c), 14, or 15(d) of the
> Exchange Act after the date of this
> Prospectus and prior to the termination of
> this offering shall be deemed to be
> incorporated by reference in this Prospectus
> and to be a part hereof from the dates of
> filing of such documents.

Compl. ¶ 324.  According to Plaintiffs, the DRP statement

incorporated by reference all of MuniMae's financial statements

issued prior to each of the dividend distributions, Compl. ¶

334.[44]  Therefore, they contend, Lundquist can be liable for

---

[44]   The Complaint alleges that the following misleading
financial statements were incorporated into the DRP registration
statement during the Class Period:
- May 2, 2005 Form 8-K
- July 28, 2005 Form 8-K
- November 7, 2005 Form 8-K
- April 11, 2006 Form 8-K
- May 4, 2006 Press Release
- July 27, 2006 Press Release
- October 26, 2006 Press Release
- January 31, 2007 Press Release
- May 4, 2007 Press Release
- August 1, 2007 Press Release

post-1997 misrepresentations, made during her tenure as CFO,

that were incorporated by reference into the 1997 DRP

registration statement.

Section 11 of the Securities Act states:

> (a) Persons possessing cause of action;
> persons liable. In case any part of the
> registration statement, when such part became
> effective, contained an untrue statement of a
> material fact or omitted to state a material
> fact required to be stated therein or
> necessary to make the statements therein not
> misleading, any person acquiring such
> security . . . may . . . sue--
>
> > (1) every person who signed the
> > registration statement;
> >
> > (2) every person who was a director of (or
> > person performing similar functions) or
> > partner in, the issuer at the time of the
> > filing of the part of the registration
> > statement with respect to which his
> > liability is asserted;
> >
> > (3) every person who, with his consent, is
> > named in the registration statement as
> > being or about to become a director,
> > person performing similar functions, or
> > partner;
> >
> > (4) every accountant, engineer, or
> > appraiser, or any person whose profession
> > gives authority to a statement made by
> > him, who has with his consent been named
> > as having prepared or certified any part
> > of the registration statement, or as
> > having prepared or certified any report or
> > valuation which is used in connection with
> > the registration statement, with respect
> > to the statement, in such registration

---

- November 2, 2007 Press Release
Compl. ¶ 332.

> statement, report, or valuation, which
> purports to have been prepared or
> certified by him;
>
> (5) every underwriter with respect to such
> security.

15 U.S.C. § 77k.

Plaintiffs contend that Lundquist is liable because she "certified the materially false and misleading 2005 Form 10-K which was incorporated into the Registration Statements by reference," and which "served as an update to the prospectus pursuant to 10(a)(3), and therefore she is deemed a signor of the DRP Registration Statement."  Opp'n [Doc. 86] 41-42.

Lundquist argues that subsequent filings incorporated by reference into the registration statement or post-effective amendments do not extend liability to those who did not sign the registration statement.  Lundquist Mot. 15 (citing Securities Offering Reform, SEC Rel. No. 33-8591, 70 F.R. 44722, 44774 (August 3, 2005) ("Any person signing any report or document incorporated by reference in the prospectus that is part of the registration statement or the registration statement, other than a document filed for the purposes of updating the prospectus pursuant to Section 10(a)(3) or reflecting a fundamental change, is deemed not to be a person who signed the registration statement as a result.")).

Lundquist also argues that her certification of, and

68

signature on, the 2005 10-K does not give rise to liability under Section 11 because the 1997 DRP registration statement was withdrawn on May 3, 2006, after the First Restatement, and several weeks before the 10-K was signed and filed on June 22, 2006.  Lundquist Reply 7.  Lundquist cites the Post-Effective Amendment No. 2 to Registration Statement, filed with the S.E.C. on May 3, 2006, which states that MuniMae "hereby remove[s] from registration 348,204 common shares registered but not offered pursuant to the Registration Statement on Form S-3 (File No. 333-34925)."[45]

While Lundquist may ultimately be determined to have a meritorious position, she did not present her contention that the DRP was withdrawn on May 3, 2006 until filing her reply memorandum.  The matter was not addressed adequately, if at all, at the hearing.  The Court does not find it appropriate to rule against Plaintiffs under these circumstances.  Accordingly, the Court will not now dismiss the DRP-based claims against Lundquist.  However, this action is without prejudice to the right of Lundquist to seek dismissal of the Count Three DRP-based claims against her on any ground, including the contention that the DRP registration statement was effectively withdrawn at the time that she signed and certified the June 22, 2006 10-K.

---

[45]    The DRP provided for issuance of up to 450,000 Growth Shares.  Compl. ¶ 326.

2.   Failure To Plead With Particularity

Sections 11 and 12(a)(2) of the Securities Act prohibit

materially false statements or omissions, but do not require

proof of scienter.  Although fraud is not an element of claims

under §§ 11 and 12(a)(2), the Fourth Circuit has stated: "[w]hen

a plaintiff makes an allegation that has the substance of fraud,

. . . he cannot escape the requirements of Rule 9(b) by adding a

superficial label of negligence or strict liability."

Cozzarelli, 549 F.3d 618, 629 (4th Cir. 2008).

Plaintiffs contend that their Securities Act allegations do

not sound in fraud.  The Complaint states that Plaintiffs, in

making the Securities Act claims:

> repeat and reallege each and every
> allegation as if set forth herein, but only
> to the extent that such allegations do not
> allege or sound in fraud, allege scienter or
> otherwise allege the intent of any defendant
> named in this count to defraud Plaintiffs .
> . . or any other members of the Class. . . .

E.g., Compl. ¶ 320 (emphasis added).

Thus, Plaintiffs contend that their Securities Act claims

are predicated exclusively on the strict liability or negligence

of MuniMae as the issuer of the relevant shares and the

Individual, Director and Underwriter Defendants as signatories

and control persons who had a duty to conduct a reasonable

investigation of the offending documents.

Here as in <u>Cozzarelli</u>, the alleged misleading statements that formed the basis for Plaintiffs' § 10(b) claims are "exactly the same" as Plaintiffs' §§ 11 and 12(a)(2) claims. 549 F.3d 618, 629; <u>see</u> Compl. ¶¶ 333, 361, 363 (summarizing that the registration statements and prospectuses failed to disclose MuniMae's lack of compliance with FIN 46R, lacked sufficient internal accounting controls, and that the restatement process would be extremely costly and would force MuniMae to cut its dividend).

Consequently, Plaintiffs cannot "claim that the false statements in the prospectuses support plaintiffs' Exchange Act counts . . . . with a straight face without also admitting that the complaint alleges the prospectuses to be fraudulent." <u>Cozzarelli</u>, 549 F.3d at 629 (noting that a conclusory disclaimer in the complaint that "expressly exclude[s] and disclaims[s] any allegation that could be construed as alleging fraud" "cannot alter the substance of plaintiffs' allegations, which sound in fraud").[46]

---

[46]   This approach has been criticized in other jurisdictions. <u>See, e.g.</u>, <u>Schultz v. TomoTherapy Inc.</u>, 2009 U.S. Dist. LEXIS 58631, 28-29 (W.D. Wis. July 8, 2009) ("A plaintiff should have the option of pleading both fraud and something else without having his non-fraud claims subject to dismissal under Rule 9(b) as collateral damage of a fraud claim that does not survive Rule 9(b) scrutiny.  Moreover, as a practical matter, a plaintiff incapable of pleading with sufficient particularity usually has the option after a Rule 9(b) dismissal to amend his complaint by removing the fraud claim and any allegations of fraud.").

Thus, this Court must apply Federal Rule of Civil Procedure 9(b) to determine whether Plaintiffs have stated with the necessary particularity "why the statements that they cite in the prospectuses were false or misleading." Id. However, while the Securities Act Defendants urge this court to dismiss Plaintiffs' Securities Act claims because they fail to plead "intent to defraud" with particularity, see Reply [Doc. 97] at 25, it is important to remember that Sections 11 and 12(a)(2) do not require a showing of scienter. See Cozzarelli, 549 F.3d at 628; Newcome v. Esrey, 862 F.2d 1099, 1106 (4th Cir. 1988). Thus, requiring plaintiffs to plead the Security Act claims with particularity according to Rule 9(b) "does not add new elements" to the Securities Act claims, Wagner, 464 F.3d at 1278. Therefore, dismissing Securities Act claims for failure to plead with the necessary particularity is appropriate where plaintiffs fail sufficiently to allege that materially false statements or omissions were made. See, e.g., Cozzarelli, 549 F.3d at 630 ("Plaintiffs have failed to plead the falsity of the prospectuses with the particularity required by Rule 9(b), so their allegations under Sections 11 and 12(a)(2) must fail.").

Defendants do not now contend that Plaintiffs failed adequately to plead the falsity of MuniMae's alleged misstatements and omissions. See Hr'g Tr. 29. Therefore, the Court finds that Plaintiffs have met the Rule 9(b) standard with

regard to their Securities Act claims.

### 3.   The Statute of Limitations

The Securities Act's one-year statute of limitations prohibits actions "unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence" – that is, after a plaintiff was on "inquiry notice." 15 U.S.C. § 77m.

The Supreme Court's decision in Merck & Co. v. Reynolds, ___ U.S. ___, 130 S. Ct. 1784 (2010), altered the legal standard for inquiry notice.[47]  Merck held that "the 'discovery' of facts that put a plaintiff on 'inquiry notice' does not automatically begin the running of the limitations period."  130 S. Ct. at 1798.  "[T]he limitations period does not begin to run until the plaintiff thereafter discovers or a reasonably diligent

---

[47]   Merck addressed the statute of limitations in the Exchange Act context, and although the language of the Exchange Act's and Securities Act's limitations statutes differ slightly, courts in the Second Circuit have applied the inquiry notice standard promulgated in Merck to Securities Act cases.  See In re Direxion Shares ETF Trust, 2012 U.S. Dist. LEXIS 29709 at *9 & n.3 (S.D.N.Y. Mar. 6, 2012) (citing cases).  While courts in the Fourth Circuit have not yet confronted the inquiry notice standard in a Securities Act case since Merck, before Merck, courts in the Fourth Circuit applied the inquiry notice standard from Brumbaugh v. Princeton Partners, 985 F.2d 157, 162 (4th Cir. 1993), an Exchange Act case, to Securities Act claims. See, e.g., Cohen v. USEC, Inc., 70 Fed. Appx. 679, 686-89 (4th Cir. 2003).

plaintiff would have discovered 'the facts constituting the

violation' . . . irrespective of whether the actual plaintiff

undertook a reasonably diligent investigation."   Id.

The Second Circuit has further explained this standard:

> [A] statute of limitations is intended to
> prevent plaintiffs from unfairly surprising
> defendants by resurrecting stale claims. . .
> . Since the purpose is to prevent stale
> claims, it would make no sense for a statute
> of limitations to begin to run before the
> plaintiff even has a claim: A claim that has
> not yet accrued could never be considered
> stale. . . . Based on this analysis, we hold
> that a fact is not deemed "discovered" until
> a reasonably diligent plaintiff would have
> sufficient information about that fact to
> adequately plead it in a complaint. In other
> words, the reasonably diligent plaintiff has
> not "discovered" one of the facts
> constituting a securities fraud violation
> until he can plead that fact with sufficient
> detail and particularity to survive a
> 12(b)(6) motion to dismiss.

Pontiac Gen. Emples. Ret. Sys. v. MBIA, Inc., 637 F.3d 169, 175

(2d Cir. 2011) (citation omitted).

Plaintiffs filed their first complaint in this matter on

February 1, 2008.  The premise of the Securities Act claims is

that the SPO and DRP registration statements and prospectuses

contained misrepresentations and omissions.  For their

Securities Act claims to be timely, a reasonably diligent

plaintiff must not have had sufficient information about the

facts of the claims to adequately plead them in a complaint on

February 1, 2007.

74

Defendants contend that the Court should find that the one-year statute of limitations began to accrue on September 13, 2006, when MuniMae publicly announced the Second Restatement or, at the latest, on January 31, 2007, when MuniMae disclosed that it would have to consolidate "substantially all" of the LIHTC Funds.  Defendants also point out that at various times in 2006, MuniMae had announced weaknesses in its internal controls, that PwC had been dismissed, and that a shareholder derivative suit had been filed.

In response, Plaintiffs contend that neither the September 13, 2006 nor the January 31, 2007 announcement was adequate to put Plaintiffs on inquiry notice of the substantial cost and financial impact of the restatement process, and that a reasonably diligent plaintiff would not have had sufficient information about the facts of the omissions and misrepresentations to adequately plead it in a complaint on February 1, 2007.

This Court agrees with Plaintiffs that dismissal on statute of limitations grounds is not appropriate.  It is at least plausible that, after MuniMae disclosed that it would have to consolidate "substantially all" of the LIHTC Funds on January 31, 2007, a reasonably diligent plaintiff did not have sufficient information adequately to plead the Securities Act violations at that time.  See Pontiac, 637 F.3d at 174-75.  The

scope of the consolidation and restatement effort, the enormous cost it would entail, and its impact on CAD and the dividend were not disclosed until much later in 2007, and in early 2008. Accordingly, the Court cannot conclude in the instant dismissal context that Plaintiffs' Securities Act claims were stale on February 1, 2008, a mere three days after MuniMae had announced in clear terms the scope of the restatement necessitated by FIN 46R.

The Court does not find persuasive Defendants' contention that because the SPO happened in 2005, only statements in 2005 are relevant to the inquiry, so claims base on the SPO are necessarily time-barred.  As Defendants state: this timing "knocks out any costs of the restatement sort of misrepresentation because it's not even conceivable that the defendants could have omitted to disclose the cost of a restatement that wasn't even in the twinkle of anybody's eye." Hr'g Tr. 158-59.  However, for limitations purposes, it is not the date of the actionable statements but the "on notice" date that governs.  It is at least plausible that a reasonably diligent plaintiff did not have sufficient information until well after 2005 to plead that the Company had failed to consolidate over 230 VIEs for which it was the primary beneficiary according to FIN 46R, or that MuniMae had failed to disclose that it would need to expend a substantial amount of

76

time and money to properly consolidate those entities.  See
Compl. ¶ 363.

Accordingly, the Court finds that the Securities Act claims
are not subject to dismissal on limitations grounds.


4.   The Statute of Repose

The Securities Act statute of repose states that no action
may be brought under Section 11 "more than three years after the
security was bona fide offered to the public."  15 U.S.C. § 77m.
The statute of repose does not define the term "bona fide
offered to the public."

Defendants contend that the SPO securities were "bona fide
offered to the public" on January 14, 2005, the date the
registration statement was declared effective by the S.E.C.  See
Jan. 14, 2005, S.E.C. Order, Holland Ex. 9.  Therefore, say
Defendants, the initial complaint filed on February 1, 2008 was
approximately two weeks late.

Plaintiffs, however, contend that the SPO securities were
not "bona fide offered to the public" until February 1, 2005
(the date on which the Securities Act Defendants filed a
"preliminary prospectus supplement"), February 2, 2005 (the date
the SPO securities were first available for sale), or February
3, 2005 (the date that MuniMae filed a finalized version of the

supplement).[48]   See Opp'n [Doc. 86] 35-37.

At the time of the SPO, S.E.C. regulations required
registrants using a Form S-3 shelf registration[49] to file "post-
effective amendments" to (1) update seriously outdated
prospectuses,[50] (2) document a fundamental change in the
information set forth in the registration statement, and (3)
include new material information pertaining to the plan of
distribution.   17 C.F.R. § 229.512(a)(1) (2005); see also In re
Countrywide Fin. Corp. Sec. Litig., 2009 WL 943271, at *6 (C.D.
Cal. Apr. 6, 2009).   S.E.C. Rule 512 sets forth:

> For the purpose of determining any liability
> under the Securities Act of 1933, each such
> post-effective amendment shall be deemed to
> be a new registration statement relating to
> the securities offered therein, and the
> offering of such securities at that time
> shall be deemed to be the initial bona fide
> offer thereof.

17 C.F.R. § 229.512(a)(2) (emphasis added).

Effective December 1, 2005, the S.E.C. adopted rules to
"modify and advance significantly the registration,
communications, and offering processes under the Securities Act

---

[48]   Plaintiffs acknowledge that the preliminary prospectus
supplement was backdated to January 14, 2005.  Opp'n [Doc. 86]
35-37.  The February 3, 2005 finalized supplement was filed
pursuant to S.E.C. Rule 424(b)(5), and notes that it supplements
the prospectus dated January 14, 2005, but that "the date of
this prospectus supplement is February 2, 2005."  Feb. 3, 2005
Prospectus Supplement, Piven Ex. 8.
[49]   The MuniMae SPO used a Form S-3 shelf registration.  See
Compl. ¶ 360.
[50]   See 15 U.S.C. § 77(j)(a)(3).

of 1933." S.E.C. Release No. 33-8591. This Securities Offering Reform ("SRO") amended certain S.E.C. regulations and added several new rules. One of the new rules, S.E.C. Rule 430B, expanded the meaning of the "initial bona fide offering date" from the date of a post-effective registration statement amendment to the date of a post-effective registration statement supplement. 17 C.F.R. § 230.430B(f)(2).[51] Rule 512 was also amended at this time to encompass post-effective prospectuses as well.

The parties agree that the February 2005 prospectuses were post-effective prospectuses, and not post-effective registration statement amendments within the meaning of the pre-December 2005 S.E.C. Rule 512.

Defendants contend that to determine the beginning date of

---

[51] "The date on which a form of prospectus is deemed to be part of and included in the registration statement pursuant to paragraph (f)(1) of this section shall be deemed, for purposes of liability under section 11 of the Act of the issuer and any underwriter at the time only, to be a new effective date of the part of such registration statement relating to the securities to which such form of prospectus relates, such part of the registration statement consisting of all information included in the registration statement and any prospectus relating to the offering of such securities (including information relating to the offering in a prospectus already included in the registration statement) as of such date and all information relating to the offering included in reports and materials incorporated by reference into such registration statement and prospectus as of such date, and in each case not modified or superseded pursuant to Rule 412 (§ 230.412). The offering of such securities at that time shall be deemed to be the initial bona fide offering thereof." 17 C.F.R. § 230.430B(f)(2) (emphasis added).

the statute of repose in the context of Section 11 liability for registered securities issued prior to the SRO, the "bona fide offered to the public" date refers to the effective date of the registration statement or a post-effective amendment, and that because there was no post-effective amendment in this case, the "bona fide offered to the public" date refers to January 14, 2005, the effective date of the registration statement.

Plaintiffs contend that the statute and rules do not require a finding that the effective date of the registration is the "bona fide offered to the public" date in the context of the instant case.  Rather, they contend, the Court can, and should, conclude under the language of the statute of repose that the "bona fide offered to the public" date is the date that the SPO shares were first available for sale: that is February 2, 2005.

The weight of authority supports Defendants' position.  The Second Circuit in P. Stolz Family Partnership L.P. v. Daum, acknowledged that "[i]n the case of § 11 liability, the repose period is triggered by the effective date of the (allegedly false) registration statement for the offer – i.e., the beginning of the offer."  355 F.3d 92, 99, 104 (2d Cir. 2004) (defining the phrase "bona fide offer to the public" in the context of an unregistered security and observing that "the [date of] registration is merely the manifestation of the underlying test: the genuineness of the offer to the public").

See also, In re Metro. Sec. Litig., 2010 WL 537740, at *1 (E.D.
Wash. Feb. 8, 2010) (rejecting plaintiffs' argument that a
security is not "bona fide offered" until the issuer actually
offers to sell it to the public and holding that "[i]n the case
of registered securities, a security is 'bona fide offered to
the public' at the effective date of the registration statement
. . . unless a post-effective amendment triggered a new period
of repose"); In re Adelphia Commc'n Corp. Sec. and Derivative
Litig., 2005 WL 1679540, at *6 (S.D.N.Y. July 18, 2005) ("Even
where registered securities are offered pursuant to a less
typical delayed offering, the limitations period runs from the
date of either the registration statement or the amendment,
depending on which document governed the particular plaintiff's
purchase."); Griffin v. PaineWebber Inc., 84 F. Supp. 2d 508,
512 (S.D.N.Y. 2000) (rejecting defendants' argument that the
'bona fide offered' date was the date the securities were priced
and offered to the public and concluding that "a security is
'bona fide offered to the public' at the effective date of the
registration statement") (internal citations omitted); Jolly v.
Pittore, 1992 WL 196813, at *1 (S.D.N.Y. 1992) (observing that
"[g]enerally, a security is 'bona fide offered to the public' on
the effective date of the security's registration" but noting an
"exception to this rule for securities registered 'for the
shelf' which delays the running of the statute of limitations

81

until the post-effective registration date if the securities are offered pursuant to a post-effective amendment"); Countrywide, 2009 WL 943271, at *6 (observing that for securities offered before the effective date of the SRO "the repose clock for registered securities begins on the first true public offering date-usually the effective date" before discussing exceptions to the rule based on post-effective date amendments); Morse v. Peat, Marwick, Mitchell & Co., 445 F. Supp. 619, 622 (S.D.N.Y. 1977) (rejecting defendants' argument that "bona fide offer" included pre-registration statement effective date offers and concluding that the "bona fide offered" date is "the date upon which the security actually becomes available to the public for purchase and sale, i.e., the effective date of the registration statement."); cf. Finkel v. Stratton Corp., 962 F.2d 169, 173 (2d Cir. 1992) (addressing the question of what constitutes a "sale" for purposes of Section 12(a)(2) but observing that "ordinarily, a security is 'bona fide offered to the public' at the effective date of the registration statement" before noting the exception for post-effective amendments).

It is true that the language contained in some decisions highlights the genuineness of the securities offering. However, the courts in those cases were attempting to apply the "bona fide offered to the public" language to circumstances inapposite to the current case. See P. Stolz, 355 F.3d at 100 (discussing

liability for unregistered securities pursuant to Section
12(1)); <u>Finkel</u>, 962 F.2d at 173 (discussing the term "sale" in
the context of Section 12(a)(2)).

Thus, the Court concludes that Plaintiffs' Section 11
claims relating to the SPO registration statement (Count Six)
are time-barred because the repose period commenced on January
14, 2005, the date the registration statement was declared
effective by the S.E.C.  The Court shall dismiss all claims in
Count Six on the basis of the statute of repose.

        5.   <u>Standing</u>

Defendants contend that the only Plaintiff asserting
Securities Act claims under Section 11 and 12(a)(2) with respect
to the SPO, Plaintiff Charles Dammeyer, lacks standing.
Defendants contend that Dammeyer's allegation that he purchased
shares of MuniMae stock "pursuant and/or traceable to" the
February 2, 2005 SPO prospectus, Compl. ¶ 103, is insufficient.

Plaintiff Dammeyer alleges that he purchased 600 shares of
MuniMae stock on February 3, 2005, at a price of $26.32 per
share, and he received a purchase confirmation stating "PROS
UNDER SEP COVER" – Prospectus Under Separate Cover.  Compl. ¶
103.  Plaintiffs also note that Dammeyer received his shares on
February 8, 2005, the date the SPO closed and the first date
MuniMae stated that the shares would be available for

distribution.  See Opp'n [Doc. 86] 29; Feb. 2, 2005 Press

Release, Piven Ex. A ("The offering is expected to close on

February 8, 2005.").

As the standing requirements for Sections 11 and 12(a)(2)

of the Securities Act differ slightly, the Court will discuss

them in turn.


a.   Section 11 Standing[52]

Section 11 states that "[i]n case any part of the

registration statement . . . contained an untrue statement . . .

any person acquiring such security . . . may . . . sue."  15

U.S.C. § 77k(a).  Aftermarket purchasers do not inevitably lack

standing under Section 11, so long as they can demonstrate their

ability to "trace" their shares to the faulty registration.

Krim v. pcOrder.com, Inc., 402 F.3d 489, 495-96 (5th Cir. 2005).

Before Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007),

and Ashcroft v. Iqbal, 556 U.S. 662 (2009), plaintiffs were not

required to explain how their shares could be traced to the

relevant prospectus and registration statement; instead,

"general allegations that plaintiff purchased pursuant or

traceable to a false registration statement" were sufficient to

---

[52]   Having already dismissed Plaintiffs' Section 11 claims
relating to the SPO registration statement (Count Six) as barred
by the statute of repose, herein the Court considers if lack of
standing provides an alternate basis to dismiss Count Six.

state a claim under Section 11.  See In re Royal Ahold N.V. Sec. and ERISA Litig., 351 F. Supp. 2d 334, 401 (D. Md. 2004).

There have been issues raised whether, after Twombly and Iqbal, relatively conclusory tracing allegations in a Section 11 claim are sufficient to survive a motion to dismiss.

Judge Richard J. Sullivan of the Southern District of New York discussed this issue in 2010, stating:

> "The pleading requirement for Section 11 standing is satisfied by general allegations that plaintiff purchased pursuant to or traceable to [a] false registration statement." Caiafa v. Sea Containers Ltd., 525 F. Supp. 2d 398, 407 (S.D.N.Y. 2007) . . .; see also In re Authentidate Holding Corp., No. 05 Civ. 5323(LTS)(DFE), 2006 WL 2034644, at *7 (S.D.N.Y. July 14, 2006) (holding that Section 11 plaintiffs "are not required to explain how their shares can be traced"). In this case, the Bond/Notes Complaint generally alleges that Plaintiffs purchased securities "pursuant or traceable to Offering Materials that contained material misstatements and omissions of fact." . . . . [T]he Court concludes that the general tracing allegation in the Bond/Notes Complaint suffices for the Section 11 claims at this stage of the litigation.  See Citiline Holdings, Inc. v. iStar Fin. Inc., 701 F. Supp. 2d 506, 511 (S.D.N.Y. 2010).

In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 373 (S.D.N.Y. 2011) (some internal citations omitted).  See also Me. State Ret. Sys. v. Countrywide Fin. Corp., 2011 U.S. Dist. LEXIS 125203, 41-42 (C.D. Cal. May 5, 2011) ("[T]he language 'pursuant or traceable to' . . . is sufficient for Section 11 claims,

which require only an allegation that the plaintiff purchased

pursuant to or traceable to a false registration statement");

cf. In re Century Aluminum Co. Sec. Litig., 749 F. Supp. 2d 964,

977 (N.D. Cal. 2010) (dismissing the plaintiffs' Section 11

claims where none of the named plaintiffs purchased any shares

on the date of the secondary offering and where two

underwriters' declarations established that the named plaintiffs

did not purchase shares in the secondary offering); Grand Lodge,

550 F. Supp. 2d 1363, 1369, 1376 (M.D. Fla. 2008) (dismissing

Section 11 claims where plaintiffs admitted to purchasing their

shares in the aftermarket approximately four months after the

secondary public offering and failed to provide any suggestion

as to how they would show tracing); Krim, 402 F.3d 489, 495-97

(dismissing Section 11 claims where most plaintiffs had conceded

that no actual tracing could be performed but sought to rely on

a "statistical tracing" methodology whereby "every aftermarket

purchaser would have standing for every share" despite the

statutory limitations on standing in Section 11).  The Court

finds the rationale of these decisions persuasive.

Plaintiff Dammeyer has plausibly alleged that he purchased

600 shares at $26.32 per share on February 3, 2005, pursuant to,

or traceable to, the SPO registration statement and prospectus.

It may well be that Dammeyer will be unable to prove that he

bought directly in the offering or that he can trace his shares

to the offering.   However, inasmuch as the allegations present a plausible claim, they are adequate.

Accordingly, Defendants' standing argument does not provide an alternate basis for dismissing Plaintiffs' Securities Act Section 11 claims relating to the SPO (Count Six).

### b.   Section 12(a)(2) Standing

The standing requirements under Section 12(a)(2) are more strictly conscribed than those for Section 11.   In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 373-74 (S.D.N.Y. 2011).

Section 12(a)(2) provides that any person who "offers or sells" a security by means of a prospectus containing a materially false statement or material omission shall be liable to any "person purchasing such security from him."   15 U.S.C. § 77l(a)(2).

The Supreme Court has interpreted the term "offers or sells" to apply when any person passes title or interest in a security to a buyer for value or solicits an offer to buy a security.   Pinter v. Dahl, 486 U.S. 622, 642-51 (1988).[53]   Thus, "[u]nlike Section 11, which permits an action by a plaintiff who

---

[53]   Although the Pinter court was interpreting the meaning of a statutory seller within the context of § 12(1), the Second, Third, Fifth and Ninth Circuits have extended the holding to § 12(a)(2)).   In re Royal Ahold N.V. Sec. and ERISA Litig., 351 F. Supp. 2d 334, 401 (D. Md. 2004) (citing In re RAC Mortgage Inv. Corp. Sec. Litig., 765 F.Supp. 860, 865 (D. Md. 1991)).

has purchased a security that is merely 'traceable to' the challenged misstatement or omission, Section 12(a)(2) requires a plaintiff to plead and prove that it purchased a security directly from the issuer as part of the initial offering, rather than in the secondary market." In re Wells Fargo Mortgage-Backed Certificates Litig., 712 F. Supp. 2d 958, 966 (N.D. Cal. 2010).

Because a plaintiff must purchase directly from an issuer as part of the offering to have standing to sue under Section 12(a)(2), most decisions have concluded that cursory allegations that plaintiffs purchased stock "pursuant and/or traceable to" the misleading registration are insufficient to state a claim. See In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 373 (S.D.N.Y. 2011) (Under 12(a)(2) "an allegation that Plaintiffs purchased 'pursuant or traceable to' the offering documents would be insufficient"); In re Century Aluminum Co. Sec. Litig., 749 F. Supp. 2d at 977 (Plaintiffs "simply generally assert that they have met their burden to show standing by pleading purchases "pursuant and/or traceable to" the January 2009 offering.  As noted above, such conclusory allegations are insufficient to establish standing under Section 12(a)(2)."); In re Lehman Bros. Sec. & Erisa Litig., 799 F. Supp. 2d 258, 310-11 (S.D.N.Y. 2011) ("A complaint that alleges that the plaintiff purchased its securities 'pursuant and/or traceable to' the

Offering Documents is not sufficient" under Section 12); Pub.
Employees' Ret. Sys. of Mississippi v. Merrill Lynch & Co. Inc.,
714 F. Supp. 2d 475, 484 (S.D.N.Y. 2010) ("Instead, rather
coyly, the Complaint makes such allegations as that
'[p]laintiffs and other Class members purchased or otherwise
acquired Certificates pursuant and/or traceable to the defective
Prospectus Supplements.' . . . Even under the modest
requirements of Rule 8(a) of the Federal Rules of Civil
Procedure, this is insufficient to allege standing for purposes
of a Section 12(a)(2) claim."); Wells Fargo, 712 F. Supp. 2d 958
at 966 (dismissing 12(a)(2) claim with leave to amend where
plaintiffs had alleged that they "'acquired' securities
'pursuant and/or traceable to' the registration statements and
prospectus supplements.").

A minority of courts have allowed such Section 12(a)(2)
claims to proceed.  However, typically in these cases the
complaint has included supporting details that suggested
plaintiffs bought directly in the challenged offering.  The
First Circuit recently vacated a district court's dismissal of
12(a)(2) claims where the district court had found it was
"evasive circumlocution" for plaintiffs to allege that they
"acquired" securities "pursuant and/or traceable to" the
registration statement and that "if plaintiffs did in fact
purchase the certificates directly from the defendants, they

89

should have said so." Plumbers' Union Local No. 12 Pension Fund
v. Nomura Asset Acceptance Corp., 658 F. Supp. 2d 299, 305 (D.
Mass. 2009) aff'd in part, vacated in part, 632 F.3d 762, 776
(1st Cir. 2011). However, the Nomura court did so in light of
the complaint's additional allegations that "plaintiffs
'acquired . . . [c]ertificates from defendant Nomura Securities'
and that the '[d]efendants promoted and sold the [c]ertificates
to [the p]laintiffs and other members of the [c]lass.'" 632 F.3d
at 776 (adding emphasis).  Similarly, the court in In re
Schering-Plough Corp./Enhance Secs. Litig., 2009 U.S. Dist.
LEXIS 78852, *20-21 (D.N.J. Aug. 31, 2009), allowed Section 12
Securities Act claims to survive where Plaintiffs "alleged with
supporting details" that they "purchased shares 'pursuant and/or
traceable to' the offering documents."  A review of the
Schering-Plough complaint reveals that it alleged an issuance of
57,500,000 shares of common stock at $27.50 on August 9, 2007,
and it attached to the complaint a transaction log showing a
purchase by one of the lead plaintiffs of 9,500 shares at a
price of $27.5000 on August 9, 2007.  Am. Compl. ¶ 44 & Ex. A,
Sept. 15, 2008, Manson v. Schering-Plough Corp., D.N.J. 2:08-cv-
00397 [Doc. 52].

In the Complaint in the instant case, Plaintiffs allege
that Plaintiff Dammeyer "purchased 600 shares of MuniMae stock
on February 3, 2005, at $26.32 per share with a confirmation

slip stating 'PROS UNDER SEP COVER.'"  Compl. ¶ 103.  Count
Seven of the Complaint states that it "is asserted by Plaintiff
Dammeyer on his own behalf and on behalf of all persons who
acquired MuniMae common stock pursuant and/or traceable to
MuniMae's SPO."  Compl. ¶ 374.

Plaintiffs cannot deny that the Section 12(a)(2) claim in
their Complaint is based upon a "pursuant and/or traceable"
allegation and does not provide supporting details to make a
plausible claim that Dammeyer purchased directly in the SPO.
Plaintiffs repeatedly refer to the SPO as "the Company's
February 2, 2005 Secondary Public Offering."  See, e.g., Am.
Compl. ¶ 2.  The only sale price alleged by the Complaint is
$26.51 per share.  See, e.g., Am. Compl. ¶ 360.  On the face of
the Complaint, the facts of Plaintiff Dammeyer's purchase - 600
shares at $26.32 on February 3, 2005 - are inconsistent with the
SPO facts as alleged in the Complaint.

Plaintiffs now contend that the SPO took place over six
days and over a range of prices that is not in the Complaint.[54]
See Opp'n [Doc. 86] 29 (citing Piven Decl., Exs. A & F).  Thus,
Plaintiffs seek to, but may not, informally amend the Complaint
in their motion responses.  Nor does the Complaint allege that

---

[54]    The Complaint does, at times, use "on or about" to hedge
the date of the SPO.  See, e.g., Am. Compl. ¶ 152 ("On or about
February 2, 2005, MuniMae conducted its SPO of 2,575,000 shares
of common stock priced at $26.51 per share").

the SPO prospectus "does not mandate all sales in the SPO at
$26.51" and rather, "expressly provides for direct sales of SPO
shares . . . 'at prices related to prevailing market prices at
the time of sale.'"  Opp'n [Doc. 86] 29 (citing Prospectus
Supplement, Piven Decl., Ex. F).

To avoid dismissal, Plaintiffs have attached Dammeyer's
purchase confirmation to their opposition to the motion to
dismiss, to demonstrate that he was a direct SPO purchaser.
Dammeyer Decl., Piven Decl. Ex. G.  In the current dismissal
context, the Court will not consider the parties' respective
arguments regarding the confirmation's significance, or lack
thereof.[55]

---

[55]    The confirmation notice shows that Dammeyer purchased 600
shares at $26.32 on February 3, 2005 with a "settlement date" of
February 8, 2005, and includes a notation "PROS UNDER SEP
COVER."  The parties dispute whether "PROS UNDER SEP COVER" is
an indicator that the shares were pursuant or traceable to the
SPO, and whether Dammeyer's purchase price and related fees
could reflect a purchase directly from the offering.
Defendants argue that the securities laws require that a
prospectus be delivered for all purchases made during the
statutory period, which can extend for up to forty days after a
secondary offering.  Reply [Doc. 97] 28 (citing 17 C.F.R. §
230.174 (2009)).
     Defendants also argue that because Dammeyer's purchase
price was $26.32 and the offering price was $26.51, it is
implausible that these shares were purchased directly in the
offering.  Defendants assert that Plaintiffs have misinterpreted
the "prevailing market price" language in the prospectus
supplement.  According to Defendants, it simply meant that the
price would be fixed at the time of the offering, and that when
the offering took place on February 2, 2005, the offering price
was set at $26.51 per share.  Reply [Doc. 97] 28.  Thus,
Defendants conclude that Dammeyer's shares were purchased in the

As discussed herein, the Complaint does not adequately plead that Dammeyer purchased his shares directly in the SPO. Accordingly, Plaintiffs' Section 12(a)(2) Securities Act claims based on the SPO (Count Seven) are subject to dismissal for lack of standing.

6.    The Immediate Seller Rule[56]

The Underwriter Defendants contend that Dammeyer has failed to allege that he purchased, or received solicitation, directly from them.

Section 12(a)(2) provides that any person who "offers or sells a security" by means of a false or misleading "prospectus or oral communication" shall be liable "to the person purchasing such security from him."  15 U.S.C. § 77l(a)(2).

Judge Catherine C. Blake of this Court stated as to the "immediate seller" requirement:

---

secondary market, because prices for MuniMae stock ranged from $26.10 to $26.38 that day.  See Mot. Dismiss [Doc. 70] 9 & n.5. Finally, Defendants contend that the fact that Dammeyer's confirmation statement reflects a charge of $338.63 in commission belies his claim that he purchased directly in the SPO, because, according to Defendants, commissions are not charged for shares purchased in the offering – a "selling concession" would have been charged in a different amount and noted in a different place on the confirmation statement.  See Opp'n [Doc. 98] n.6.

[56]    Having already dismissed Plaintiffs' Section 12(a)(2) claims relating to the SPO (Count Seven) for lack of standing, herein the Court considers if the immediate seller rule provides an alternate basis to dismiss Count Seven.

Those who offer or sell securities include:
(1) persons who directly pass title or
interest in a security to a buyer for value,
and (2) persons who directly solicit an
offer to buy a security. See Royal Ahold,
351 F.Supp.2d at 401 (citing Pinter v. Dahl,
486 U.S. 622, 642–51, 108 S.Ct. 2063, 100
L.Ed.2d 658 (1988)). The Supreme Court's
holding in Pinter limited § 12(a)(2)
liability to "immediate sellers", or "those
who were directly involved in the actual
solicitation of a securities purchase." . .
. Thus, "neither involvement in preparation
of a registration statement or prospectus
nor participation in activities relating to
the sale of securities, standing alone,
demonstrates the kind of relationship
between defendant and plaintiff that could
establish statutory seller status."

Courts sometimes have found that determining
whether a defendant is a statutory seller
under § 12(a)(2) is "a question of fact, not
properly decided on a motion to dismiss."
[Pinter] at 402 . . . Where plaintiffs fail
even to allege, however, that they purchased
securities from or were solicited by the
defendant, they fail to state a claim under
§ 12(a)(2). . . . Although plaintiffs need
not allege exactly which plaintiff purchased
which security from which defendant,
plaintiffs cannot survive a motion to
dismiss if they do not allege that any
defendant sold them shares or solicited them
to buy shares. See In re Westinghouse Sec.
Litig., 90 F.3d 696, 718 (3d Cir.1996)
(stating that "plaintiffs must provide a
short and plain statement showing that the
underwriter defendants are statutory sellers
and that plaintiffs purchased securities
from them"). In other words, plaintiffs'
allegations "must be supported by specific
factual allegations demonstrating a direct
relationship between the defendant and the
plaintiff-purchaser." Royal Ahold, 351
F.Supp.2d at 406.

In re Constellation Energy Group, Inc. Sec. Litig., 738 F. Supp. 2d 614, 632 (D. Md. 2010) (some citations omitted) (dismissing the remaining Section 12(a)(2) claims with leave to amend on this basis).

Plaintiffs allege that:

- The Underwriter Defendants were "lead underwriters" of the offering, Am. Compl. ¶ 121;

- The Underwriter Defendants "were sellers, offerors and/or solicitors of purchasers of the shares offered pursuant to the Company's SPO Registration Statement and/or Prospectus", Am. Compl. ¶ 375;

- "The SPO was conducted primarily by lead underwriters Merrill Lynch and RBC Capital", Am. Compl. ¶ 152;

- The "Underwriter Defendants engaged in solicitation includ[ing] participating in the preparation of the false and misleading SPO Registration Statement and/or Prospectus", Am. Compl. ¶ 376;

- "[T]he Underwriter Defendants owed to the purchasers of MuniMae shares the duty to make a reasonable and diligent investigation of the statements contained in the SPO Prospectus and/or Registration Statement, to insure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading", Am. Compl. ¶ 377;

- "In connection with the SPO, the Underwriter Defendants were indirectly paid approximately $2.92 million in fees", Am. Compl. ¶ 122.

In their briefing opposing dismissal, Plaintiffs argue that the Underwriter Defendants were "sellers" within the meaning of Section 12(a)(2) because the SPO was a "firm commitment

offering."[57]  However, the Complaint does not include this allegation.  Nor does the Complaint allege any connection between the Underwriters and Dammeyer's shares.  Plaintiffs' generic and broad allegations regarding the Underwriter Defendants are insufficient to state a Section 12(a)(2) claim against them.

Accordingly, all claims against the Underwriter Defendants based on the SPO in Count Seven are subject to dismissal for failure to state a claim.

### 7.  Failure to Plead a Primary Violation

Defendants argue that Plaintiffs' "control person" Securities Act claims must be dismissed because the Complaint fails to plead a primary violation.

Section 15 of the Securities Act creates control-person liability only where Sections 11 or 12 have been violated. Cozzarelli, 549 F.3d 618, 630.

As discussed above, Plaintiffs have succeeded in pleading a primary violation of Sections 11 and 12 of the Securities Act

---

[57]  "In a 'firm commitment' underwriting: the underwriters agree that they will purchase the shares being offered for the purpose of resale to the public.  The underwriters must pay for and hold the shares for their own account if they are not successful in finding public purchasers."  In re Am. Bank Note Holographics, Inc. Sec. Litig., 93 F.Supp.2d 424, 438-39 (S.D.N.Y. 2000) (internal quotations and citations omitted).

with respect to the claims relating to the DRP (Counts Three and
Four), but not with respect to the SPO claims (Counts Six and
Seven).  Accordingly, Plaintiffs' control person Securities Act
claims based upon underlying claims not herein dismissed, _i.e._,
Count Five, shall remain pending.  The balance, _i.e._, Count
Eight, shall be dismissed.

### 8.    Resolution of Securities Act Claims

As discussed above, Counts Three, Four, and Five of the
Complaint, relating to the DRP, have been adequately pleaded and
are not now subject to dismissal.  The Securities Act claims
relating to the SPO are all subject to dismissal.  Count Six is
barred by the statute of repose and is hereby dismissed.  Count
Seven is dismissed for lack of standing and for failure to plead
adequately that the Underwriters were immediate sellers.  Count
Eight is dismissed for failure to plead a primary violation.

### C.    Mandatory Compliance Review

In any private action arising under the Securities Act of
1933 or the Exchange Act of 1934, upon final adjudication of the
action, the court shall include in the record specific findings
regarding compliance by each party and each attorney
representing any party with each requirement of Rule 11(b) of
the Federal Rules of Civil Procedure as to any complaint,

responsive pleading, or dispositive motion.  15 U.S.C. § 77z-1(c)(1); 15 U.S.C. § 78u-4(c).  No argument has been made, and this Court does not find, that Rule 11(b) has been violated by any party or counsel in this case.


D.   Leave to Amend

Defendants have requested leave to amend the Complaint at issue.  Under Federal Rule of Civil Procedure 15(a)(2), federal courts are instructed to "freely give leave [to amend] when justice so requires."  In Foman v. Davis, 371 U.S. 178 (1962), the Supreme Court offered the following factors a district court should consider in deciding whether to grant leave to amend:

> In the absence of any apparent or declared
> reason -- such as undue delay, bad faith or
> dilatory motive on the part of the movant,
> repeated failure to cure deficiencies by
> amendments previously allowed, undue
> prejudice to the opposing party by virtue of
> allowance of the amendment, futility of
> amendment, etc. -- the leave sought should,
> as the rules require, be "freely given."

Foman, 371 U.S. at 182; see also Edwards v. City of Goldsboro, 178 F.3d 231, 242 (4th Cir. 1999).

The Court concludes that it must grant the request and will do so.  However, in doing so it is not making a determination that amendment will cure any, much less all, of the defects in the Complaint before the Court.  Moreover, Plaintiffs must be aware that filing another amended complaint pleading – to which

motions to dismiss are virtually inevitable - will serve to delay substantive proceedings.  Hence, Plaintiffs may wish to consider whether it would be in their interest to forego, or limit to a realistic minimum, any amendment and proceed expeditiously with regard to the claims that have not been dismissed.

V.    <u>CONCLUSION</u>

For the foregoing reasons:

1.    Defendants Merrill Lynch, Pierce, Fenner & Smith
      Inc.'s and RBC Capital Markets Corp.'s Motion to
      Dismiss [Document 70] is GRANTED.

2.    Municipal Mortgage & Equity, LLC and the Individual
      Defendants' Motion to Dismiss [Document 72] is GRANTED
      IN PART and DENIED IN PART.

3.    Lundquist's Motion to Dismiss [Document 76] is GRANTED
      IN PART and DENIED IN PART.

4.    Therefore:

      a.    Counts One and Two are dismissed.

      b.    Counts Three, Four, and Five remain pending.

      c.    Counts Six, Seven, and Eight are dismissed.

5.    Plaintiffs may file a Second Amended Complaint by a
      date to be set by further Order.

6.    Plaintiff shall arrange a telephone conference to be
      held by July 18, 2012, to discuss the scheduling of
      further proceedings, including the deadline for filing
      any Second Amended Complaint.


SO ORDERED, this <u>Monday, June 25, 2012</u>.


                    _____/s/_____
                      Marvin J. Garbis
                 United States District Judge

100